**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| Pennsylvania Voters Alliance, Stephanie Borowicz, Kristine Eng, Theodore A. Dannerth, Eric Kroner, Eric Nelson, Daryl Metcalfe, Dawn Wetzel Keefer, Russ Diamond, Chris Dush, Jim Gregory, Francis Ryan, Michael Harvey, David Torres, Dasha Pruett, | Civil Action No.: 4:20−CV−01761−MWB Hon. Matthew W. Brann |
| Plaintiffs, | |
| vs. | **Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order** |
| Centre County, Delaware County, and the City of Philadelphia, | |
| Defendant. | |

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Statement of Facts ........................................................................................................... 1

    The Defendant sought and obtained private federal election grant moneys to conduct federal elections. ......................................................................................... 1

    I.    CTCL's 2020 private federal elections grant application process. ............................. 2

    II.    CTCL's 2020 private federal election grants have gone to local governments with demographics showing progressive voting patterns. ..................................................................................................... 2

Argument .......................................................................................................................... 7

Plaintiffs are entitled to a temporary restraining order. .................................................. 7

    The Plaintiffs satisfy the factors for a temporary restraining order. ......................... 7

I.    The Plaintiffs are likely to succeed on the merits. ................................................. 7

A. The acceptance of private moneys to conduct federal elections lends to the prospect of undue influence on a core public government responsibility funded through federal and state appropriations. ....................................7

B. The PVA has a private cause of action and legal standing. ..............................9

    1. The Supremacy Clause provides a citizen's private cause of action and legal standing to bring preemption lawsuits against local governments regarding federal elections. ....................................9

    2. HAVA, 52 U.S.C. § 21112, confers a private cause of action and legal standing to bring preemption lawsuits against local governments with regard to federal elections. ....................................10

    3. The government favoring progressive demographic groups in elections causes injury to Plaintiffs who favor non-progressive candidates. ....................................11

C. The Cities' CTCL private federal election grants are within a subject area, federal elections, where public-private partnerships are constitutionally impermissible ....................................12

D. The Counties' and City's acceptance of CTCL's $14 million in grants is preempted by federal law. ....................................14

    1. U.S. Constitution's Elections Clause and Supremacy Clause preempt CTCL's private federal election grants to local governments. ....................................15

    2. Help America Vote Act (HAVA) preempts CTCL's private federal election grants to local governments. ....................................16

    3. The National Voters Registration Act (NVRA) preempts CTCL's private federal election grants to local governments. ....................................17

II. The moving party will suffer irreparable injury absent the injunction. ....................................18

III. The harm to other interested parties is little or none if the relief is granted. ....................................20

IV. The public interest is aided by the preliminary injunction. ....................................21

Conclusion ....................................22

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ....................................................................8

*Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687 (1994) ....................................................................................................................13

*Christian Legal Soc'y v. Walker*, 453 F.3d 853 (7th Cir. 2006)........................................20

*Citizens for Resp. and Ethics in Washington v. Fed. Election Commn.,* 316 F. Supp. 3d 349 (D.D.C. 2018).............................................................................................................8

*Citizens United v. Fed. Election Commn.,* 558 U.S. 310 (2010) .........................................8

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................................19

*Ferguson v. City of Charleston*, 532 U.S. 67 (U.S. 2001) ................................................13

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205 (3d Cir. 2014) ........................7

*Issa v. School District of Lancaster,* 847 F.3d 121 (3d Cir. 2017)......................................7

*In re Nomination Papers of Carlson,* 60 Pa.Cmwlth. 170, 430 A.2d 1210 (1981)............14

*League of Women Voters of N. Carolina v. North Carolina,* 769 F.3d 224 (4th Cir. 2014)........................................................................................................................20

*League of Women Voters v. Blackwell*, 340 F.Supp.2d 823 (N.D. Ohio 2004) .................9

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) ................................................19

*Pennsylvania Democratic Party v. Boockvar*, 2020 WL 5554644..........................................8

*Phelps–Roper v. Nixon,* 545 F.3d 685 (8th Cir.2008) .......................................................21

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978) ........................................................19

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .............................................................................8

*Reynolds v. Sims,* 377 U.S. 533 (1964) ............................................................................18

*Shields v. Zuccarini*, 254 F.3d 476 (3d Cir.2001).................................................... 7, 20, 21

*Tashjian v. Republican Party of Conn.,* 479 U.S. 208 (1986) ..........................................15

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ................................................15

*U.S. v. Berks County, Pennsylvania*, 277 F.Supp.2d 570 (E.D.Pa. 2003).........................................18

*Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006).........................14

*Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986) ...........................................................................19

*Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784 (Del Ch. 2015) ...........................11, 12, 19, 21

**Statutes**

25 P.S. § 3046.2........................................................................................................................11

52 U.S.C. § 21082 ....................................................................................................................18

52 U.S.C. § 21083 ....................................................................................................................18

52 U.S.C. § 21084 ....................................................................................................................18

52 U.S.C. § 21085 ....................................................................................................................18

52 U.S.C. § 21112 ....................................................................................................................10

52 U.S.C. § 21141 ....................................................................................................................18

**Other Authorities**

2020 CARES Act Grant ..............................................................................................................3

*Center for Tech and Civic Live" Democratic election operatives masquerading as concerned voters' group, critic says*, W.J. Kennedy, Legal Newsline (Aug. 24, 2020) .....................................1

Help America Vote Act..........................................................................................................3, 16

National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501–20511............................. 17, 18

**Constitutional Provisions**

U.S. Const., Art. I......................................................................................................................7, 15

U.S. Const. Art. II .......................................................................................................................8

U.S. Const. Art. VI......................................................................................................................9, 15

The Plaintiffs, based on federal preemption, seek a temporary restraining order against the Defendants using private federal election grants.

### Statement of Facts

**The Defendant sought and obtained private federal election grant moneys to conduct federal elections.**

The Defendants sought and received grants from Center of Tech and Civic Life totaling over $14,000,000:

- Centre County -- $863,828
- Delaware County -- $2,200,000
- Philadelphia -- $10,016,074

CTCL is a Chicago based non-profit organization[1] that received $250 million from Mark Zuckerberg (creator of Facebook) and his wife Dr. Priscilla Chan[2] to provide funding for city and county election officials to perform election operations. CTCL's mission, in part, includes the training of public election officials in communication and technology and to inform and mobilize voters.[3]

Notably, CTCL can be characterized as a progressive organization.[4] While the organization seeks to "foster a more informed and engaged democracy, and help[ ] modernize elections" with its team of "civic technologists, trainers, researchers, election administration and data experts," it is using millions of dollars to target certain cities in

---

[1] Kaardal Decl. Ex. A-3.
[2] *Id.* Ex. B-2.
[3] *Id.* Ex. A-4–5.
[4] A critic of CTCL identified it as a "bunch of Democratic operatives using donations from left-of-center groups…" *Center for Tech and Civic Live" Democratic election operatives masquerading as concerned voters' group, critic says*, W.J. Kennedy, Legal Newsline (Aug. 24, 2020) Kaardal Ex. D.

certain states, which have significant progressive voting patterns, with private federal election grants for what is normally core government responsibilities—conducting federal elections—funded normally with federal and state moneys.

## I.      CTCL's 2020 private federal elections grant application process.

On its website, CTCL markets to election offices the federal election grants as "COVID-19 response grants":

> We provide funding to U.S. local election offices to help ensure they have the critical resources they need to safely serve every voter in 2020.

CTCL stated that it intends to award $250 million of private federal election grants to local election offices for the November 3, 2020 elections. Any U.S. election office that is responsible for administering election activities may apply for a private grant through a minimal grant application process.[5]   Minimum grants are $5,000, but the actual amount awarded is "based on a formula that considers the citizen voting age population and other demographic data of [the] jurisdiction."[6] Further, combined local government applications are encouraged for those who share election responsibilities.[7]

## II.     CTCL's 2020 private federal election grants have gone to local governments with demographics showing progressive voting patterns.

The voting patterns of the local governments that CTCL have funded are overwhelmingly progressive.  For example, Wayne County, Michigan, voted in 2016 for Hilary Clinton at 94.95% rate.  As the chart below shows, CTCL's private federal election grants are targeting cities with demographics showing high rates of progressive voters.

---

[5] Kaardal Decl. Ex. A-5.
[6] *Id.* A-5.
[7] *Id.* A-6.

| Jurisdiction/City | Grant Amount (in dollars) | Trump 2016 | Clinton 2016 | Clinton Percentage |
|---|---|---|---|---|
| Green Bay City, WI | 1,093,400 | 19,821 | 21,291 | 51.78% |
| Kenosha City, WI | 862,779 | 15,829 | 22,849 | 58.98% |
| Madison City, WI | 1,271,788 | 23,053 | 120,078 | 83.89% |
| Milwaukee City, WI | 2,154,500 | 45,167 | 188,653 | 80.68% |
| Racine City, WI | 942,100 | 8,934 | 19,029 | 68.05% |
| Philadelphia City, PA | 10,016,074 | 108,748 | 584,025 | 84.30% |
| Wayne County, MI-Detroit | 3,512,000 | 7,682 | 234,871 | 94.95% |
| Flint City, MI | 475,625 | 4,572 | 24,790 | 84.42% |
| East Lansing, MI | 8,500 | 4,147 | 13,073 | 75.9% |
| Lansing, MI | 440,000 | 11,219 | 32,716 | 74.46% |
| Minneapolis City, MN | 3,000,000 | 25,693 | 174.585 | 87.17% |
| Fulton County, GA – Atlanta | 6,000,000 | 110,372 | 281,875 | 69.2% |
| Richland County, SC | 730,000 | 52,469 | 108,000 | 67.2% |
| Delaware County, PA | 2,200,000 | 110,667 | 177,402 | 61.58% |
| Centre County, PA | 863,828 | 35,274 | 37,088 | 50.93% |

Meanwhile, Pennsylvania received $14,223,603 for appropriations to support programs under the Help America Vote Act.[8]  The state matching contribution of $2,844,721 brought the total to about $17.1 million.[9] Another $15,175,567 in federal moneys was distributed to Pennsylvania under the 2020 CARES Act Grant.[10] The state match was $3,035,114—bringing the total to about $18.2 million.[11] So, the total federal and state grants in Pennsylvania for federal election purposes totaled $35.3 million.  The Secretary of the Commonwealth allocated the federal grants to the counties.[12]

---

[8] Kaardal Decl. Ex. F-3
[9] *Id.*
[10] Kaardal Decl. Ex. G-2.
[11] *Id.*
[12] Kaardal Decl. Ex. H.

**2020 Commonwealth Disbursements of Federal Election Grants to Counties**

| County | Election Security Grants | CARES Act Grants |
|---|---|---|
| ADAMS | $55,122.67 | $47,235.33 |
| ALLEGHENY | $731,548.78 | $626,873.59 |
| ARMSTRONG | $34,271.10 | $29,367.35 |
| BEAVER | $89,967.99 | $77,094.73 |
| BEDFORD | $26,205.97 | $22,456.23 |
| BERKS | $208,993.37 | $179,089.12 |
| BLAIR | $61,374.38 | $52,592.50 |
| BRADFORD | $29,515.46 | $25,292.17 |
| BUCKS | $375,012.49 | $321,353.04 |
| BUTLER | $105,268.03 | $90,205.53 |
| CAMBRIA | $67,654.72 | $57,974.20 |
| CAMERON | $3,750.00 | $3,750.00 |
| CARBON | $36,064.90 | $30,904.48 |
| CENTRE | $89,411.77 | $76,618.10 |
| CHESTER | $291,921.95 | $250,151.69 |
| CLARION | $18,900.72 | $16,196.27 |
| CLEARFIELD | $37,823.53 | $32,411.47 |
| CLINTON | $16,917.16 | $14,496.53 |
| COLUMBIA | $31,045.87 | $26,603.60 |
| CRAWFORD | $43,550.92 | $37,319.34 |
| CUMBERLAND | $145,309.06 | $124,517.21 |
| DAUPHIN | $152,642.12 | $130,801.00 |
| DELAWARE | $329,614.60 | $282,451.01 |
| ELK | $15,599.41 | $13,367.34 |
| ERIE | $159,135.12 | $136,364.94 |

| | | |
|---|---|---|
| FAYETTE | $62,829.54 | $53,839.44 |
| FOREST | $3,750.00 | $3,750.00 |
| FRANKLIN | $76,896.09 | $65,893.25 |
| FULTON | $7,407.49 | $6,347.58 |
| GREENE | $17,683.59 | $15,153.30 |
| HUNTINGDON | $21,716.98 | $18,609.56 |
| INDIANA | $40,670.86 | $34,851.39 |
| JEFFERSON | $24,583.13 | $21,065.60 |
| JUNIATA | $11,069.52 | $9,485.62 |
| LACKAWANNA | $115,921.21 | $99,334.38 |
| LANCASTER | $269,895.79 | $231,277.18 |
| LAWRENCE | $44,108.77 | $37,797.38 |
| LEBANON | $70,602.66 | $60,500.33 |
| LEHIGH | $190,896.71 | $163,581.85 |
| LUZERNE | $172,116.23 | $147,488.62 |
| LYCOMING | $56,134.50 | $48,102.37 |
| McKEAN | $19,552.64 | $16,754.91 |
| MERCER | $57,471.05 | $49,247.68 |
| MIFFLIN | $20,506.39 | $17,572.19 |
| MONROE | $89,529.56 | $76,719.03 |
| MONTGOMERY | $466,749.74 | $399,963.87 |
| MONTOUR | $10,863.40 | $9,308.98 |
| NORTHAMPTON | $173,311.28 | $148,512.67 |
| NORTHUMBERLAND | $43,883.83 | $37,604.62 |
| PERRY | $22,799.14 | $19,536.88 |
| PHILADELPHIA | $878,827.50 | $753,078.62 |

| | | |
|---|---|---|
| PIKE | $33,298.54 | $28,533.95 |
| POTTER | $8,693.33 | $7,449.43 |
| SCHUYLKILL | $69,579.39 | $59,623.48 |
| SNYDER | $18,024.68 | $15,445.58 |
| SOMERSET | $37,919.23 | $32,493.48 |
| SULLIVAN | $3,750.00 | $3,750.00 |
| SUSQUEHANNA | $20,760.77 | $17,790.17 |
| TIOGA | $20,523.56 | $17,586.91 |
| UNION | $19,523.19 | $16,729.68 |
| VENANGO | $25,263.67 | $21,648.77 |
| WARREN | $24,891.50 | $21,329.85 |
| WASHINGTON | $118,426.63 | $101,481.31 |
| WAYNE | $27,144.17 | $23,260.19 |
| WESTMORELAND | $195,200.84 | $167,270.12 |
| WYOMING | $13,990.48 | $11,988.62 |
| YORK | $236,610.33 | $202,754.44 |

(REMAINDER OF PAGE INTENTIONALLY LEFT BLANK)

**Argument**

**Plaintiffs are entitled to a temporary restraining order.**

**The Plaintiffs satisfy the factors for a temporary restraining order.**

A preliminary injunction, inclusive of a temporary restraining order, is an extraordinary remedy granted in limited circumstances. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). Those seeking one must establish that (1) they are likely to succeed on the merits of their claims, (2) they are likely to suffer irreparable harm without relief, (3) the balance of harms favors them, and (4) relief is in the public interest. *Id. See Issa v. School District of Lancaster,* 847 F.3d 121, 131 (3d Cir. 2017); *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001). The plaintiffs satisfy the requirements for a temporary restraining order.

I.     **The Plaintiffs are likely to succeed on the merits.**

   A.  **The acceptance of private moneys to conduct federal elections lends to the prospect of undue influence on a core public government responsibility funded through federal and state appropriations.**

Congress and state legislatures fund election processes to conduct federal elections to support, improve, and implement election systems. Normally, government moneys fund federal elections because they are a core government responsibility. Principally, the State has the "power to regulate [its] own elections[,]" relying on the constitutional authority for states to regulate "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const., art. I, § 4. The Elections Clause provides the state with legal authority over elections for congressional offices subject to Congressional enactments. Similarly, Article II of the United States Constitution governs presidential elections,

7

distributing authority between the states and Congress. U.S. Const. art. II, § 1, cls. 2, 4. The Electors Clause provides that states appoint presidential electors and Congress determines the timing of the election and the day of electoral voting.

Federal election laws create regulatory mechanisms which are designed to deter corruption, prevent particular individuals or organizations from having an undue influence on federal elections, and assist in enforcement of laws prohibiting foreign contributions in federal elections, while also protecting the exercise of political speech so crucial to the functioning of this country's vibrant democracy. *Citizens for Resp. and Ethics in Washington v. Fed. Election Commn.,* 316 F. Supp. 3d 349, 368 (D.D.C. 2018), *aff'd,* 971 F.3d 340 (D.C. Cir. 2020) *citing Citizens United v. Fed. Election Commn.,* 558 U.S. 310, 366–67 (2010).

Hence, the federal government and the states have "important regulatory interests" in fair, honest, and orderly elections. *See Anderson v. Celebrezze,* 460 U.S. 780, 788 (1983). Thus, the conduct of elections is a core government responsibility of government entities because of the public interest in ensuring the fairness and integrity of Pennsylvania's elections. *See Pennsylvania Democratic Party v. Boockvar,* 2020 WL 5554644, at *32, quoting *Purcell v. Gonzalez,* 549 U.S. 1, 4 (2006) (*per curiam*).   (Pa. 2020) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy.").  Because federal elections are a core government responsibility, federal elections are normally funded with federal and state moneys.

HAVA ensures that in the disbursement of federal moneys for federal elections, each state receives a proportionate balance based upon specific criteria. The state then uses those moneys in a manner directed by law, including in the support of various county, city, town,

or village governmental entities which are required to conduct federal elections as a core government responsibility.

But, when private organizations provide grant moneys to specific counties and cities based on favoring demographic groups with progressive voting patterns, there is a conflict with the federal scheme.

### B.  The PVA has a private cause of action and legal standing.

The PVA[13] has a private cause of action and legal standing to seek a pre-election injunction against the Cities accepting and using CTCL's $6.4 million in private federal election grants for the November 3 election.  The Supremacy Clause and HAVA confer a private cause of action and legal standing.

### 1.  The Supremacy Clause provides a citizen's private cause of action and legal standing to bring preemption lawsuits against local governments regarding federal elections.

The Supremacy Clause of the United States Constitution, Article VI, clause 2, provides a federal jurisdictional basis for a suit brought to enforce the provisions of federal election law.  In *League of Women Voters v. Blackwell*, 340 F.Supp.2d 823 (N.D. Ohio 2004), the court held that the Supremacy Clause of the U.S. Constitution (U.S. Const. Art. VI, cl. 2) provides a basis for federal court jurisdiction of the League's suit that challenged an election official's actions relating to balloting procedures in federal elections as violative of HAVA, which has preemptive effect.  *Id.* at 827–28

---

[13] For convenience, "PVA" includes all named Plaintiffs unless otherwise specifically identified.

Similarly, in this case, the Supremacy Clause provides the private cause of action and § 1331 provides federal issue jurisdiction. Like *League of Women Voter,* the PVA asserts that the Cities actions violate a federal law which has preemptive effect. Specifically, the PVA's claim is that federal law preempts the Cities and its officials from accepting their respective CTCL's private federal election grant to conduct federal elections. As a federal preemption claim, the Supremacy Clause provides the cause of action and federal jurisdiction.

### 2. HAVA, 52 U.S.C. § 21112, confers a private cause of action and legal standing to bring preemption lawsuits against local governments with regard to federal elections.

HAVA, 52 U.S.C. § 21112, confers upon the PVA a private cause of action and legal standing.  It fits the statutory category of "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)."  As to the PVA's prospective remedies sought in this Court, HAVA, 52 U.S.C. § 21112, titled "Establishment of State-based administrative complaint procedures to remedy grievances," guarantees an "appropriate remedy" to "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)" of HAVA.  Under section (a) of 52 U.S.C. § 21112, Pennsylvania, having received federal HAVA payments, is "required to establish and maintain State-based administrative complaint procedures which meet the requirements of paragraph (2)."  Paragraph (2), among other things, requires that Pennsylvania provide that:

> (F) If, under the procedures, the State determines that there is a violation of any provision of subchapter III, the State shall provide the *appropriate remedy.*

(Emphasis added.)

However, in this case, 25 P.S. § 3046.2 has failed to provide the federally required "appropriate remedy" to "any person who believes that there is… [a HAVA] violation which has occurred, is occurring, or is about to occur" because there is effectively no pre-election injunctive relief allowed under 25 P.S. § 3046.2. 25 P.S. § 3046.2 is the proverbial "slow boat to China" and does not provide the immediate injunctive relief required to stop Philadelphia from accepting and using CTCL's private federal election grants before the November 3, 2020 election.  25 P.S. § 3046.2 authorizes no one, not even the Pennsylvania Attorney General, to pursue injunctive relief for HAVA violations against Pennsylvania's local governments.  25 P.S. § 3046.2 is legally insufficient to satisfy the federal "appropriate remedy" requirement for "any person" filing a HAVA complaint in Pennsylvania to obtain pre-election injunctive relief.

### 3. The government favoring progressive demographic groups in elections causes injury to Plaintiffs who favor non-progressive candidates.

A government's election policy favoring demographic groups in elections is an equivalent injury to disfavoring demographic groups.  "Parity of reasoning suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups."  *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).  Here, the Plaintiffs complain that the CTCL's nationwide federal election grants are skewed towards progressive voters injuring the plaintiffs because close elections will be lost by plaintiffs' favored non-progressive candidates because of the Pennsylvania counties and cities favoring progressive demographic

groups.  At least one Pennsylvania state election official in 2020 has recognized the danger of private federal election grants to our non-partisan elections.[14]

### C. The Cities' CTCL private federal election grants are within a subject area, federal elections, where public-private partnerships are constitutionally impermissible.

Pennsylvania receives federal moneys.  The Secretary of the Commonwealth apportions those moneys to local governments to conduct federal elections.[15] But, Centre County, Delaware County and Philadelphia chose to seek and accept private moneys from CTCL. In receiving the CTCL's grants of more than $14 million in grants, they created a public-private relationship, privatizing in part, the conduct of federal elections.

*Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group.  The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law.  The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.*  The court stated that the government favoring a demographic group caused equivalent injury to a voter as the government disfavoring a demographic group. *Id.*

Other cases show the need to announce the constitutional impermissibility of public-private relationships. For example, in *Board of Education of Kiryas Joel Village School District v.*

---

[14]  Kaardal Decl. Ex. J.
[15]  *See e.g.* Kaardal Decl. Ex. H.

*Grumet*, 512 U.S. 687 (1994), the U.S. Supreme Court drew such a line finding a public-private partnership constitutionally impermissible. In *Kiryas*, the New York legislature sought to create a homogenous school district for Satmar Hasidic Jews and did so by statute.  This "religious" motive was improper for the state and the statute forming the new district was stuck down. *Id.* at 691.   Similarly, in *Ferguson v. City of Charleston*, 532 U.S. 67, 81-86 (U.S. 2001), the U.S. Supreme Court held another public-private partnership unconstitutionally impermissible.  Here, the local prosecutor, concerned about crack babies, teamed up with the local hospital to develop a program seeking to prevent expecting mothers from using cocaine during the pregnancy.  They developed a program where the hospital would test for the presence of cocaine and provide a program to help with abstinence.  If the patient refused, the results were shared with the prosecutor's office that in turn would encourage participation at the threat of prosecution.  The U.S. Supreme Court found the entanglement of public and private interests sufficient to conclude the blood test by the hospital was a Fourth Amendment violation by the state. *Id.* at 86.

Here,  "permitting the government to depart from a neutral position would threaten both the reliability of the election result as an expression of the popular will and the appearance of integrity crucial to maintaining public confidence in the electoral process."[16] And in Pennsylvania there is a significant public interest in ensuring the fairness and integrity

---

[16] Steven J. André, Government Election Advocacy: Implications of Recent Supreme Court Analysis, 64 Admin. L. Rev. 835, 851 (2012), *citing* Note, The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns, 93 Harv. L. Rev. 535, 554, 554 n.112 (1980) (observing that "[t]he [United States Supreme] Court has explicitly recognized that the validity of elections as bona fide expressions of the popular will depends as much upon citizens' faith that the electoral process is free from government tampering as on the actual fairness of that process").

of state elections. *In re Nomination Papers of Carlson,* 60 Pa.Cmwlth. 170, 430 A.2d 1210, 1212 (1981) (Crumlish, J.) (Pennsylvania courts are "entrusted with the responsibility of protecting the Commonwealth's compelling interest in preserving the integrity of the election process." )   The purpose of the federal and Pennsylvania state government exclusively funding federal elections is to eliminate undue influence and the appearance of undue influence by private parties. With the entanglement of public and private interests, CTCL's private funding of federal elections introduces undue influence and the appearance of undue influence into federal elections.

### D. The Counties' and City's acceptance of CTCL's $14 million in grants is preempted by federal law.

Whether a local government action is preempted by federal law such as HAVA is to be determined by application of conflict-preemption principles.   The federal court held in *Washington Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006), that in adjudicating HAVA preemption issues, the court will find preemption where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.   Similarly, the Pennsylvania Supreme Court held in *Kuznik v. Westmoreland County Bd. of Com'rs*, 588 Pa. 95, 902 A.2d 476 (2006), in resolving an issue of preemption of a state statute by HAVA, state law may be displaced under conflict preemption principles if the state law in question presents a conflict with federal law in one of two situations: when it is impossible to comply with both the state and the federal law, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Colorado Common Cause v. Davidson*, 2004 WL 2360485 (Colo. Dist. Ct. 2004).

14

1.  **U.S. Constitution's Elections Clause and Supremacy Clause preempt CTCL's private federal election grants to local governments.**

The U.S. Constitution, Article I's Elections Clause and Article VI's Supremacy Clause preempts CTCL's private federal elections grant to local governments.  The Elections Clause states:

> Time, place, and manner of holding. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators.

U.S. Constitution, Art. I, sec. 4, cl. 1. The Clause grants to the States "broad power" to prescribe the procedural mechanisms for holding congressional elections, *e.g., Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986) but does not authorize them to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints, *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 833-43 (1995)

The Supremacy Clause states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Constitution, Art. VI, sec. 2.

The Elections Clause and Supremacy Clause preempt CTCL's private federal election grants to local governments. CTCL's private federal election grants are not legally authorized by federal law nor state law.  The Cities have acted ultra vires, without legal authority, in accepting and using CTCL's private federal election grants.

2.  **Help America Vote Act (HAVA) preempts CTCL's private federal election grants to local governments.**

The Help America Vote Act (HAVA), 52 USC § 209, preempts CTCL's private federal election grants for the following reasons.  HAVA established the Election Assistance Commission (EAC) to assist the states regarding HAVA compliance and to distribute HAVA funds to the states.

The EAC is also charged with creating voting system guidelines and operating the federal government's first voting system certification program.  EAC is also responsible for maintaining the National Voter Registration form, conducting research, and administering a national clearinghouse on elections that includes shared practices, information for voters and other resources to improve elections.

HAVA requires that the states implement the following new programs and procedures:

- Provisional Voting
- Voting Information
- Updated and Upgraded Voting Equipment
- Statewide Voter Registration Databases
- Voter Identification Procedures
- Administrative Complaint Procedures

In the past, Pennsylvania's HAVA plan, required by HAVA, was approved by the EAC.  HAVA's purpose was to coordinate federal and state administration of federal elections.  HAVA does not legally authorize local governments to accept private federal election grants.  HAVA's preemption prohibits local governments from accepting private federal election grants.

16

Under HAVA, the EAC is to be bi-partisan and work with all the states in a bi-partisan way.   The CTCL's private federal election grants circumvent the EAC and the states and thus conflict with HAVA. Under HAVA, the EAC and the states work toward election plans and budgets.

CTCL's private federal election grants to local governments lead to deviations from the federally-approved and state-approved election administration plans and budgets—thus, conflicting with HAVA.  The federal and state money distributed to county and city clerks that administer elections are distributed pursuant to a legally-authorized method that is approved by the states under the guidance of EAC, so the counties and cities receive a state-approved share for election purposes.  But, local governments accepting CTCL's private federal election grants, violate HAVA by injecting private money into federal elections which is not approved by the EAC or the states.

### 3.   The National Voters Registration Act (NVRA) preempts CTCL's private federal election grants to local governments.

National Voters Registration Act (NVRA), 52 U.S.C. §§ 20501–20511, preempts CTCL's private federal election grants for the following reasons.  Congress enacted the National Voter Registration Act of 1993 (also known as the "Motor Voter Act"), to create "national procedures for voter registration for elections for Federal office."  52 U.S.C. § 20503.  The Act gave responsibility to the Federal Election Commission (FEC) to provide States with guidance on the Act, to develop a national mail voter registration form, and to compile reports on the effectiveness of the Act. A 2002 amendment in HAVA transferred the FEC's responsibilities under the Act to the EAC.

17

NVRA's preemption prohibits local governments from accepting private federal election grants for voter registration. Under 52 U.S.C. § 21085, "the specific choices on the methods of complying with the requirements of this subchapter shall be left to the discretion of the State." "Subchapter," refers to the minimum requirements[17] regarding voting systems standards,[18] voting information requirements and computerized statewide voter registration list requirements and requirements for voters who register by mail.[19] "State" does not mean "county", "city" or "municipality."[20] Therefore, as it pertains to federal elections, Centre County, Delaware County and Philadelphia cannot act contrary to laws of either the federal or state governments. Each law preempts the actions of local governments in accepting the CTCL's private federal election grant.

## II.     The moving party will suffer irreparable injury absent the injunction.

The PVA, absent the injunction, will suffer irreparable injury. Denial of the right to participate in an election is by its nature an irreparable injury. *U.S. v. Berks County, Pennsylvania*, 277 F.Supp.2d 570, 578 (E.D.Pa. 2003) (citation omitted). And, the "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964). The government's election policy favoring demographic groups is an equivalent injury to disfavoring demographic groups. "Parity of reasoning

---

[17] 52 U.S.C. § 21084.
[18] 52 U.S.C. § 21082.
[19] 52 U.S.C. § 21083.
[20] 52 U.S.C. § 21141: "In this chapter, the term 'State' includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.

suggests that a government can violate the Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups." *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).

The plaintiffs do not want progressive candidates to win in the November 3 elections; the plaintiffs are injured by CTCL's private federal election grants because they are targeted to counties and cities with progressive voter patterns—resulting in more progressive votes and a greater chance that progressive candidates will win. *See, id.* The injury to the plaintiffs is real and concrete.

Where, as here, the plaintiffs have demonstrated a likelihood of success on the merits as to a constitutional claim, such an injury has been held to constitute irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (where plaintiff had proven a probability of success on the merits, the threatened loss of First Amendment freedoms "unquestionably constitutes irreparable injury"); *Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). Moreover, courts have specifically held that infringement on the fundamental right to vote constitutes irreparable injury. *See Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) ("restriction on the fundamental right to vote constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (holding that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon").

Once the November election occurs, the damage to plaintiffs' favored non-progressive candidates will be complete. Without injunctive relief, the CTCL moneys will cause a non-conformity of uniform elections in the Cities sought by Congress under HAVA

19

and all other election laws, including those of the state of Pennsylvania. This illegal public-private partnership causes the PVA irreparable injury.

Additionally, traditional legal remedies are inadequate, since infringement on a citizens' constitutional right to vote cannot be redressed by money damages. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

### III.    The harm to other interested parties is little or none if the relief is granted.

The PVA, absent the injunction, will suffer harm. *Shields,* 254 F.3d at 482. While it is known there will be anticipated increases in voting, namely absentee ballot voting, it does not excuse the circumvention of federal and state laws.[21] Hence, the need of the $14 million of private federal election grants split between two Pennsylvania counties and Philadelphia is questionable at best. The counties and cities have access to HAVA moneys and additional Cares Act moneys, specifically for election related needs—as does every other county and city in Pennsylvania responsible for conducting the 2020 federal elections.

On the other hand, the introduction of a public-private relationship in the federal election context is a first-time foreign element not contemplated by either HAVA or by the Secretary of the Commonwealth nor the Pennsylvania Legislature since the laws exclusively control the conduct and moneys related to federal elections. There is no question of the historical success and consistency of the counties and cities in their election process. What also is notably are the voter outcomes—predominately progressive.  Hence, the $14 million

---

[21] *E.g.* Kaardal Decl. Ex. I.

in grants from the CTCL raises sufficient questions as to the propriety of the public-private created relationship and government advocacy in favor of a demographic group. In short, injunctive relief to stay expenditures of the grant will cause little or no harm to the conduct of elections.

Moreover, a grant process is in place through the Secretary of the Commonwealth should the Defendants need more money to conduct federal elections. By doing so, the local governments will stay true to their core public responsibilities in conducting elections consistent with federal and state laws.  For these reasons, the balance of harms favors granting the motion.

## IV.    The public interest is aided by the preliminary injunction.

The public interest, absent the injunction, will be impeded.  *Shields,* 254 F.3d at 482. Centre County's, Delaware County's and Philadelphia's acceptance of the CTCL's grants reveal a public-private relationship that privatizes federal elections to skew the outcome of an election in an area of a favored demographic group. It skews the neutrality of an election which is the core public responsibility of the Cities. *Red Clay Consol. Sch. Dis*t., 122 A.3d at 857–58. Threats of private unconstitutional interference with the November 3 elections pose the same type of public interest analysis as in First Amendment deprivations.  *See Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir.2008) (concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation").  And, it is always in the public interest to protect constitutional rights.  Additionally, the PVA has no

alternative administrative remedy to obtain immediate injunctive relief against the counties and Philadelphia.

## Conclusion

The Court should grant the temporary restraining order.

Dated: September 24, 2020.

*Electronically Signed by Jordan P. Shuber*
Jordan P. Shuber, PA ID 317823
Ronald T. Elliott, PA ID 71567
Thomas W. King, III, PA ID 21580 (Admission Pending)
Thomas E. Breth, PA ID 66350 (Admission Pending)
Special Counsel for the Amistad Project of Thomas More Society
Dillon McCandless King Coulter & Graham, LLP
128 West Cunningham Street
Butler, PA  16001
Telephone:        (724) 283-2200
Facsimile:        (724) 283-2298
E-mail addresses:  jshuber@dmkcg.com
relliott@dmkcg.com
tking@dmkcg.com
tbreth@dmkcg.com


Erick G. Kaardal, MN 229647 (pro hac vice motion forthcoming)
Special Counsel for the Amistad Project of Thomas More Society
Mohrman, Kaardal and Erickson, P.A.
150 S. Fifth St., Ste. 3100
Minneapolis MN 55402
612-341-1074
e.   612-341-1076

*Admission   application   pending   or forthcoming

22