# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| | : | |
| **PENNSYLVANIA VOTERS ALLIANCE,** | : | |
| **STEPHANIE BOROWICZ, KRISTINE ENG,** | : | |
| **THEODORE A. DANNERTH, ERIC KRONER,** | : | |
| **ERIC NELSON, DARYL METCALFE, DAWN** | : | |
| **WETZEL KEEFER, RUSS DIAMOND, CHRIS** | : | |
| **DUSH, JIM GREGORY, FRANCIS RYAN,** | : | |
| **MICHAEL HARVEY, DAVID TORRES, and** | : | **No. 4:20-CV-01761** |
| **DASHA PRUETT,** | : | |
| | : | |
| **Plaintiffs,** | : | **(Judge Brann)** |
| **v.** | : | |
| | : | |
| **CENTRE COUNTY, DELAWARE COUNTY,** | : | |
| **and THE CITY OF PHILADELPHIA,** | : | |
| | : | |
| **Defendants.** | : | |

_____:

## DEFENDANT COUNTIES' RESPONSE IN OPPOSITION TO
## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

**BABST, CALLAND, CLEMENTS**
**AND ZOMNIR, P.C.**
Molly Meacham (Pa. Id. No. 318272)
Two Gateway Center, 9th Floor
603 Stanwix Street
Pittsburgh, PA 15222
Tel.: (412) 394-5400
mmeacham@babstcalland.com

Elizabeth A. Dupuis (Pa. Id. No. 80149)
330 Innovation Boulevard, Suite 302
State College, PA 16803
Tel.: (814) 867-8055
bdupuis@babstcalland.com
*Counsel for Defendant Centre County*

**DILWORTH PAXSON LLP**
Jerry R. DeSiderato (Pa. Id. No. 201097)
Timothy J. Ford (Pa. Id. No. 325290)
Claire Blewitt Ghormoz (Pa. Id. No. 320816)
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
cghormoz@dilworthlaw.com
Tel.: (215) 575-7000
*Counsel for Defendant City of Philadelphia*

**BALLARD SPAHR LLP**
Edward D. Rogers (Pa. Id. No. 69337)
Terence M. Grugan (Pa. Id. No. 307211)

Elizabeth V. Wingfield (Pa. Id. No. 324277)
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel.: (215) 665-8500
RogersE@ballardspahr.com
GruganT@ballardspahr.com
WingfieldE@ballardspahr.com
*Counsel for Defendant Delaware County*

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

COUNTER-STATEMENT OF THE FACTS AND COUNTER-HISTORY OF
THE CASE............................................................................................................3

I.     The COVID-19 pandemic has created new challenges for
       Pennsylvania counties, which have responsibility for election
       administration, including funding. ..................................................................3

II.    CTCL awards grants to eighteen Pennsylvania counties to ensure
       "every eligible voter can participate in a safe and timely way and have
       their vote counted."........................................................................................5

III.   CTCL awards Defendant Counties grants to address specific, pressing
       election administration needs. .......................................................................7

IV.    Plaintiffs seek a temporary restraining order to prevent Defendant
       Counties from accepting and using CTCL grants on the eve of the
       election.............................................................................................................9

ARGUMENT ........................................................................................................9

I.     Plaintiffs are not likely to succeed on the merits...........................................11

       A.    Plaintiffs lack standing to seek relief on their claim. .........................11

             1.    Plaintiffs' purported injury is a "generalized grievance"
                   that does not constitute Article III injury-in-fact.....................13

             2.    Plaintiffs' purported injury is speculative and attenuated. .......15

             3.    Plaintiffs' purported injury is not redressable by the relief
                   they seek...................................................................................17

       B.    Plaintiffs have identified no viable private cause of action. ...............18

             1.    The Supremacy Clause does not provide a cause of
                   action.........................................................................................18

             2.    HAVA does not provide a private cause of action. ..................19

       C.    Plaintiffs are unlikely to succeed on the merits of their claim............22

             1.    The Elections Clause and the Supremacy Clause do not
                   preempt the CTCL grants at issue in this case..........................23

             2.    HAVA does not preempt the CTCL grants at issue in this
                   case............................................................................................26

|  | 3. | The NVRA does not preempt the CTCL grants at issue in this case. | 33 |

|  | 4. | There is no general constitutional prohibition on public-private partnerships in local election funding | 34 |

II. Plaintiffs cannot show a likelihood of irreparable harm or that the balance of the equities or the public interest favor a temporary restraining order. .................................................................................................36

A. Plaintiffs' alleged harm is too speculative to be irreparable. ..............36

B. The balance of equities weighs against granting emergency relief to Plaintiffs who showed no diligence in seeking to protect their asserted interests. ............................................................38

C. The public interest does not benefit from an order restraining funds for election administration on the eve of an election. ...............39

CONCLUSION AND RELIEF REQUESTED ......................................................40

# TABLE OF CITATIONS

## Cases

*Alexander v. Sandoval*,
  532 U.S. 276 (2001) ..................................................................................... 19, 21

*Allen v. Wright*,
  468 U.S. 737 (1984) ..................................................................................... 14, 17

*Am. Civil Rights Union v. Phila. City Comm'rs*,
  872 F.3d 175 (3d Cir. 2017) ......................................................................... 20, 28

*Am. Civil Rights Union v. Phila. City Comm'rs*,
  Civ. A. No. 16-1507, 2016 WL 4721118 (E.D. Pa. Sept. 9, 2016)........ 28, 31, 32

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
  570 U.S. 1 (2013) ...............................................................................................24

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ..................................................................................... 18, 23

*Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*,
  512 U.S. 687 (1994) ...........................................................................................35

*Bellitto v. Snipes*,
  935 F.3d 1192 (11th Cir. 2019)................................................................... 20, 21

*Berg v. Obama*,
  574 F. Supp. 2d 509 (E.D. Pa. 2009).......................................................... 13, 14

*Bieros v. Nicola*,
  857 F. Supp. 445 (E.D. Pa. 1994)......................................................................10

*Blunt v. Lower Merion Sch. Dist.*,
  767 F.3d 247 (3d Cir. 2014)...............................................................................14

*Brunner v. Ohio Republican Party*,
  555 U.S. 5 (2008) ...............................................................................................19

*Chamber of Commerce for Greater Phila. v. City of Phila.*,
  Civ. A. No. 17-1548, 2017 WL 11544778 (E.D. Pa. May 30, 2017) ................14

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398, 414 n.5 (2013) ............................................................... 12, 15, 16

*Colo. Common Cause v. Davidson*,
  No. 04CV7709, 2004 WL 2360485 (Colo. Dist. Ct. Oct. 18, 2004) .................32

*Cook v. Gralike,*
   531 U.S. 510 (2001) ............................................................................................24

*Corman v. Torres,*
   287 F. Supp. 3d 558 (M.D. Pa. 2018) ................................................................14

*Crowley v. Nevada ex rel. Nev. Sec'y of State,*
   678 F.3d 730 (9th Cir. 2012) .............................................................................31

*Democratic Nat'l Comm. v. Republican Nat'l Comm.,*
   673 F.3d 192 (3d Cir. 2012) ....................................................................... 27, 30

*Farina v. Nokia Inc.,*
   625 F.3d 97 (3d Cir. 2010) .................................................................. 23, 24, 33

*Ferguson v. City of Charleston,*
   532 U.S. 67 (2001) .............................................................................................35

*Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.,*
   680 F. Supp. 159 (D.N.J. 1988) .........................................................................10

*Fla. State Conference of N.A.A.C.P. v. Browning,*
   522 F.3d 1153 (11th Cir. 2008) ................................................. 27, 29, 30, 31, 32

*Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.,*
   847 F.2d 100 (3d Cir. 1988) ..............................................................................10

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ......................................................................................13

*Gonzalez v. Arizona,*
   677 F.3d 383 (9th Cir. 2012) .............................................................................27

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ...........................................................................................14

*In re Nomination Papers of Carlson,*
   430 A.2d 1210 (Pa. Commw. Ct. 1981) .............................................................35

*Kobell v. Suburban Lines,*
   731 F.2d 1076 (3d Cir. 1984) ............................................................................38

*Lance v. Coffman,*
   459 U.S. 437 (2007) ...........................................................................................13

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .................................................................................... 12, 15

*New Dana Perfumes Corp. v. Disney Store, Inc.,*
   131 F. Supp. 2d 616 (M.D. Pa. 2001) ...............................................................38

*Parker v. Dacres*,
130 U.S. 43 (1889) ............................................................................................38

*Pub. Interest Legal Found. v. Boockvar*,
370 F. Supp. 3d 449 (M.D. Pa. 2019) ...............................................................21

*Purcell v. Gonzales*,
549 U.S. 1 (2006) .............................................................................................39

*Raines v. Byrd*,
521 U.S. 811 (1997) .........................................................................................14

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) .............................................................................10

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*,
140 S. Ct. 1205 (2020) .....................................................................................39

*Republican Party of Pa. v. Cortés*,
218 F. Supp. 3d 396 (E.D. Pa. 2016)..................................................................36

*SAM Party v. Kosinski*,
No. 20 Civ. 323, 2020 WL 5359640 (S.D.N.Y. Sept. 1, 2020) .........................37

*Sandusky Cty. Democratic Party v. Blackwell*,
387 F.3d 565 (6th Cir. 2004) ............................................................................20

*Sanofi-Aventis U.S. LLC v. Novo Nordisk, Inc.*,
No. 06-1369, 2006 WL 8457950 (D.N.J. June 23, 2006) ...................................11

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000)..........................................................................36

*Susan B. Anthony List v. Driehaus*,
573 U.S. 14 (2014). ................................................................................... 12, 15

*T.W. by and through Waltman v. S. Columbia Area Sch. Dist.*,
No. 4:20-CV-01688, 2020 WL 5751219 (M.D. Pa. Sept. 25, 2020) .................10

*U.S. Term Limits, Inc. v. Thornton*,
514 U.S. 779 (1995) .........................................................................................25

*URL Pharma, Inc. v. Reckitt Benckiser Inc.*,
No. 15-0505, 2016 WL 1592695 (E.D. Pa. Apr. 20, 2016) ................................10

*Warth v. Seldin*,
422 U.S. 490 (1975) .........................................................................................14

*Wash. Ass'n of Churches v. Reed*,
492 F. Supp. 2d 1264 (W.D. Wash. 2006) ..........................................................32

*Young v. Red Clay Sch. Dist.*,
 122 A.3d 784 (Del. Ch. 2015) ........................................................................ 34, 35

## Constitutional Provisions

U.S. Const. art. I, § 4 ............................................................................................18

U.S. Const. art. VI, cl. 2 ........................................................................................18

## Statutes, Rules & Regulations

25 Pa. Stat. § 2641 ...................................................................................................3

25 Pa. Stat. § 2642 ................................................................................................3, 9

25 Pa. Stat. § 2645 ....................................................................................... 3, 25, 34

25 Pa. Stat. §§ 3150.11 *et seq.* ..............................................................................4

52 U.S.C. § 20501(b)(2) ........................................................................................33

52 U.S.C. § 20503 ..................................................................................................33

52 U.S.C. § 20510(b)(2) ........................................................................................21

52 U.S.C. § 21085 ..................................................................................................33

52 U.S.C. § 21111 ..................................................................................................21

52 U.S.C. § 21112 ............................................................................................ 20, 21

52 U.S.C. § 21142(a) .............................................................................................26

52 U.S.C. §§ 20501 *et seq.* .............................................................................. 18, 33

52 U.S.C. §§ 20901 *et seq.* ...................................................................................18

52 U.S.C. § 21003 ..................................................................................................29

52 U.S.C. § 21004 ..................................................................................................29

Help America Vote Act of 2002, P.L. 107-252, Oct. 29, 2002, 116 Stat. 1666......31

Act of Oct. 31, 2019, P.L. 552, No. 77 ....................................................................4

## **INTRODUCTION**

Elections are local and, in Pennsylvania, local governments are responsible for ensuring the safe and efficient administration of elections. Their role is crucial to the functioning of our democracy and is of particularly heightened significance now. The global COVID-19 pandemic poses unprecedented challenges for the conduct of elections, the ability of individuals to safely vote, and the manner in which they do so. To meet these challenges and satisfy their responsibilities to their constituents, local governments need to reinforce, improve and expand their elections administration capabilities. This includes recruiting and training poll workers, obtaining personal protective equipment, and acquiring new technology to expedite processing of mail ballots. These and other measures are critically important parts of local governments' efforts to ensure people can vote and they are costly.

When Centre County, Delaware County, and the City of Philadelphia (collectively, "Defendant Counties") learned of an opportunity to obtain funding that would help them improve their ability to safely and effectively administer the upcoming general election, they acted on it. Defendant Counties, along with fifteen other Pennsylvania counties and the Pennsylvania Department of State, applied for and accepted election administration grants from the non-partisan, non-profit Center for Technology and Civic Life ("CTCL"). Recognizing that local

governments desperately needed resources to safely and securely administer elections during a pandemic, CTCL made grant funds available to localities nationwide—without regard to their residents' political leaning or any other partisan consideration—to ensure that *all* of their residents will be able to vote safely, securely, and efficiently, no matter their political orientation.

Yet this lawsuit does not mention the majority of the counties in Pennsylvania that received CTCL grants. Rather, a collection of Plaintiffs "oppose[d] to the election of progressive candidates" has, targeted three of the eighteen county-recipients of CTCL grants because those counties allegedly lean "progressive." In so doing, Plaintiffs attempt to politicize nonpartisan improvements to local election administration by turning the responsible efforts of local governments against them. But Plaintiffs' unsupported insinuation that CTCL grants are politically motivated is as meritless as the legal theories supporting their request for preliminary injunctive relief. Plaintiffs lack Article III standing, lack a cognizable cause of action, and fail to identify a single federal statute or constitutional provision that supports their argument that Defendant Counties' receipt of CTCL grants was invalid. In a virtually identical claim, another federal court recently denied a TRO, holding that Plaintiffs "have not demonstrated a strong likelihood of success on the merits" because "no such explicit prohibition exists." Ford Decl., Ex. H at 2. Furthermore, Plaintiffs failed to identify any risk of

irreparable harm. As the federal court distinguished, "Plaintiffs allege that they will be harmed on November 3, 2020, but they do not allege that there is any ongoing use of the grants that causes them immediate, irreparable harm." *Id.* Finally, the remaining equitable factors militate against the preliminary relief they seek. Their motion should be denied.

**COUNTER-STATEMENT OF THE FACTS AND
COUNTER-HISTORY OF THE CASE**

**I.    The COVID-19 pandemic has created new challenges for Pennsylvania counties, which have responsibility for election administration, including funding.**

Under the Pennsylvania Election Code, county boards of elections "have jurisdiction over the conduct of primaries and elections in such county." 25 Pa. Stat. § 2641(a); *see also id.* § 2642 (powers and duties). The Election Code places the burden of funding primaries and elections on counties—not on federal or state sources. *Id.* § 2645. This arrangement is not unusual. As a recent Congressional Research Service report explained,

> States typically have primary responsibility for making decisions about the rules of elections (policymaking). Localities typically have primary responsibility for conducting elections in accordance with those rules (implementation). *Localities, with varying contributions from states, typically also have primary responsibility for paying for the activities and resources required to conduct elections* (funding).

Ford Decl., Ex. A (emphasis added). In other words, Pennsylvania's counties bear the costs to conduct elections, and only a portion of those costs are paid for by

3

federal and state funding.

The COVID-19 pandemic abruptly imposed significant new challenges to counties in shouldering election administration responsibilities. These counties were already working to implement mail-in ballot procedures for the first time in a general election. Act of Oct. 31, 2019, P.L. 552, No. 77, § 8 (codified at 25 Pa. Stat. §§ 3150.11 *et seq.*). With new procedures for mail-in ballots and the utilization of these ballots soaring as a result of voters' COVID-19 concerns, new procedures and infrastructure were needed to ensure voting could be both safe and efficient during a pandemic. Pennsylvania's primary election made clear that in the upcoming general election counties "will essentially have to run two elections, at the same time, on an unprecedented scale." Kaardal Decl., Ex. C at 5. The significant election-related imperatives facing counties include the need to process many more mail-in ballot applications and send out those ballots on time and with precision; hire and train additional employees; relocate polling places away from senior communities and other locations unsuitable for in-person voting amid the pandemic; educate voters about voting changes and combat misinformation; offer safe voting options to groups who are skeptical of mail-in voting; and accelerate the vote count.[1] Ford Decl., Exs. B, C; Kaardal Decl., Ex. C at 5. These challenges

---

[1]    In addition, Defendant Counties have already committed significant portions of their CTCL grants. Indeed, Philadelphia and Delaware County have already

came amidst an economic downturn already straining county budgets.

## II. CTCL awards grants to eighteen Pennsylvania counties to ensure "every eligible voter can participate in a safe and timely way and have their vote counted."

Localities around the country faced similar challenges. Recognizing this, the Center for Tech and Civic Life ("CTCL"), a nonpartisan nonprofit organization that has worked closely with local election administrators since its founding in 2012, launched a grant program for local election jurisdictions. Kaardal Decl., Ex. A at 2; Ford Decl., Exs. D, E. As reflected in Plaintiffs' own exhibits, CTCL recognized that "[e]lection officials have made it clear that one of their most pressing needs is funding." Kaardal Decl., Ex. A at 3. CTCL grants help local election administrators "ensure" that they "have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted." Kaardal Decl., Ex. A at 1. CTCL grants are available for four general categories:

- Ensure safe, efficient election day administration

- Expand voter education and outreach efforts

- Launch poll worker recruitment, training and safety efforts

- Support early in-person voting and vote by mail

---

spent significant portions of their CTCL grants. Defendant Counties may provide the Court with further details in declarations in advance of the October 16, 2020 hearing.

Kaardal Decl., Ex. A at 4–5. Localities decide to spend funds within those broad parameters. *See* Kaardal Decl., Ex. A at 4–5, 7–8. Grants are guaranteed to any local election office that applies and are calculated using nonpartisan criteria. Ford Decl., Ex. F at 1. More than 1,100 local election administrators from around the country have applied for CTCL grants.

In Pennsylvania, as of October 5, 2020, CTCL has awarded grants to eighteen counties and the Pennsylvania Department of State. Ford Decl., Ex. F at 17–18. Eleven of these counties eighteen counties voted for Donald Trump over Hillary Clinton in the 2016 presidential election, and five did so by more than a two-to-one margin:[2]

| Counties Receiving CTCL Grants by 2016 Presidential Vote by Percentage | | |
|---|---|---|
| **County** | **Donald Trump** | **Hillary Clinton** |
| Centre | 46.32% | 48.71% |
| Chester | 43.20% | 52.71% |
| Dauphin | 46.51% | 49.44% |
| Delaware | 37.18% | 59.60% |
| Erie | 48.57% | 46.99% |
| Juniata | 79.14% | 17.42% |
| Lancaster | 57.20% | 37.78% |
| Luzerne | 58.29% | 38.86% |
| Mercer | 60.30% | 35.81% |
| Mifflin | 75.77% | 20.84% |
| Monroe | 47.86% | 48.63% |
| Montgomery | 37.44% | 58.91% |
| Northumberland | 69.43% | 26.73% |

---

[2]    Plaintiffs rely on the 2016 presidential election results to show "rates of progressive voters." *See* Compl. ¶¶ 70–73.

| Philadelphia | 15.37% | 82.53% |
|:---:|:---:|:---:|
| Pike | 61.51% | 35.46% |
| Somerset | 76.54% | 20.62% |
| Wayne | 67.63% | 29.18% |
| York | 62.40% | 33.27% |

Ford Decl., Ex. G.

### III.    CTCL awards Defendant Counties grants to address specific, pressing election administration needs.

Yet Plaintiffs have sued only three of the eighteen counties: Centre, Delaware, and Philadelphia. CTCL awarded Delaware County its grant on August 18, 2020. Ford Decl., Ex. B. Delaware County's detailed plan for spending the funds explains how it will address pressing needs in several categories: "Absentee, Vote by Mail," "Early Voting Sites & Expanded Hours Early-Voting," "Equity & Voter Outreach, Particularly to Communities of Color," "Poll Worker Recruitment, Training & Safety," and "Election Day in November 2020," with plans to provide poll workers personal protective equipment ("PPE") and nearly double the number of polling locations that were open in the primary election. *Id.* The largest expense, $607,847, is for a Blue Crest Sorter that will dramatically reduce the processing time for inbound mail. *Id.* The next largest covered expenses are $367,709 for pop-up voting centers and $308,800 for poll worker training and recruitment. *Id.*

CTCL awarded Philadelphia its grant on August 21, 2020. Kaardal Decl., Ex. C. Philadelphia's detailed plan explains how it will use grant funds to address pressing needs in four general categories: "Mail in and absentee equipment,"

7

"Satellite Election Offices and Ballot Drop-off Options," "Secure Dropboxes," and "In-person Voting at Polling Places on Election Day." *Id.* More than half the grant—$5.5 million—is for technology necessary to create an automated system to "efficiently and accurately manage" mail-in ballots so that Philadelphia can report results faster and eliminate the extensive manual counting that occurred during the June primary. *Id.* at 6–8. Other covered expenses include $250,000 for poll worker PPE and $136,548 each to set up 15 satellite offices throughout the city where voters can request and drop off mail-in ballots in person. *Id.* at 8–9.

CTCL awarded Centre County its grant on September 21, 2020. Ford Decl., Ex. C. Centre County's detailed plan explains that the funds will address pressing needs in four categories: "Absentee and Mail-In Ballot Assembly and Processing Equipment," "Early Voting Site and Ballot Drop-off Options," "Secure Ballot Drop Boxes and related needs," and "In-Person Voting at Polling Places on Election Day." *Id.* Centre County's largest expenses are $391,372.50 for absentee and mail-in ballot assembly and processing equipment, including processing equipment and personnel; and $344,850.00 for in-person voting on Election Day. *Id.*

Plainly, Defendant Counties are using the funds to benefit all county residents as opposed to just "progressive" voters. *See generally* Ford Decl., Exs. B, C; Kaardal Decl. Ex. C. In addition, nothing in the grants limits counties' state-law

8

authority to control their own election procedures under 25 Pa. Stat. § 2642. As Philadelphia's award letter makes clear, CTCL does not purport "to limit in any way the independent decision-making rights, ability, and obligations of the Philadelphia County Board of Elections." Kaardal Decl., Ex. C at 2–3.

## IV. Plaintiffs seek a temporary restraining order to prevent Defendant Counties from accepting and using CTCL grants on the eve of the election.

Plaintiffs filed their Complaint on September 25, 2020. Plaintiffs are 14 individual "eligible Pennsylvania voter[s]" in Defendant Counties and elsewhere who each "oppose[] the election of progressive candidates" in state and federal elections, Compl. ¶¶ 5–18, as well as an advocacy organization, Compl. ¶ 4. Plaintiffs assert that they "are injured by CTCL's private federal election grants because they are targeted to counties and cities with progressive voter patterns— resulting in more progressive voters and a greater chance that progressive candidates will win." Compl. ¶ 35.

On September 28, 2020, Plaintiffs filed a Motion for Temporary Restraining Order ("TRO"). Following a telephone conference and this Court's October 7, 2020 scheduling order, Defendant Counties timely file this Response in Opposition to the Motion.

## ARGUMENT

"Injunctive relief is an 'extraordinary remedy, which should be granted only

9

in limited circumstances.'" *T.W. by and through Waltman v. S. Columbia Area Sch. Dist.*, No. 4:20-CV-01688, 2020 WL 5751219, at *3 (M.D. Pa. Sept. 25, 2020) (quoting *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 112 (3d Cir. 1988)). "The standards for a [TRO] are the same as those for a preliminary injunction." *Id.* at *3 n.30 (internal quotation marks omitted) (quoting *Bieros v. Nicola*, 857 F. Supp. 445, 446 (E.D. Pa. 1994)). "A movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: it must demonstrate that it can win on the merits . . . and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors," balance of equities and public interest, "and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.*

An order requiring a defendant to take affirmative action is considered a mandatory injunction. *URL Pharma, Inc. v. Reckitt Benckiser Inc.*, No. 15-0505, 2016 WL 1592695, at *3 (E.D. Pa. Apr. 20, 2016). Because of their highly compulsory nature, mandatory injunctions are "looked upon disfavorably [by courts] and are generally only granted in compelling circumstances." *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F. Supp. 159, 166 (D.N.J. 1988).

10

Accordingly, "the burden of showing an entitlement to relief is greater" when a movant seeks a mandatory, rather than a prohibitory, injunction. *Sanofi-Aventis U.S. LLC v. Novo Nordisk, Inc.*, No. 06-1369, 2006 WL 8457950, at \*7 (D.N.J. June 23, 2006). Plaintiffs seek a mandatory injunction because they seek to change the status quo by asking Defendant Counties to un-accept the grants they have already accepted. As explained below, Plaintiffs cannot clear the high bar required for a TRO, let alone a mandatory injunction.

## I.   Plaintiffs are not likely to succeed on the merits.

Plaintiffs cannot show a likelihood of success on the merits for three independently dispositive reasons: (1) Plaintiffs lack standing; (2) neither the Supremacy Clause nor the Help America Vote Act ("HAVA") create a private right of action; and (3) Plaintiffs are unlikely to succeed on their argument that the Supremacy Clause, the Elections Clause, HAVA, or the National Voter Registration Act ("NVRA") preempt Defendant Counties' acceptance of CTCL's grants. Each of these reasons on its own is sufficient to deny Plaintiffs' request for a TRO.

### A.   Plaintiffs lack standing to seek relief on their claim.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complaint of,' and (3) a 'likelihood' that the injury 'will be redressed by a

11

favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014). "[A]n injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Future injury is sufficient only "if the threatened injury is 'certainly impending,' or there is a 'substantial risk that the harm will occur.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 n.5 (2013)). Further harm that is speculative or merely "possible" does not suffice. *Clapper*, 568 U.S. at 409.

The plaintiffs here are: (1) 14 individual "eligible Pennsylvania voter[s]" who "oppose[] the election of progressive candidates," Compl. ¶¶ 5–18, along with (2) the Pennsylvania Voters Alliance ("PVA"), an unincorporated association that allegedly aims to promote compliance with Pennsylvania election laws and processes, Compl. ¶ 4. All plaintiffs assert the same injury, alleging that CTCL grants are "skewed toward progressive voters injuring the plaintiffs because close elections will be lost by plaintiffs' favored non-progressive candidates." TRO at 11; *see also id.* at 19 ("a greater chance that progressive candidates will win"); Compl. ¶ 35 (same).

This alleged injury is insufficient to confer Article III standing because: (1) it is not concrete and particularized; (2) it is a future harm that is too speculative to constitute injury-in-fact; and (3) it is neither causally linked to the conduct they

12

challenge nor redressable by the relief they seek from Defendant Counties.

### 1. Plaintiffs' purported injury is a "generalized grievance" that does not constitute Article III injury-in-fact.

First, any harm to Plaintiffs' alleged interest in seeing "non-progressive" ideals prevail at the ballot box is too abstract and generalized to satisfy the injury-in-fact requirement. TRO at 11. Federal courts "refus[e] to serve as a forum for generalized grievances" that do not reflect a personal stake in the resolution of the issues sought to be adjudicated. *Lance v. Coffman*, 459 U.S. 437, 439 (2007) (per curiam). When "[t]he only injury plaintiffs allege is that the law . . . has not been followed," that is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [federal courts] have refused to countenance." *Id.* at 442. The same is true when a harm is "abstract and widely shared" by all citizens of a state or country. *Berg v. Obama*, 574 F. Supp. 2d 509, 518 (E.D. Pa. 2009).

Under this standard, Plaintiffs lack standing because they have asserted only an "abstract interest in the policies adopted" after an election, and that interest does not satisfy the injury-in-fact requirement. *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). None of Plaintiffs has even attempted to show that they would suffer harm in a "personal and individual way." *Id.* at 1929. The individual plaintiffs claim only an "abstract" interest in certain electoral outcomes, but that interest is "widely shared" with their fellow citizens throughout Pennsylvania and the country. *Berg*,

574 F. Supp. 2d at 518. And the PVA has not identified any concrete harm to the organization itself that is "more than simply a setback to the organization's abstract societal interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).[3] Crediting these bases for standing would impermissibly "transform [this Court] into no more than a vehicle for the vindication of the value interests of concerned bystanders." *Allen v. Wright*, 468 U.S. 737, 756 (1984).[4]

---

[3] The PVA must show that it has suffered some injury that gives it standing "in its own right" because it could only sue on behalf of its members if those members would have standing in their own right. *Warth v. Seldin*, 422 U.S. 490, 511 (1975); *see Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 279 (3d Cir. 2014). The PVA has not carried that burden because it has not identified any of its members, much less explained why those members would have standing. *See* Compl. ¶ 4 (alleging only that the PVA "has many members" including unspecified "candidates seeking elective office"); *see also Chamber of Commerce for Greater Phila. v. City of Phila.*, Civ. A. No. 17-1548, 2017 WL 11544778, at *4 (E.D. Pa. May 30, 2017) ("Thus, the Chamber has failed to demonstrate 'through specific facts . . . that one or more of [its] members [will] . . . be 'directly' affected'' by the Ordinance, and I therefore cannot determine whether the Chamber's members would have standing to bring this suit."). Notably, none of the individual plaintiffs are alleged to be members of the PVA, but even if they were the association would lack standing for the same reasons they do.

[4] The Complaint alleges that a number of the individual "eligible Pennsylvania voter" plaintiffs are either members of the state legislature or candidates for office. Compl. ¶¶ 5, 9–18. Neither the Complaint nor Plaintiffs' TRO briefing asserts that these plaintiffs have any distinct individual interest grounded in these facts, much less attempts to carry Plaintiffs' burden to establish that such an interest would satisfy the prerequisites of Article III standing. Any such argument would fail in any event. Individual legislators can assert "standing based on a loss of political power" only in limited circumstances that are clearly not present here. *Raines v. Byrd*, 521 U.S. 811, 821 (1997); *see id.* at 821–26; *Corman v. Torres*, 287 F. Supp. 3d 558, 568 (M.D. Pa. 2018). And even if the potential harm to any of these plaintiffs as legislators or candidates were

## **2.     Plaintiffs' purported injury is speculative and attenuated.**

Second, Plaintiffs have not established that Defendants' acceptance of private funding is sufficiently likely to cause their asserted injury. Their theory is that "close elections will be lost" on November 3 by unspecified "non-progressive candidates" because Defendant Counties accepted these funds. TRO at 11. But that theory "relies on a highly attenuated chain of possibilities" and thus "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410; *see also Susan B. Anthony List*, 573 U.S. at 158 (quoting *Lujan*, 504 U.S. at 560) (asserted future harm must be "'actual or imminent, not conjectural or hypothetical'").

In their futile attempt to connect CTCL grants to predicted future victories by progressive candidates that would not otherwise occur, Plaintiffs rely on a chain of speculative and unsupported inferences about the effect of the grants—while ignoring the fifteen other counties in Pennsylvania that were awarded grants, including several counties that voted for Donald Trump over Hillary Clinton by more than two-to-one. Among other things, Plaintiffs presuppose without evidence or explanation:

- • That Defendant Counties would not have found a way to undertake the

---

sufficiently personal to them, that harm would remain far too speculative and attenuated to constitute injury-in-fact. *See infra* Section I.A.2. It would also remain unredressable by the relief Plaintiffs seek. *See infra* Section I.A.3.

15

same measures to facilitate safe and efficient voting options for their residents absent CTCL funding;

- That these safe and efficient voting measures will induce some residents to vote who otherwise would not have intended to do so, rather than simply providing those who intend to vote safer and more efficient means of doing so during the pandemic;

- That the expanded electorate in these counties will include more voters for unidentified "progressive" candidates, even though Defendant Counties are using the funds for the benefit *all* county residents;

- That voting patterns in the upcoming election will mirror voting patterns in the 2016 elections, despite different candidates running and different issues having prominence;

- That whatever changes occur in the electorate in Defendant Counties will not be mirrored or counteracted by changes in the electorate in other counties; and

- That *any* of these changes will have a significant enough impact to affect the outcome of any particular election.

Plaintiffs must prove each inference to show Article III injury, yet they have not submitted evidence to establish that *any* of these inferences is likely. To the contrary, their theory relies on uncorroborated and non-intuitive inferences about the behavior of third parties (including election administrators and countless individual voters throughout Pennsylvania), as well as how that behavior would influence future election results. Plaintiffs thus fail to meet the standard that their "threatened injury must be certainly impending to constitute injury in fact." *Clapper*, 568 U.S. at 410.

### 3. Plaintiffs' purported injury is not redressable by the relief they seek.

Still a third reason Plaintiffs lack standing is that their purported injury is not redressable by the relief they seek, an injunction against these three Defendant Counties to prevent them from continuing to spend CTCL grants. As an initial matter, Plaintiffs' theory of harm that CTCL grants favor "progressive" jurisdictions is demonstrably false: CTCL makes grants available on a nonpartisan basis to any local jurisdiction that seeks them. *See* Ford Decl., Ex. F at 1, 17–18 (diverse group of 18 Pennsylvania counties have sought grants, and more than 1,100 nationwide). But even if Plaintiffs' allegation were true, the imbalance they allege could arise only because other counties with less "progressive" electorates did not apply for grants (though they actually did), or because CTCL does not issue them to such counties (though it actually does). An injunction here would not affect those conditions. Therefore, any purported injury to Plaintiffs is attributable to "the independent action of" other "third part[ies] not before the court." *See Allen*, 468 U.S. at 758. As a result, a TRO to prevent Defendant Counties, and only Defendant Counties, from using CTCL grant money cannot redress the imbalance asserted by Plaintiffs. That mismatch between the relief sought and the harm alleged is particularly clear in Pennsylvania, where CTCL has also awarded grants to Pennsylvania counties that voted for Donald Trump in 2016 by wide margins.

For the foregoing reasons, Plaintiffs lack standing to pursue this Complaint

and the Court should deny a TRO on this ground alone.

### B.    Plaintiffs have identified no viable private cause of action.

A second dispositive basis to deny a TRO is the absence of a cause of action. Plaintiffs claim that Defendant Counties are preempted from accepting CTCL grants based on congressional silence through the interaction of two constitutional clauses and two statutes: the Elections Clause, U.S. Const. art. I, § 4; the Supremacy Clause, U.S. Const. art. VI, cl. 2; the Help America Vote Act, 52 U.S.C. §§ 20901–21145 ("HAVA"); and the National Voter Registration Act, 52 U.S.C. §§ 20501–11 ("NVRA"). Plaintiffs lack a cause of action and therefore are not likely to succeed on the merits of any of their claims.

### 1.    The Supremacy Clause does not provide a cause of action.

Plaintiffs cannot make out a claim based on the Supremacy Clause alone because it "certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 325 (2015). It is black-letter law that the Supremacy Clause "is not the source of any federal rights" and "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 324–25. Accordingly, the Supremacy Clause does not create the needed cause of action.[5]

---

[5]    Although Plaintiffs also claim that CTCL's grants are preempted by another constitutional provision, the Elections Clause, TRO at 15, Plaintiffs do not assert a

## **2. HAVA does not provide a private cause of action.**

Under controlling Supreme Court precedent, Plaintiffs cannot find their necessary cause of action in HAVA. TRO at 10–11. *Brunner v. Ohio Republican Party* is directly on point. 555 U.S. 5 (2008) (per curiam). There, the Supreme Court reversed a TRO granted to a private plaintiff because "regardless of whether HAVA [was] being properly implemented," the plaintiffs were "not sufficiently likely to prevail on the question whether Congress has authorized [a federal court] to enforce [the relevant HAVA provision] in an action brought by a private litigant." *Id.* at 6.

*Brunner* follows from the well-established principle that federal courts generally do not imply private causes of action, particularly when the statute at issue contains an "express provision [for] one method of enforcing a substantive rule," which "suggests that Congress intended to preclude others," including private rights of action. *Alexander v. Sandoval*, 532 U.S. 276, 290 (2001). HAVA provides two such express remedial schemes: first, it authorizes the Attorney General to bring suits to enforce the statute, 52 U.S.C. § 21111; and second, it requires states that receive funds to establish administrative complaint procedures, 52 U.S.C. § 21112.

---

cause of action under that Clause; they instead rely on their (incorrect) assertion that the Supremacy Clause provides them a cause of action, *id.* at 9–10.

19

Accordingly, the Third Circuit has held that "HAVA does not include a private right of action that allows aggrieved parties to sue nonconforming states." *Am. Civil Rights Union v. Phila. City Comm'rs*, 872 F.3d 175, 181 (3d Cir. 2017); *see also Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019) ("Congress established only two HAVA enforcement mechanisms: (1) a civil action brought by the Attorney General, and (2) a state-based administrative complaint procedure. 52 U.S.C. §§ 21111, 21112."); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 572 (6th Cir. 2004) ("HAVA does not itself create a private right of action.").

Plaintiffs seek to avoid the preclusive force of these precedents by citing HAVA's administrative remedy provision, which requires states to provide an "appropriate remedy" to "any person who believes that there is a violation of any provision of subchapter III (including a violation which has occurred, is occurring, or is about to occur)." TRO at 10 (quoting 52 U.S.C. § 21112). Without citing any authority, Plaintiffs then claim that Pennsylvania state law fails to satisfy this obligation because it lacks a mechanism for "pre-election injunctive relief." *Id.* But even if Pennsylvania's state administrative procedures were inadequate under HAVA (and they are not), that would not somehow create a private right of action under HAVA for two reasons. First, Plaintiffs' argument directly contradicts *Sandoval*: a provision expressly identifying state administrative procedures as the

20

remedy for a statutory violation cannot create a separate private right of action by implication. *See* 532 U.S at 290 (where a statute makes "express provision [for] one method of enforcing a substantive rule . . . Congress intended to preclude others."). And second, Plaintiffs' argument ignores the availability of a second, independent means of enforcing HAVA—namely, a civil action brought by the Attorney General. *See* 52 U.S.C. § 21112. This second express remedy likewise precludes implication of a private cause of action. *See Bellitto*, 935 F.3d at 1202 (citing 52 U.S.C. §§ 21111, 21112).

In sum, Plaintiffs cannot overcome the binding precedents foreclosing the availability of a private cause of action under HAVA. [6]

---

[6]   Plaintiffs argue that the NVRA preempts CTCL's grants, TRO at 17–18, though they do not actually claim to have a cause of action under the NVRA, *id.* at 9–11. Even if they did assert a cause of action under the NVRA, they failed to satisfy its exhaustion requirement. Plaintiffs filed their Complaint on September 25, 2020—thirty-nine days before the November 3, 2020 election—complaining of grants received by Defendant Counties well in advance of the filing of the Complaint. Taking Defendant Counties' grant award dates (August 18, August 21, and September 21), Plaintiffs were required to file a notice with and allow Pennsylvania's chief election official twenty days to correct the alleged violation before they could file an action in federal court. 52 U.S.C. § 20510(b)(2). The Complaint does not contain any allegations that Plaintiffs attempted to do so. This Court has held that the failure to serve notice is fatal to a claim under the NVRA and requires dismissal. *Pub. Interest Legal Found. v. Boockvar*, 370 F. Supp. 3d 449, 457 (M.D. Pa. 2019).

### C.    Plaintiffs are unlikely to succeed on the merits of their claim.

Even if Plaintiffs could somehow establish standing and a private cause of action, a TRO should still be denied because they cannot show a likelihood of success on the merits of any of their claims. Notably, Plaintiffs never identify any language prohibiting Defendant Counties from accepting private grants for election administration. In a virtually identical claim, another federal court recently denied a TRO, holding that Plaintiffs "have not demonstrated a strong likelihood of success on the merits" because "no such explicit prohibition exists." Ford Decl., Ex. H at 2 ("But Plaintiffs never identify language in any of those laws that explicitly prohibits cities from accepting private grants to administer elections. On the Court's review, no such explicit prohibition exists.").

Plaintiffs contend that Defendant Counties cannot lawfully accept election-administration grant funds from a private source because those grants are "preempted" under various constitutional provisions and federal laws. *See* TRO at 12–18. Plaintiffs appear to proceed on a theory of "conflict preemption." *See id.* But "conflict preemption" occurs only when "compliance with both laws is impossible" or when the "state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (internal quotation marks omitted). As we explain below, neither circumstance exists here.

### 1. The Elections Clause and the Supremacy Clause do not preempt the CTCL grants at issue in this case.

Plaintiffs passingly assert that the Elections Clause and the Supremacy Clause preempt CTCL's grants to Defendant Counties. TRO at 15. But neither the Elections Clause nor the Supremacy Clause has anything to do with this case.

It is inconceivable that the Supremacy Clause applies of its own force here because, as noted above, the Supremacy Clause "is not the source of any federal rights" and "is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong*, 575 U.S. at 324–25.

Nor does the Elections Clause have preemptive effect here. That Clause provides that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof;

but the Congress may at any time by Law make or alter such Regulations, except as to the places of chusing Senators." *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 7–8 (2013) (quoting U.S. Const. art. I, § 4). Its focus is the balance of authority between states and Congress in regulating federal elections, *see id.* at 8, and it says nothing about how local governments fund federal elections.

Indeed, CTCL's grants have no bearing on the time, place, and manner of the November 3, 2020 election, and Plaintiffs do not allege otherwise. Nor could they. The time and place are fixed, and how Defendant Counties choose to pay for election administration systems is not a "manner" subject to the Elections Clause, and therefore could not possibly make compliance with the Elections Clause impossible or defeat the operation of the Clause. *See Farina*, 625 F.3d at 115; s*ee also Cook v. Gralike*, 531 U.S. 510, 523–24 (2001) ("manner" "encompasses" substantive "matters like 'notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns,'" not the funding thereof) (citation omitted).

Notably, Plaintiffs cite no case holding that the Elections Clause preempts an election administrator's source of funding. Instead, they appear to argue that federal elections must be *exclusively* funded by federal and state governments and that "private federal election grants are not legally authorized by federal law nor

24

state law." TRO at 15. But that is not how conflict preemption works. The question is not whether federal or state law affirmatively authorizes CTCL's grants, but rather whether federal law expressly prohibits those grants (*e.g.*, by creating conflict preemption). As explained above, they do not. And contrary to Plaintiffs' assertions, Pennsylvania law places the burden of funding primaries and elections on *counties*—not on federal or state sources. 25 Pa. Stat. § 2645(a) ("The county commissioners or other appropriating authorities of the county shall appropriate annually, and from time to time, to the county board of elections of such county, the funds that shall be necessary for the maintenance and operation of the board and for the conduct of primaries and elections in such county . . . ."). In other words, Defendant Counties are expected to pay for the activities and resources required to conduct elections beyond whatever federal or state funding they may receive. Plaintiffs have not shown any likelihood of success on their argument that, in obtaining that funding partly through nonpartisan private grants, Defendant Counties have violated the federal Constitution.[7]

---

[7]     Plaintiffs' invocation of *U.S. Term Limits, Inc. v. Thornton*, TRO at 15, is wholly inapposite. *U.S. Term Limits* recognizes that states may not "dictate electoral outcomes, . . . favor or disfavor a class of candidates, or . . . evade important constitutional restraints." 514 U.S. 779, 833–34 (1995). Plaintiffs do not even attempt to explain how private funds to supplement election administration activities—afforded to jurisdictions of all political and partisan stripes throughout Pennsylvania and used to support safer, more efficient voting by all voters within

### 2. HAVA does not preempt the CTCL grants at issue in this case.

Plaintiffs are also unlikely to succeed in establishing that acceptance of private grants is prohibited by HAVA under "conflict-preemption" principles. TRO at 14, 16–17. Nothing about Defendant Counties' acceptance of CTCL's grants renders HAVA compliance impossible, or stands as "an obstacle to the accomplishment and execution of the full purposes and objectives" of HAVA. *See Farina*, 625 F.3d at 115.

First, nothing in HAVA makes it "impossible" for Defendant Counties to accept private grant money while complying with HAVA. *Id.* Not only do Plaintiffs fail to identify a *single* provision of HAVA that would give rise to such impossibility, but Plaintiffs also *ignore* that HAVA specifically contemplates that states will receive funding from other sources: HAVA includes a recordkeeping requirement to "fully disclose the amount and disposition . . . of funds, the total cost of the project or undertaking for which such funds are used, and the amount of that portion of the cost of the project or undertaking *supplied by other sources*." 52 U.S.C. § 21142(a) (emphasis added).

Second, accepting private grant money promotes—not impedes—full accomplishment of HAVA's purposes. HAVA is principally "concerned with

---

each jurisdiction—run afoul of any of those requirements or relate in any way to their Elections Clause claim.

updating election technologies and other election-day issues at polling places."
*Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 211 (3d Cir. 2012); *Gonzalez v. Arizona*, 677 F.3d 383, 402 (9th Cir. 2012) (same). Those purposes are *furthered* by Defendant Counties' acceptance of CTCL's grant funding, which "help[s] ensure [local governments] have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted." Kaardal Decl., Ex. A at 1.

Given this harmony between Defendant Counties' actions and HAVA's text and purpose, it is unsurprising that Plaintiffs fail in each of their attempts to manufacture a conflict.

For starters, Plaintiffs claim that HAVA "does not legally authorize local governments to accept private federal election grants." TRO at 16. But even if true, the absence of express authorization in HAVA cannot support federal conflict preemption as a matter of law. *Florida State Conference of N.A.A.C.P. v. Browning* is on point: in that case, the Eleventh Circuit rejected a similar argument from "negative implication," holding that Florida's voter registration statute—which conditioned registration on a new "matching" verification requirement—was not preempted by HAVA section 303(a), which governs state voter registration databases. 522 F.3d 1153, 1168 (11th Cir. 2008). As *Browning* emphasized, just because HAVA may not have "prescribe[d] matching as a federal precondition for

27

voter registration," that does not mean that HAVA thereby impliedly "prohibit[s] states from implementing [matching]." *Id.*

In other words—and as explained above—there is a difference between affirmative authorization and conflict preemption. The question here is not whether federal law expressly authorizes receipt of grants to fund election administration; it is whether the receipt of such grants affirmatively offends or defeats federal law. Because HAVA is simply silent on the matter at hand, "there is no conflict of laws," and "the [counties' actions] cannot be preempted." *Am. Civil Rights Union v. Phila. City Comm'rs*, Civ. A. No. 16-1507, 2016 WL 4721118, at \*10 (E.D. Pa. Sept. 9, 2016), *aff'd*, 872 F.3d 175 (3d Cir. 2017) ("*ACRU*"). In *ACRU*, the plaintiffs argued that the NVRA, "taken together" with HAVA, preempted Pennsylvania law to the extent state law did not require "remov[ing] incarcerated felons from voter registration rolls." *Id.* at \*3, \*10. Rejecting this contention, "the Court . . . thoroughly reviewed each potentially applicable section of both the NVRA and HAVA, and . . . found no such requirement" to remove incarcerated persons, and therefore held "[t]here can be no conflict preemption." *Id.* at \*10. Similarly, here, because there is no *requirement* in HAVA that municipalities refrain from accepting private grants, there is no conflict between HAVA and Defendant Counties' actions. Therefore, there "can be no preemption." *Id.*

Plaintiffs' citation to HAVA's creation of the Election Assistance

28

Commission ("EAC") also fails to support a finding of conflict preemption. Plaintiffs cite no authority for the proposition that private grants somehow "circumvent the EAC." TRO at 17. The "state plan" requirements under HAVA pertain only to states' use of supplementary payments provided under the statute and do not confer any sort of comprehensive binding authority upon the federal government, or the EAC, over state and local governments' own spending plans and election administration budgets or funding streams. Because nothing in the HAVA provisions setting forth the conditions for receipt of funds or the required contents of the state plans submitted to EAC, *see* 52 U.S.C. §§ 21003, 21004, prohibits election administrators from deciding how to fund election systems, Plaintiffs' preemption argument fails.[8] *Cf. Browning*, 522 F.3d at 1172 ("[O]n issues relating . . . not specifically addressed by HAVA, Congress essentially

---

[8]     To the extent Plaintiffs imply that acceptance of CTCL's private grants somehow undermines the bipartisan mission of the EAC because the voters in these counties may lean progressive, TRO at 17 ("Under HAVA, the EAC is to be bi-partisan and work with all the states in a bipartisan way."), that argument is baseless for two reasons. *First*, CTCL's funds are available to all municipalities that meet the same nonpartisan requirements. *See* Kaardal Decl., Ex. A at 5 ("If your U.S. election office is responsible for administering election activities covered by the grant, you're eligible to apply for grant funds."). Plaintiffs have not offered any evidence to the contrary. *Second*, any election administrator's acceptance and use of CTCL funds would not undermine, or in any way impact, the bipartisan make-up or mission of the EAC, regardless of whether Plaintiffs label that city "progressive" or not. The AC would continue to operate in the same bipartisan manner whether or not a particular municipality happens to accept CTCL funding.

29

punted to the states.").

Nor does the use of grants to fund *enhancements* to local election systems conflict with HAVA, even if such improvements exceed the "minimum requirements" in HAVA, *see Browning*, 522 F.3d at 1172, or any "federally-approved and state-approved election administration plans and budgets," TRO at 17. In other words, HAVA's national standards for election technology and administration set a *floor*, not a *ceiling*. Defendant Counties' actions do not conflict with HAVA when they fund improvements to local election administration above the bare minimum.

Having failed to demonstrate a likelihood that CLTC's grants render HAVA compliance impossible, Plaintiffs likewise fail to demonstrate that these grants would likely pose an obstacle to accomplishing any of HAVA's purposes. As an initial matter, Plaintiffs theory, unsupported by any citation, that HAVA's core purpose is federal-state coordination stands in marked contrast to the Third Circuit's articulation of HAVA's *actual* statutory purposes. *Compare* TRO at 16 ("HAVA's purpose was to coordinate federal and state administration of federal elections."), *with Democratic Nat'l Comm.*, 673 F.3d at 211 (explaining that HAVA was concerned with "updating election technologies and other election-day issues at polling places"). In any event, Plaintiffs do not explain how a municipality's acceptance of a private grant is an obstacle—or even marginally

30

relevant—to any federal-state coordination objective. To the contrary, as explained above, proactive steps by election administrators to enhance funding for election administration improvements do not interfere or conflict with implementation of any "minimum" federal standards under HAVA. *See Crowley v. Nevada ex rel. Nev. Sec'y of State*, 678 F.3d 730, 734 (9th Cir. 2012) (emphasis added) (HAVA "establishes minimum election administration standards for States and *units of local government* with responsibility for the administration of Federal elections.") (quoting Help America Vote Act of 2002, P.L. 107-252, Oct. 29, 2002, 116 Stat. 1666). Defendant Counties' acceptance of CTCL's grants in an effort to improve local election administration leaves federal-state relations untouched.

HAVA simply does not preempt state election law unless such compliance with such state laws renders simultaneous compliance physically impossible, or the state law "impedes HAVA's objectives." *Browning*, 522 F.3d at 1171. And because there is no such "conflict of laws" here, the municipalities' actions cannot be preempted. *ACRU*, 2016 WL 4721118, at \*10. That principle also demonstrates why the handful of authorities Plaintiffs do cite are inapposite: Those cases found conflict preemption under HAVA only because the relevant laws "directly conflict[ed] with [HAVA]." *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d

1264, 1269 (W.D. Wash. 2006)[9]; *see also Kuznik v. Westmoreland County Bd. of Comm'rs*, 902 A.2d 476, 479–80 (Pa. 2006) (holding that state law requiring referendum before purchase of replacement of lever voting machines was preempted by HAVA's express requirement "to *replace* lever machines with [electronic voting systems]"); *Colo. Common Cause v. Davidson*, No. 04CV7709, 2004 WL 2360485, at *11–12 (Colo. Dist. Ct. Oct. 18, 2004) (finding conflict preemption likely where HAVA's purpose to "insure that registered and eligible voters are allowed to vote provisionally, even though their names do not appear on polling place voting rolls" conflicted with a state law "categorically preclud[ing] provisional ballots from being counted if the voter had requested an absentee ballot"). These cases have no application here because the grants do not conflict with HAVA.

Plaintiffs have not met their burden to establish that HAVA likely preempts acceptance of CTCL's grants.

---

[9]     *Reed*, which enjoined Washington State's "matching statute" requiring the state to match a potential voter's name to a database before allowing that person to register to vote, is in tension with *Browning*'s approval of Florida's matching statute. But even under *Reed*, there can be no preemption here. Unlike the plaintiffs in *Reed*, Plaintiffs here do not point to any specific provision of HAVA that *directly* conflicts with Defendant Counties' acceptance of CTCL grants. *Compare Reed*, 492 F. Supp. 2d at 1269 (holding Washington's matching statute likely conflicts with three specific provisions of HAVA), *with ACRU*, 2016 WL 4721118, at *10 (Because "the Court has thoroughly reviewed each potentially applicable section of . . . HAVA" and found no conflict, "Pennsylvania law cannot be preempted.").

### 3. The NVRA does not preempt the CTCL grants at issue in this case.

Plaintiffs claim that the NVRA "preempts CTCL's private federal election grants." TRO at 17. But once again, they articulate no reason that Defendant Counties' acceptance of CTCL's grants would make compliance with the NVRA impossible or defeat the operation of the statute. *See Farina*, 625 F.3d at 115. The NVRA provision Plaintiffs cite, *see* TRO at 17 (quoting 52 U.S.C. § 20503), says nothing about funding local election administration. It merely explains that the NVRA creates "national procedures for voter registration for elections for Federal office." *Id.* The rest of the NVRA does not address election funding either. *See* 52 U.S.C. §§ 20501–11. And nothing about the facts alleged here conflict with any existing procedures for voter registration. If anything, given that the NVRA's stated purposes include "mak[ing] it possible for Federal, State, and local governments" to "enhance the participation of eligible citizens as voters in elections for Federal office," *see* 52 U.S.C. § 20501(b)(2), the NVRA's purposes are furthered (not defeated) by local election grants.

Plaintiffs then cite HAVA—not the NVRA—which leaves "the specific choices on the methods of complying with the requirements of this subchapter . . . to the discretion of the State." TRO at 18 (quoting 52 U.S.C. § 21085). That provision plainly does not "preempt[] the actions of local governments in accepting the CTCL's private federal election grant," TRO at 18—because it does not

concern local funding of election administration. And, as described above, Pennsylvania has exercised its discretion under HAVA to require counties, not federal or state government, to fund primary and elections, underscoring that CTCL's grants here are no obstacle to Congress's purposes. *See* 25 Pa. Stat. § 2645(a). Plaintiffs' argument that the NVRA preempts Defendant Counties' acceptance of CTCL's grants is therefore unlikely to succeed on the merits.

### 4. There is no general constitutional prohibition on public-private partnerships in local election funding.

As a fallback, Plaintiffs manufacture a novel theory of constitutional law, asserting (without reference to any specific constitutional text) that public-private partnerships in local election administration are inherently repugnant to the Constitution. TRO at 12–14. This theory is baseless, and the cases Plaintiffs cite have nothing to do with local election funding.

*Young v. Red Clay School District*, for example, does not support the idea that Defendant Counties' receipt of private funds violates the Constitution; indeed, that case involves neither a public-private funding agreement nor a federal election. 122 A.3d 784 (Del. Ch. 2015). Instead, *Young* addressed a school district's "selective get-out-the-vote efforts," which "diminished the voting rights of one portion of the electorate and enhanced the voting rights of another portion of the electorate" by encouraging residents likely to favor the district's voting preferences (parents with children) while simultaneously discouraging voting by

34

those considered likely to oppose the district's preferences (elderly and disabled residents). *See id.* at 837, 859. But Plaintiffs allege nothing of the sort here, much less do they provide any evidence of selective get-out-the-vote efforts. And CTCL grant eligibility is determined on an objective, nonpartisan basis. *See* Kaardal Decl., Ex. A at 5. Defendant Counties are accordingly just three of the eighteen counties in Pennsylvania that have received funding from CTCL at this point, and plenty of the recipient counties do *not* lean "progressive." There is simply no evidence whatsoever that the grants offered by CTCL have been provided, accepted, used, or otherwise implemented in any partisan manner.

The three remaining cases that Plaintiffs cite in support of their public-private partnership theory are even further afield—and like *Young*, none addresses either a public-private partnership or election funding. *Kiryas Joel* concerned a violation of the Establishment Clause, and *Ferguson* concerns a violation of the Fourth Amendment—neither bears any relevance whatsoever to this case. *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 690 (1994); *Ferguson v. City of Charleston*, 532 U.S. 67 (2001).

Last, Plaintiffs cite a Pennsylvania Commonwealth Court decision in which a candidate misrepresented himself to voters on his nomination papers and was removed from the ballot under state law. *See In re Nomination Papers of Carlson*, 430 A.2d 1210, 1212 (Pa. Commw. Ct. 1981). *Carlson*, too, is wholly inapposite to

this case, where there are neither allegations nor evidence of any fraudulent conduct by a candidate for office or anyone else.

In sum, even if Plaintiffs had both Article III standing and a cause of action to pursue their claims (which they do not), no precedent or constitutional provision supports Plaintiffs' theory that private grants are statutorily or constitutionally impermissible.

## II. Plaintiffs cannot show a likelihood of irreparable harm or that the balance of the equities or the public interest favor a temporary restraining order.

### A. Plaintiffs' alleged harm is too speculative to be irreparable.

Plaintiffs cannot show irreparable harm for the same reasons that they do not have standing. Considering the allegations in the Complaint and the evidence (or lack thereof) before the Court, the only alleged harm asserted by Plaintiffs—that CTCL grants will lead to more progressive votes and more progressive candidates elected—is too speculative to constitute irreparable harm. *Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (refusing to grant a preliminary injunction because alleged harm that manual recounts would result in the victory of plaintiffs' opposing candidate was "wholly speculative"); *Republican Party of Pa. v. Cortés*, 218 F. Supp. 3d 396, 410 (E.D. Pa. 2016) ("Plaintiffs also assert that denying an injunction 'could have a determinative effect on the election.' This highly speculative concern is insufficient to warrant the extraordinary remedy of a

36

preliminary injunction.") (citations omitted); *SAM Party v. Kosinski*, No. 20 Civ. 323, 2020 WL 5359640, at \*9 (S.D.N.Y. Sept. 1, 2020) ("The WFP plaintiffs' primary theory for irreparable harm seems to be concern that they will fail to secure enough votes in the November election to maintain party status. Such an injury is too speculative to warrant a preliminary injunction and is not 'irreparable' without relief granted at this time. It is far from certain that the WFP will fail to achieve the required number of votes. But, even if the WFP did fail to meet that threshold, the WFP could pursue relief at that time."). As the U.S. District Court for the Western District of Michigan recently distinguished, "Plaintiffs allege that they will be harmed on November 3, 2020 if their chosen candidates do not prevail, but they do not allege that there is any ongoing use of the grants that causes them immediate, irreparable harm." Ford Decl., Ex. H at 2. Plaintiffs' alleged harm is simply too speculative.

Plaintiffs' claim that denial of their right to vote or participate in the election is an irreparable injury, TRO at 18–19, is baseless. They have not argued or shown that their personal right to vote will be infringed. The truth is that the additional resources for safe and efficient voting provided by CTCL grants will improve *all* residents' ability to safely participate in the election—including that of Plaintiffs who live in Defendant Counties. The irreparable harm requirement thus weighs strongly in favor of Defendant Counties and against a temporary restraining order.

**B.    The balance of equities weighs against granting emergency relief to Plaintiffs who showed no diligence in seeking to protect their asserted interests.**

Plaintiffs' delay in filing this suit undercuts any claim that the balance of the equities weighs in their favor. As discussed above, CTCL awarded grants to Delaware County on August 18, 2020, Ex. B, and to Philadelphia on August 21, 2020, Compl. Ex. C. Plaintiffs did not file their Complaint until September 25, 2020—over a month later. It was entirely foreseeable that the grants would be relied upon, spent, committed, and otherwise operationalized in this period of time, yet Plaintiffs did not take any steps to state their claims or protect their asserted interests.

This delay defeats their entitlement to equitable relief. *See Parker v. Dacres*, 130 U.S. 43, 50 (1889) (noting "the principle upon which courts of equity uniformly proceed, independently of any statute of limitations, of refusing relief to those who unreasonably delay to invoke their aid"). It also weakens any inference that Plaintiffs are suffering any actual, irreparable harm. *See, e.g.*, *Kobell v. Suburban Lines*, 731 F.2d 1076, 1091 n.27 (3d Cir. 1984) ("[T]he district court may legitimately think it suspicious that the party who asks to preserve the status quo through interim injunctive relief has allowed the status quo to change through unexplained delay."); *New Dana Perfumes Corp. v. Disney Store, Inc.*, 131 F. Supp. 2d 616, 618 (M.D. Pa. 2001) (plaintiff's delay in seeking injunctive relief

precluded a finding of immediate irreparable harm).

### C. The public interest does not benefit from an order restraining funds for election administration on the eve of an election.

The public interest also favors Defendant Counties, who are using the grant monies they have received to facilitate safe, secure, and efficient voting for all residents during the COVID-19 pandemic. This is a public and constitutional interest of the highest order. In contrast, Plaintiffs assert an interest in stripping funds from election administration systems based on an entirely conjectural fear that more "progressive" voters, in particular, will cast ballots if county-wide election systems are improved through use of funds provided by CTCL. Making it harder for Pennsylvanians to vote safely and securely is not in the public interest, even where a handful of residents theorize (without evidence) that doing so is in their partisan interest.

In all events, the public interest unquestionably does not weigh in favor of a temporary restraining order so close to the November 3, 2020 election. Plaintiffs ask this Court to restrain funds available for election administration while mail-in and absentee voting is *already* underway. As the Supreme Court recently reiterated, "lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020); *see also Purcell v. Gonzales*, 549 U.S. 1, 4–5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves

result in voter confusion and consequent incentive to remain way from the polls. As an election draws closer, that risk will increase."). An order restricting the use of funds so close to an election could cause disruption to election administration efforts and injure the residents of Defendant Counties.

To the extent Plaintiffs argue that addressing constitutional violations is always in the public interest, Plaintiffs have simply not proven a constitutional violation for the reasons in this brief. Their Motion for Temporary Restraining Order should therefore be denied.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Defendants Centre County, Delaware County, and the City of Philadelphia respectfully request this Court deny Plaintiffs' Motion for a Temporary Restraining Order.

Respectfully submitted,

 /s/ *Jerry R. DeSiderato*
Jerry R. DeSiderato (Pa. Id. No. 201097)
Timothy J. Ford (Pa. Id. No. 325290)
Claire Blewitt Ghormoz (Pa. Id. No. 320816)
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
jdesiderato@dilworthlaw.com
tford@dilworthlaw.com
cghormoz@dilworthlaw.com
Tel.: (215) 575-7000
Fax: (215) 575-7200
*Counsel for Defendant City of Philadelphia*

 /s/ *Molly Meacham*
Molly Meacham (Pa. Id. No. 318272)
**BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.**
Two Gateway Center, 9th Floor
603 Stanwix Street
Pittsburgh, PA 15222
Tel.: (412) 394-5400
mmeacham@babstcalland.com

Elizabeth A. Dupuis (Pa. Id. No. 80149)
**BABST, CALLAND, CLEMENTS AND ZOMNIR, P.C.**
330 Innovation Boulevard, Suite 302
State College, PA 16803
Tel.: (814) 867-8055
bdupuis@babstcalland.com
*Counsel for Defendant Centre County*

 /s/ *Edward D. Rogers*
Edward D. Rogers (Pa. Id. No. 69337)
Terence M. Grugan (Pa. Id. No. 307211)
Elizabeth V. Wingfield (Pa. Id. No. 324277)
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel.: (215) 665-8500
Fax: (215) 864-8999
RogersE@ballardspahr.com
GruganT@ballardspahr.com
WingfieldE@ballardspahr.com
*Counsel for Defendant Delaware County*

41