# Exhibit A



# The State and Local Role in Election Administration: Duties and Structures

March 4, 2019

**Congressional Research Service**

https://crsreports.congress.gov

R45549

**CRS REPORT**
Prepared for Members and
Committees of Congress



**Congressional Research Service**
Informing the legislative debate since 1914

SUMMARY

R45549

March 4, 2019

Karen L. Shanton
Analyst in American
National Government

# The State and Local Role in Election Administration: Duties and Structures

The administration of elections in the United States is highly decentralized. Elections are primarily administered by thousands of state and local systems rather than a single, unified national system.

States and localities share responsibility for most election administration duties. Exactly how responsibilities are assigned at the state and local levels varies both between and within states, but there are some general patterns in the distribution of duties. States typically have primary responsibility for making decisions about the rules of elections (policymaking). Localities typically have primary responsibility for conducting elections in accordance with those rules (implementation). Localities, with varying contributions from states, typically also have primary responsibility for paying for the activities and resources required to conduct elections (funding).

The structures of the state and local systems that conduct elections also vary between and within states. Common variations include differences related to the leadership of the system, the relationship between local election officials and the state, and the population size and density of the jurisdiction the system serves. The leadership of a state or local election system may be elected or appointed, and both the leaders and the methods used to select them may be partisan, bipartisan, or nonpartisan. State officials may have more or less direct influence over local election officials, and the extent of their influence may be affected by other structural features of the state's election systems, such as the methods used to select local officials. Finally, larger election jurisdictions have different administrative advantages and challenges than smaller ones, and more urban jurisdictions have different advantages and challenges than more rural ones. These differences between jurisdictions may be reflected in structural features of the election systems that serve them, such as how the systems allocate resources and where they find specialized expertise.

Understanding the duties and structures of state and local election systems may be relevant to Congress for at least two reasons. First, the way state and local election systems work can affect how well federal action on election administration serves its intended purposes. The effectiveness of federal action depends in part on how it is implemented. How it is implemented can depend, in turn, on how the state and local election systems that implement it work. Second, Congress can make or incentivize changes to the way state and local election systems work. Congress has a number of policy tools it can use to affect the administration of federal elections. The use of these tools can—either intentionally or unintentionally—affect the state and local election systems that administer federal elections.

# Contents

Introduction ........................................................................................................................................ 1

    Scope and Format of the Report ................................................................................................... 2

Distribution of State and Local Election Administration Duties ....................................................... 3

    Policymaking ............................................................................................................................... 3

    Implementation ............................................................................................................................ 7

    Funding ........................................................................................................................................ 9

Structures of State and Local Election Implementation Systems ..................................................... 11

    Leadership .................................................................................................................................. 11

    State-Local Relationship ............................................................................................................ 15

    Jurisdiction Size and Density .................................................................................................... 16

Interactions with the Federal Role in Election Administration ...................................................... 17

    Selected Effects of State and Local Duties and Structures on Federal Action ...................... 17

        Compliance with Federal Requirements ............................................................................ 18

        Timeliness and Tailoring of Federal Funding ................................................................... 18

        Timeliness of Federal Information Sharing ....................................................................... 19

    Selected Effects of Federal Action on State and Local Duties and Structures ....................... 20

Potential Considerations for Congress ........................................................................................... 20

## Tables

Table 1. States with Citizen Initiative or Popular Referendum Processes ....................................... 5

Table 2. States with Multiple Local Election Offices ...................................................................... 8

Table 3. State Contributions to the Costs of Acquiring Voting Equipment .................................... 10

Table 4. State Contributions to the Costs of Maintaining and Operating Voting Equipment ........ 10

Table 5. Titles and Selection Methods of Chief State Election Officials ....................................... 12

## Appendixes

Appendix. Selected Federal Statutes Governing State and Local Administration of
    Federal Elections ....................................................................................................................... 22

## Contacts

Author Information.......................................................................................................................... 26

# Introduction

Election administration attracted significant attention in 2000, when issues with the vote count delayed the results of the presidential race.[1] Administrative issues have also been reported in subsequent election cycles. For example, issues with voter registration were reported in multiple states in 2016 and 2018.[2]

Some responses to such reports focus on the rules of elections. The Help America Vote Act of 2002 (HAVA; P.L. 107-252; 116 Stat. 1666), for example, requires states to establish a uniform standard of what counts as a vote for each voting system they use (52 U.S.C. §21081(a)(6)), and bills have been introduced in recent Congresses to change how voter registration is handled.[3]

Other responses focus on the systems that apply election rules. In the United States, that typically means state and local systems. The administration of elections in the United States is highly decentralized. Elections are primarily administered by thousands of state and local systems rather than a single, unified national system.[4]

Understanding how those state and local systems work may be relevant to Congress for at least two reasons. First, the way state and local election systems work can affect how well federal action on election administration serves its intended purposes. Most federal action on election administration is carried out by state and local election systems. Interactions between the workings of those systems and federal actions can help determine how effective the federal actions are at achieving their objectives.

Second, Congress can require or encourage changes to the way state and local election systems work.[5] Congress has a number of tools for influencing election administration policy.[6] The use of these tools can—either intentionally or unintentionally—affect the workings of the state and local systems that administer federal elections.

This report is intended to help Congress understand how state and local election systems work and how their workings might relate to federal activity on election administration. It starts by describing the distribution of election administration duties at the state and local levels and the structures of the state and local systems that conduct elections. It then uses examples from past federal action on election administration to illustrate some of the ways the duties and structures of

---

[1] Jessica Reaves, "Counting the Lost Votes of Election 2000," *Time*, July 17, 2001, at http://content.time.com/time/nation/article/0,8599,167906,00.html; Thomas E. Mann, "Reflections on the 2000 U.S. Presidential Election," The Brookings Institution, January 1, 2001, at https://www.brookings.edu/articles/reflections-on-the-2000-u-s-presidential-election/.

[2] See, for example, Laura Vozzella, "Voter Registration System Crashes in Va., Preventing Some from Signing Up in Time," *The Washington Post*, October 18, 2016, at https://www.washingtonpost.com/local/virginia-politics/voter-registration-system-crashes-in-va-preventing-some-from-signing-up-in-time/2016/10/18/5336f1ae-9558-11e6-9b7c-57290af48a49_story.html?utm_term=.f1b3055443be; Erin Cox and Michael Dresser, "Maryland Voter Registration Snafu Affects 80,000, Four Times as Many as Initially Announced," *The Baltimore Sun*, June 25, 2018, at https://www.baltimoresun.com/news/maryland/politics/bs-md-voting-snafu-update-20180625-story.html.

[3] See, for example, H.R. 1044 and S. 360 in the 115th Congress and H.R. 1 in the 116th Congress.

[4] National Conference of State Legislatures, *Election Administration at State and Local Levels*, June 15, 2016, at http://www.ncsl.org/research/elections-and-campaigns/election-administration-at-state-and-local-levels.aspx.

[5] CRS Report RL30747, *Congressional Authority to Direct How States Administer Elections*, by Kenneth R. Thomas.

[6] For a general overview of some available policy tools, see Marie Louise Bemelmans-Videc, Ray C. Rist, and Evert Vedung, *Carrots, Sticks, and Sermons: Policy Instruments and Their Evaluation* (New York: Transaction Publishers, 1998).

state and local election systems interact with federal activity. It closes by introducing some considerations that may be relevant to Members interested in election administration.

## Scope and Format of the Report

This report focuses on the administration of federal elections in the states by executive and legislative branches of state and local government. Much of the discussion applies to nonfederal as well as federal elections, but the report is intended explicitly to address only federal elections.[7] The report also does not cover the federal role in administering federal elections, election administration in the U.S. territories, the role of law enforcement and the courts in election administration, or issues of constitutional or legal interpretation.[8]

The typical federal election process has three main parts: voter registration, vote casting, and vote counting.[9] This report focuses on those three parts of the process rather than on other aspects of campaigns and elections, such as campaign finance and redistricting.[10]

Finally, the way federal elections are administered varies between and within states. A full accounting of the variations is beyond the scope of this report. Instead, the report describes general patterns and illustrates them with examples. Examples appear in text boxes like the box below, which describes the role the text boxes play in the report in more detail.

---

### The Role of Text Boxes in the Report

Most, if not all, aspects of election administration are carried out differently in some of the thousands of election jurisdictions in the United States than in others. There are some general patterns in the variations between state and local systems, and awareness of those patterns may be relevant to Members interested in election administration. For example, awareness of typical approaches to funding election administration and common exceptions may be relevant to Members who are considering proposing federal funding for state and local election administration.

However, by their nature, general patterns are abstract. To make the discussion of the workings of state and local election systems more concrete, as well as to illustrate more fully the range of choices states and localities have made about certain aspects of election administration, the report provides examples in text boxes. As examples, these cases are jurisdiction-specific and cannot be assumed to generalize to other states or localities. Detailed information about election administration in other states and localities is available to congressional clients on request.

---

[7] Congress's authority over the administration of nonfederal elections is more limited than its authority over the administration of federal elections. For more information, see CRS Report RL30747, *Congressional Authority to Direct How States Administer Elections*, by Kenneth R. Thomas.

[8] For examples of the role of the courts in election administration, see CRS Report R44675, *Recent State Election Law Challenges: In Brief*, by L. Paige Whitaker. For more on the federal role in election administration, see CRS Report R45302, *Federal Role in U.S. Campaigns and Elections: An Overview*, by R. Sam Garrett.

[9] One exception to this general characterization of the election process is North Dakota, which does not have voter registration. North Dakota Secretary of State, *Q: How Many North Dakota Residents Are Registered to Vote?*, at https://vip.sos.nd.gov/PortalListDetails.aspx?ptlhPKID=81&ptlPKID=7; Heather K. Gerken, *The Democracy Index* (Princeton, NJ: Princeton University Press, 2009), pp. 27-28.

[10] For more information about these topics, see CRS Report R43719, *Campaign Finance: Constitutionality of Limits on Contributions and Expenditures*, by L. Paige Whitaker; CRS Report R41542, *The State of Campaign Finance Policy: Recent Developments and Issues for Congress*, by R. Sam Garrett; and CRS Report R44199, *Congressional Redistricting: Legal and Constitutional Issues*, by L. Paige Whitaker.

# Distribution of State and Local Election Administration Duties

Election administration involves making decisions about the rules of elections, such as whether voters should be able to register online, whether they should be required to show photo identification at the polls, and whether election results should be audited. It also involves conducting elections in accordance with those decisions and paying for the activities and resources required to conduct them.

These three election administration duties can be described as

- policymaking,
- implementation, and
- funding.

This section describes some common patterns in the distribution of these duties at the state and local levels.

## Policymaking

In the U.S. system, states generally play the primary decisionmaking role in election administration.[11] State legislatures, with input from their governors, can make state laws about the administration of elections and make or initiate election administration amendments to their state constitutions.[12] State laws and constitutions can also delegate or defer responsibility for decisions about the administration of elections to other state or local officials and to voters.

The U.S. Constitution also provides for a federal role with respect to decisionmaking about elections, and Congress has exercised such powers in a number of instances.[13] For more information about federal laws governing the state and local conduct of federal elections, see the **Appendix**.

**Box 1** uses examples from voter registration to illustrate a number of these approaches to policymaking. It starts with a discussion of a registration policy enacted by the federal government and then describes an adjustment to the policy made, respectively, by a state legislature on the recommendation of a state executive branch official, by state executive branch officials, and by voters.

---

**Box 1. Paths to Automatic Voter Registration**

The National Voter Registration Act (NVRA; P.L. 103-31; 107 Stat. 77) requires certain agencies, such as motor vehicle agencies and public assistance offices, to offer eligible voters opportunities to register to vote (52 U.S.C. §20504; 52 U.S.C. §20506). Traditionally, these agency-based registration opportunities have been opt-in; voters are not registered unless they indicate that they want to be.

---

[11] For further information, see, for example, CRS Report R45302, *Federal Role in U.S. Campaigns and Elections: An Overview*, by R. Sam Garrett; and CRS Report RL30747, *Congressional Authority to Direct How States Administer Elections*, by Kenneth R. Thomas.

[12] Ballotpedia, *Amending State Constitutions*, at https://ballotpedia.org/Amending_state_constitutions.

[13] CRS Report RL30747, *Congressional Authority to Direct How States Administer Elections*, by Kenneth R. Thomas.

Starting in 2015, however, some states have shifted select agencies to an opt-out, or automatic, model. Automatic voter registration uses information submitted during other interactions with an agency, such as applying for a driver's license, to register voters. Eligible voters are automatically registered unless they opt out of registration.[14]

Sixteen states and the District of Columbia had authorized automatic voter registration as of December 2018, according to the National Conference of State Legislatures.[15] Those 17 jurisdictions took a variety of paths to the policy change, including the following:

- **State Legislative Passage on the Recommendation of a State Executive Branch Official.** Oregon enacted the first automatic registration law in the nation in 2015. The bill was prefiled for the 2015 legislative session at the request of then-Oregon Secretary of State Kate Brown, and the Oregon state legislature passed it in March 2015. It was signed into law later that month by Brown, who was sworn in as governor in February 2015.[16]

- **Administrative Implementation by State Executive Branch Officials.** The Connecticut Department of Motor Vehicles and the Office of the Connecticut Secretary of State signed a memorandum of understanding in 2016 to establish automatic voter registration in state motor vehicle agencies. The memorandum referenced the offices' respective authorities to issue and renew state credentials and to coordinate the state's activities under the NVRA.[17]

- **Ballot Measure Approval by Voters.** In November 2016, Alaska voters approved a proposal to institute automatic voter registration at the state's Permanent Fund Dividend (PFD) Division.[18] The PFD is an annual dividend that is available to Alaskans who have lived in the state for at least one calendar year, intend to remain there indefinitely, and meet certain other criteria.[19]

State and local officials may be granted decisionmaking authority explicitly by a variety of constitutional provisions, laws, charters, ordinances, and regulations at multiple levels of government. They may also be left discretion over policy details that are not specified in legislative or regulatory text. For example, states may set out general guidelines for voting technology and ballot design but leave decisions about exactly which machines to buy or how to lay out ballots to local officials.[20]

---

[14] National Conference of State Legislatures, *Automatic Voter Registration*, December 3, 2018, at http://www.ncsl.org/research/elections-and-campaigns/automatic-voter-registration.aspx.

[15] National Conference of State Legislatures, *Automatic Voter Registration*.

[16] In most states, the lieutenant governor is the first in the line of gubernatorial succession. Oregon, which does not have a lieutenant governor, starts its line of succession with the secretary of state. Oregon State Legislature, *House Bill 2177*, at https://gov.oregonlive.com/bill/2015/HB2177/; Jeff Mapes, "Kate Brown Gets to Sign Her Own Bill, for Automatic Voter Registration in Oregon," *The Oregonian*, March 16, 2015, at https://www.oregonlive.com/mapes/index.ssf/2015/03/kate_brown_gets_to_sign_her_ow.html; Jeff Mapes, "Kate Brown Is Sworn In as Oregon's 38th Governor," *The Oregonian*, February 18, 2015, at https://www.oregonlive.com/mapes/index.ssf/2015/02/kate_brown_is_sworn_in_as_oreg.html; National Lieutenant Governors Association, *States' Lines of Succession of Gubernatorial Powers*, May 2011, at http://www.nlga.us/wp-content/uploads/States-Lines-of-Gubernatorial-Succession-2.pdf.

[17] Office of the Secretary of State of Connecticut, "Memorandum of Understanding Between the Office of the Secretary of State of Connecticut and the Connecticut Department of Motor Vehicles Regarding the Execution of the National Voter Registration Act of 1993," May 16, 2016, at http://www.ncsl.org/Portals/1/Documents/Elections/DMV.SOTS.pdf.

[18] Alaska Division of Elections, *An Initiative to Allow Qualified Individuals to Register to Vote When Submitting a Permanent Fund Dividend Application*, June 11, 2015, at http://www.elections.alaska.gov/petitions/15PFVR/15PFVR-Proposed-Bill-Language.pdf.

[19] Alaska Department of Revenue—Permanent Fund Dividend Division, *About Us*, at https://pfd.alaska.gov/Division-Info/About-Us; Alaska Department of Revenue—Permanent Fund Dividend Division, *Eligibility Requirements*, at https://pfd.alaska.gov/Eligibility/Requirements.

[20] Kathleen Hale, Robert Montjoy, and Mitchell Brown, *Administering Elections: How American Elections Work* (New York: Palgrave Macmillan, 2015), pp. 32-33; Jocelyn F. Benson, *State Secretaries of State: Guardians of the Democratic Process*, p. 8; U.S. Government Accountability Office, *Elections: Observations on Voting Equipment Use*

Voters have a say in election administration measures that are referred to the ballot by their state legislatures. Some states also offer citizen initiatives or popular referendums, which voters can use to propose their own state election administration statutes or state constitutional amendments or to repeal or affirm election administration laws adopted by their state legislatures.[21] **Table 1** lists the citizen initiative and popular referendum options available to voters in states that offer such mechanisms, as presented by the Initiative & Referendum Institute at the University of Southern California in January 2019.

**Table 1. States with Citizen Initiative or Popular Referendum Processes**

| State | Citizen Initiative for Statutes | Citizen Initiative for Constitutional Amendments | Popular Referendum |
|---|---|---|---|
| Alaska | X | — | X |
| Arizona | X | X | X |
| Arkansas | X | X | X |
| California | X | X | X |
| Colorado | X | X | X |
| Florida | — | X | — |
| Idaho | X | — | X |
| Illinois | — | X | — |
| Maine | X | — | X |
| Maryland | — | — | X |
| Massachusetts | X | X | X |
| Michigan | X | X | X |
| Mississippi | — | X | — |
| Missouri | X | X | X |
| Montana | X | X | X |
| Nebraska | X | X | X |
| Nevada | X | X | X |
| New Mexico | — | — | X |
| North Dakota | X | X | X |
| Ohio | X | X | X |
| Oklahoma | X | X | X |
| Oregon | X | X | X |
| South Dakota | X | X | X |
| Utah | X | — | X |
| Washington | X | — | X |
| Wyoming | X | — | X |

**Source:** Initiative & Referendum Institute at the University of Southern California, January 2019, at http://www.iandrinstitute.org/states.cfm.

**Note:** States with none of these three processes are not included in the table.

---

*and Replacement*, April 2018, pp. 8-9, at https://www.gao.gov/assets/700/692024.pdf.

[21] National Conference of State Legislatures, *Initiative, Referendum and Recall*, September 20, 2012, at http://www.ncsl.org/research/elections-and-campaigns/initiative-referendum-and-recall-overview.aspx.

**Box 2** uses examples from the November 2018 election to illustrate how states and voters have used ballot measures to make election administration policy. It describes a statewide proposal to enact automatic voter registration in Nevada that was initiated by citizens, and a statewide proposal to enact a voter ID requirement in North Carolina that was referred to the ballot by the state legislature.[22]

---

**Box 2. Statewide Election Administration Ballot Measures in Nevada and North Carolina**

Election administration measures were on the ballot in a number of states and localities in November 2018.[23] One of those measures was an automatic voter registration proposal in Nevada. As in most states, voter registration at Nevada motor vehicle agencies was opt-in as of the 2018 general election.[24] The automatic registration measure on the 2018 ballot proposed making it opt-out.[25]

Nevada offers an indirect citizen initiative process for state statutes.[26] If proponents of a change in state law collect enough signatures in favor of the change, it is sent to the Nevada state legislature for consideration. The change is enacted if the state legislature and governor approve it and sent to the ballot for voter consideration if not.[27] The 2018 automatic registration proposal was approved by the state legislature but vetoed by the governor.[28] That meant it went to the ballot, where it was approved with 60% of the vote.[29]

North Carolina voters weighed in on a voter ID proposal in November 2018. North Carolina enacted a law in 2013 requiring voters to show photo identification at the polls.[30] The law was struck down in 2016 by the U.S. Court of Appeals for the Fourth Circuit.[31]

North Carolina, like most states, permits its legislature to refer amendments to the state constitution to the ballot for voter approval.[32] The North Carolina General Assembly referred a new photo ID requirement to the November 2018 ballot as a state constitutional amendment, and it was approved by voters 55% to 45%.[33]

---

[22] For more on the election administration measures on the November 2018 ballot, see CRS Insight IN11000, *Election Policy on the November 2018 Ballot*, by Karen L. Shanton.

[23] Ballotpedia, *2018 Ballot Measures*, at https://ballotpedia.org/2018_ballot_measures; Ballotpedia, *Local Elections and Campaigns on the Ballot*, at https://ballotpedia.org/Local_elections_and_campaigns_on_the_ballot.

[24] National Conference of State Legislatures, *Automatic Voter Registration.*

[25] Nevada Secretary of State, *Statewide Ballot Questions to Appear on the November 6, 2018 General Election Ballot*, at https://www.washoecounty.us/voters/files/18_election_files/18_ballot_questions_public_book.pdf.

[26] Nevada also offers a direct initiative process for state constitutional amendments. For more information about direct and indirect initiatives, see National Conference of State Legislatures, *Initiative, Referendum, and Recall*, September 20, 2012, at http://www.ncsl.org/research/elections-and-campaigns/initiative-referendum-and-recall-overview.aspx.

[27] Nevada Constitution, Article 19, §2, clause 3; Initiative & Referendum Institute at the University of Southern California, *Comparison of Statewide Initiative Processes*, at http://www.iandrinstitute.org/docs/A_Comparison_of_Statewide_IandR_Processes.pdf.

[28] Sandra Chereb, "Sandoval's First Veto of 2017 Session Rejects Voter Registration Initiative," *Las Vegas Review-Journal*, March 21, 2017, at https://www.reviewjournal.com/news/politics-and-government/nevada/sandovals-first-veto-of-2017-session-rejects-voter-registration-initiative/.

[29] Nevada Secretary of State, *Silver State Election Night Results 2018*, at http://silverstateelection.com/ballot-questions/.

[30] North Carolina General Assembly, *House Bill 589*, at https://www.ncleg.gov/BillLookup/2013/h589.

[31] United States Court of Appeals for the Fourth Circuit, *Opinion in Consolidated Cases No. 16-1468, 16-1469, 16-1474, and 16-1529*, at http://www.ca4.uscourts.gov/opinions/published/161468.p.pdf; Anne Blythe, "4th U.S. Circuit Judges Overturn North Carolina's Voter ID Law," *The Charlotte Observer*, July 29, 2016, at https://www.charlotteobserver.com/news/politics-government/article92595012.html.

[32] An exception is Delaware. The Delaware state legislature can approve state constitutional amendments unilaterally with a two-thirds vote of its members in two consecutive legislative sessions. Delaware Constitution, Article XVI, §1.

[33] North Carolina State Board of Elections, *Information on Constitutional Amendments on 2018 Ballot*, at

## Implementation

Early U.S. elections were conducted almost entirely locally.[34] Some states have departed from that tradition. For example, in Alaska, the state conducts elections above the borough level, and, in Delaware, all elections are conducted by the state.[35]

Congress has also shifted some responsibility for conducting elections to the state level. For example, the Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA; P.L. 99-410; 100 Stat. 924) requires states to designate a single state office to provide absent uniformed services and overseas voters with information about voter registration and absentee voting (52 U.S.C. §20302(b)). The NVRA requires states to designate a chief state election official to coordinate state responsibilities under the act (52 U.S.C. §20509), and HAVA requires chief state election officials to implement statewide voter registration lists and oversee development of plans for use of federal election administration funding (52 U.S.C. §21083(a)(1)(A); 52 U.S.C. §21005(a)).

However, the day-to-day implementation of election administration policy is still mostly handled by localities. For example, localities typically add eligible voters to the voter rolls; design and print ballots; recruit and train poll workers; select and prepare polling places; store and transport voting equipment; and count, canvass, and report election results.[36]

The level of locality primarily responsible for conducting elections is typically the county, but there are some exceptions. The New England states, which have a strong tradition of township government, tend to assign primary responsibility to municipalities. Some states also split implementation duties between counties and municipalities.[37]

Responsibility for implementing election administration policy may also be divided between offices or agencies at the same level of local government. For example, according to one scholarly source, as of 2015, localities in about one-third of states split responsibility for conducting elections between two or more offices or agencies.[38] **Table 2** lists the states identified by those scholars.

---

https://www.ncsbe.gov/elections/2018-election-information; North Carolina State Board of Elections, *11/06/2018 Unofficial General Election Results—Statewide*, at https://er.ncsbe.gov/?election_dt=11/06/2018&county_id=0& office=REF&contest=0.

[34] Alec Ewald, *The Way We Vote: The Local Dimension of American Suffrage* (Nashville, TN: Vanderbilt University Press, 2009), p. 21.

[35] Alaska Division of Elections, *Division of Elections Responsibilities*, at http://www.elections.alaska.gov/Core/ cityandboroughelections.php; Delaware General Assembly, *Chapter 275*, June 26, 2014, at http://delcode.delaware.gov/sessionlaws/ga147/chp275.shtml#TopOfPage; National Conference of State Legislatures, *Election Costs: What States Pay*, August 3, 2018, at http://www.ncsl.org/research/elections-and-campaigns/election-costs.aspx; Hale, Montjoy, and Brown, *Administering Elections*, p. 41.

[36] Hale, Montjoy, and Brown, *Administering Elections*, p. 38; U.S. Government Accountability Office, *Elections: Observations on Voting Equipment Use and Replacement*, April 2018, p. 9, at https://www.gao.gov/assets/700/ 692024.pdf.

[37] For example, Michigan splits implementation duties between counties and municipalities, and counties conduct some elections in Illinois while municipalities conduct others. Michigan Secretary of State, *Michigan's Elections System Structure Overview*, at https://www.michigan.gov/sos/0,4670,7-127-1633_8716-27476—,00.html; Hale, Montjoy, and Brown, *Administering Elections*, p. 38.

[38] Hale, Montjoy, and Brown, *Administering Elections*, pp. 42-43.

### Table 2. States with Multiple Local Election Offices

| State | Local Election Offices |
|---|---|
| Alabama | Probate Judge<br>Clerk of Circuit Court<br>Sheriff<br>Board of Registrars |
| Arizona | Director or Administrator<br>County Recorder |
| Arkansas | County Board of Election Commissioners<br>County Clerk |
| Connecticut | Registrars of Voters<br>Town Clerk |
| Georgia | Judge of Probate<br>County Board of Registrars |
| Indiana | County Election Board<br>Clerk of Circuit Court or Board of Registration |
| Louisiana | Clerk of District Court<br>Registrar of Voters |
| Maine | Town/City Clerk<br>Registrar of Voters |
| Massachusetts | City/Town Clerk<br>Board of Registrars of Voters |
| Michigan | County Clerk<br>County Election Commission<br>City/Township Clerk<br>City/Township Election Commission |
| Mississippi | County Board of Election Commissioners<br>County Registrar (Clerk of Circuit Court) |
| Nevada | County Clerk<br>Registrar of Voters in Clark and Washoe Counties |
| New Hampshire | Moderator<br>Town/City Clerk<br>Superintendent of Checklist (towns)/Board of Registrars (cities)<br>Board of Selectmen |
| New Jersey | County Clerk<br>County Board of Elections |
| New Mexico | County Board of Registration<br>County Clerk |
| South Carolina | County Board of Registration<br>Commissioners of Elections |
| Texas | County Clerk<br>County Tax Assessor/Collector |
| Virginia | County/City Electoral Boards<br>County/City Registrars |

**Source:** Kathleen Hale, Robert Montjoy, and Mitchell Brown, *Administering Elections: How American Elections Work* (New York: Palgrave Macmillan, 2015), p. 43.

**Note:** The data in this table were published in 2015 and have not been independently verified by CRS.

# Funding

Election administration involves both intermittent and ongoing costs. *Intermittent costs* include irregular expenses like the costs of acquiring voting equipment. *Ongoing costs* include expenses that are linked to and recur with each individual election, such as the costs of printing ballots, paying poll workers, and transporting voting equipment to polling places, as well as expenses that are incurred whether or not there is an election, such as the costs of training election officials, maintaining voter registration lists, and providing IT support for online voter registration systems.

The federal government does not supply ongoing funding to states and localities to conduct elections. To date, Congress has authorized significant federal funding for state and local election administration in one bill: HAVA. HAVA authorized $3.65 billion for three main types of formula-based payments to states as well as additional funding for a number of smaller grant and payment programs (52 U.S.C. §§20901-20906; 52 U.S.C. §§21001-21072).[39] Congress appropriated most of the $3.65 billion for the three types of formula-based payments between FY2003 and FY2010 and appropriated an additional $380 million in March 2018.[40]

That means states and localities are responsible for most of the costs of conducting federal elections. Localities typically assume primary responsibility for those costs, with states contributing to varying degrees.[41] All states have supplied or committed to supplying matching funds as required to receive federal HAVA funds (52 U.S.C. §21003(b)(5)(a)).[42] All states but North Dakota, which does not have voter registration, have also contributed to establishing and maintaining the statewide voter registration lists required by HAVA (52 U.S.C. §21083(a)).[43]

State contributions to other costs vary. Many states used HAVA funding to help replace or update voting technology, and some have put additional money from state coffers toward those expenses. **Table 3** lists state contributions to the costs of acquiring voting equipment, as reported by the U.S. Government Accountability Office (GAO) in 2018.[44]

---

[39] In addition to the 50 states, the District of Columbia, American Samoa, Guam, Puerto Rico, and the U.S. Virgin Islands were eligible for formula-based payments (52 U.S.C. §20310(6)). For more information about HAVA grants and payments, see CRS Report RS20898, *The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election*, by Arthur L. Burris and Eric A. Fischer; and CRS In Focus IF10925, *State Election Reform Payments: FY2018 Appropriations*, by Karen L. Shanton.

[40] CRS Report RS20898, *The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election*, by Arthur L. Burris and Eric A. Fischer; CRS In Focus IF10925, *State Election Reform Payments: FY2018 Appropriations*, by Karen L. Shanton; National Association of Secretaries of State, "NASS Urges Congress to Pass Omnibus Appropriations Bill Featuring HAVA Funding," March 22, 2018, at https://www.nass.org/node/1364.

[41] California Legislative Analyst's Office, *Considering the State's Role in Elections*, 2017, p. 3; National Conference of State Legislatures, *Election Costs: What States Pay*.

[42] States are required to provide matching funds for requirements payments and for the funding appropriated in March 2018 in H.R. 1625. For more information, see U.S. Election Assistance Commission, *Managing Requirements Payments*, at https://www.eac.gov/payments-and-grants/managing-requirements-payments/; and U.S. Election Assistance Commission, *HAVA Funds State Chart View*, at https://www.eac.gov/payments-and-grants/hava-funds-state-chart-view/.

[43] National Conference of State Legislatures, *Election Costs: What States Pay*.

[44] U.S. Government Accountability Office, *Observations on Voting Equipment Use and Replacement*, April 2018, at https://www.gao.gov/assets/700/691201.pdf.

### Table 3. State Contributions to the Costs of Acquiring Voting Equipment

Which of the following statements best describes your state's current level of involvement in the acquisition of voting equipment used in your state?

| Contribution | Number of States |
|---|---|
| State covers all acquisition costs for the voting equipment | 11 |
| State provides financial assistance or cost sharing to local jurisdictions for equipment acquisition | 8 |
| State does not provide any financial assistance or cost sharing to local jurisdictions for equipment acquisition | 24 |
| Other | 2 |
| Don't know | 1 |

**Source:** *Observations on Voting Equipment Use and Replacement*, U.S. Government Accountability Office, April 2018, at https://www.gao.gov/assets/700/691201.pdf.

**Notes:** GAO surveyed the 50 states and the District of Columbia. It received surveys from 46 respondents. All 46 respondents answered this question.

**Table 4** provides information from the same report about states' contributions to the costs of maintaining and operating voting equipment.[45] As GAO uses the terms in the survey, operation costs "include things such as poll worker labor to set up equipment, postage for mailing absentee or vote-by-mail ballots, paper and printing supplies for paper ballots or voter-verified paper trails, and electricity to operate equipment during elections." Maintenance costs "include things such as labor to conduct maintenance between elections of any equipment hardware and software as well as any required parts."[46]

### Table 4. State Contributions to the Costs of Maintaining and Operating Voting Equipment

Does your state generally pay all, some, or none of the operation or maintenance costs of the voting equipment used in your state?

| Contribution | Maintenance Costs | Operation Costs |
|---|---|---|
| State generally pays all costs | 12 states | 8 states |
| State generally pays some costs | 8 | 11 |
| State does not pay any costs | 25 | 26 |
| Don't know | 0 | 0 |

**Source:** *Observations on Voting Equipment Use and Replacement*, U.S. Government Accountability Office, April 2018, at https://www.gao.gov/assets/700/691201.pdf.

**Notes:** GAO surveyed the 50 states and the District of Columbia. It received surveys from 46 respondents. Forty-five of the 46 respondents answered this question.

Some states cover or contribute to the costs of training local election officials, and some share election-specific costs, such as printing ballots and transporting voting equipment.[47] **Box 3** uses

---

[45] U.S. Government Accountability Office, *Observations on Voting Equipment Use and Replacement*.

[46] U.S. Government Accountability Office, *Observations on Voting Equipment Use and Replacement.*

[47] Some states also share the election-specific costs of conducting certain nonfederal elections. For more information about both types of cost-sharing arrangements, see National Conference of State Legislatures, *Election Costs: What States Pay*.

five examples of cost-sharing arrangements for election-specific costs of federal elections to illustrate the range of approaches states have taken to such arrangements.

---

**Box 3. Examples of State-Local Cost-Sharing Arrangements for Federal Elections**

The states that have federal election cost-sharing arrangements with their localities take different approaches to sharing the costs. Some share costs for all federal elections, whereas others cover expenses only for certain types of races. What kinds of costs states cover, how much of the cost they assume, and how they calculate their share also varies.

Cost-sharing arrangements for federal elections can be detailed and complex. The examples below summarize one of the kinds of cost sharing employed by each of five selected states.

- **Alabama:** 100% of the costs of conducting elections that include only state or federal races and 50% of the costs of elections that also include county races.[48]
- **Delaware:** 100% of the costs of conducting elections.[49]
- **Kentucky:** $255 per precinct for each election.[50]
- **Michigan:** 100% of the costs of conducting presidential primary elections.[51]
- **Washington:** Prorated shares of the costs of conducting special elections for the U.S. Senate and the U.S. House of Representatives.[52]

For more information about state-local cost-sharing arrangements for federal elections, see National Conference of State Legislatures, *Election Costs: What States Pay*, August 3, 2018, at http://www.ncsl.org/research/elections-and-campaigns/election-costs.aspx.

---

# Structures of State and Local Election Implementation Systems

The structures of the state and local systems that conduct federal elections vary both between and within states. Common variations include differences related to the

- leadership of the election system;
- relationship between local election officials and the state; and
- population size and density of the jurisdiction served by the system.

This section describes these structural variations.

## Leadership

The state and local election systems that conduct federal elections may be led by an individual, such as the state secretary of state or a town or county clerk; a group, such as a state elections commission or a county board of elections; or a combination of individuals or groups, such as a state secretary of state and state board of elections, or a city clerk and city registrar of voters.[53]

---

[48] *Alabama Code* §17-16-3; *Alabama Code* §17-16-4.

[49] *Delaware Code* title 15, §215; *Delaware Code* title 15, §3111; *Delaware Code* title 15, §4514; *Delaware Code* title 15, §5714; *Delaware Code* title 15, §7109; *Delaware Code* title 15, §7306.

[50] *Kentucky Revised Statutes* §117.345.

[51] *Michigan Compiled Laws* §168.624g.

[52] *Washington Revised Code* §29A 04-420.

[53] Hale, Montjoy, and Brown, *Administering Elections*, pp. 38-43.

Election system leadership may be chosen by voters or appointed by an authority such as the governor or state legislature. The selection method—and the leaders themselves—may be partisan, bipartisan, or nonpartisan.

Federal law requires states to designate a chief election official to carry out certain tasks.[54] **Table 5** lists the titles of chief state election officials, as reported to CRS by the EAC, and the methods of selecting them, as listed by the National Association of Secretaries of State (NASS) and the National Association of State Legislatures (NCSL).

**Table 5. Titles and Selection Methods of Chief State Election Officials**

| State | Chief State Election Official | Selection Method |
|---|---|---|
| Alabama | Secretary of State | Elected |
| Alaska | Lieutenant Governor | Elected |
| Arizona | Secretary of State | Elected |
| Arkansas | Secretary of State | Elected |
| California | Secretary of State | Elected |
| Colorado | Secretary of State | Elected |
| Connecticut | Secretary of State | Elected |
| Delaware | State Election Commissioner | Appointed |
| Florida | Secretary of State | Appointed |
| Georgia | Secretary of State | Elected |
| Hawaii | Chief Election Officer | Appointed |
| Idaho | Secretary of State | Elected |
| Illinois | Executive Director of the State Board of Elections | Appointed |
| Indiana | Secretary of State | Elected |
| Iowa | Secretary of State | Elected |
| Kansas | Secretary of State | Elected |
| Kentucky | Secretary of State | Elected |
| Louisiana | Secretary of State | Elected |
| Maine | Secretary of State | Appointed |
| Maryland | Administrator of Elections | Appointed |
| Massachusetts | Secretary of the Commonwealth | Elected |
| Michigan | Secretary of State | Elected |
| Minnesota | Secretary of State | Elected |
| Mississippi | Secretary of State | Elected |

---

[54] The NVRA requires states to designate a chief state election official to coordinate the state's responsibilities under the act (52 U.S.C. §20509). HAVA and UOCAVA also assign certain responsibilities to the chief state election official (see, for example, 52 U.S.C. §20302(g)-(h) and 52 U.S.C. §21083(a)(1)(A)). HAVA defines the chief state election official as the officeholder designated as such under NVRA (52 U.S.C. §21003(e)), but some states name different individuals to the position under the different laws. For example, Indiana law names the co-directors of the state Election Division to coordinate NVRA responsibilities but assigns primary responsibility for HAVA-related duties to the secretary of state.

| State | Chief State Election Official | Selection Method |
|---|---|---|
| Missouri | Secretary of State | Elected |
| Montana | Secretary of State | Elected |
| Nebraska | Secretary of State | Elected |
| Nevada | Secretary of State | Elected |
| New Hampshire | Secretary of State | Appointed |
| New Jersey | Secretary of State | Appointed |
| New Mexico | Secretary of State | Elected |
| New York | Co-Director of the State Board of Elections | Appointed |
| North Carolina | Executive Director of the State Board of Elections | Appointed |
| North Dakota | Secretary of State | Elected |
| Ohio | Secretary of State | Elected |
| Oklahoma | Secretary of the State Election Board | Appointed |
| Oregon | Secretary of State | Elected |
| Pennsylvania | Secretary of the Commonwealth | Appointed |
| Rhode Island | Secretary of State | Elected |
| South Carolina | Executive Director of the State Election Commission | Appointed |
| South Dakota | Secretary of State | Elected |
| Tennessee | Secretary of State | Appointed |
| Texas | Secretary of State | Appointed |
| Utah | Lieutenant Governor | Elected |
| Vermont | Secretary of State | Elected |
| Virginia | Commissioner of the State Department of Elections | Appointed |
| Washington | Secretary of State | Elected |
| West Virginia | Secretary of State | Elected |
| Wisconsin | Administrator of the State Elections Commission | Appointed |
| Wyoming | Secretary of State | Elected |

**Sources:** U.S. Election Assistance Commission; National Association of Secretaries of State; and National Conference of State Legislatures.

**Note:** Some states designate different chief state election officials for different purposes, so this list may deviate from lists of chief state election officials in other sources. Congressional clients may contact CRS for more information about such variations.

The leadership types and selection methods of local election systems may vary within a state. **Box 4** uses examples from Florida and Wisconsin to illustrate such variations. It describes the different causes of variation in the two states and a recent change in Florida to a more uniform selection process.

---

**Box 4. Variations in the Leadership of Local Election Systems in Florida and Wisconsin**

State law may permit or require variations in the leadership of local election systems. One example of a state that has permitted variation is Florida. Florida has county home rule, which means that residents of a county can choose to establish their own county government by charter.[55] Unlike non-charter counties, which have only the powers of self-government explicitly granted to them by the state, charter counties have all powers of self-government that are not inconsistent with state law.[56]

Prior to a 2018 change, which is described in **Box 5**, those powers included decisions about how to select county supervisors of elections. For example, the state's two most populous counties, Miami-Dade County and Broward County, are both charter counties.[57] Miami-Dade opted for an appointed election supervisor, whereas Broward chose to elect its election supervisor.[58]

An example of a state that requires variation in the leadership of its local election systems is Wisconsin. Municipalities have primary responsibility for running elections in Wisconsin, and most local election systems are led by a municipal clerk.[59] However, state law requires cities with more than 500,000 people to establish a three-member municipal board of election commissioners.[60]

---

The leadership structures of both state and local systems can also change over time. **Box 5** uses the two states from **Box 4** to illustrate the types of changes states might make, how they might make them, and how frequently they might make them. It describes one change that was approved by voters as a ballot measure and a number of others that were enacted legislatively.

---

[55] Florida Constitution Article VIII, §1, cl. (c), available at http://www.leg.state.fl.us/statutes/index.cfm?submenu= 3#A8.

[56] Florida Constitution Article VIII, §1, cl. (f)-(g), available at http://www.leg.state.fl.us/statutes/index.cfm?submenu= 3#A8.

[57] Florida Association of Counties, *County Population and General Information*, at https://www.fl-counties.com/ county-population-and-general-information; Florida Association of Counties, *Charter County Information*, at https://www.fl-counties.com/charter-county-information.

[58] The Home Rule Amendment and Charter, Miami-Dade County, Florida, *Section 2.01. Responsibilities of the Mayor*, p. 21, at https://www.miamidade.gov/charter/library/charter.pdf; Charter of Broward County, FL, *Section 11.10. Constitutional Officers Subject to Code of Ethics*, p. 30, at https://www.broward.org/Charter/Documents/ CharterBrowardCountyRevisedNov82016.pdf.

[59] Steven F. Huefner, Daniel P. Tokaji, and Edward B. Foley, *From Registration to Recounts: The Election Ecosystems of Five Midwestern States* (Columbus, OH: The Ohio State University, 2007), p. 132, at https://moritzlaw.osu.edu/ electionlaw/projects/registration-to-recounts/book.php.

[60] Wisconsin Statutes Annotated §7.20, at https://docs.legis.wisconsin.gov/statutes/statutes/7.

---

**Box 5. Changes in the Leadership of Election Systems in Florida and Wisconsin**

Changes in the leadership of election systems, like other election administration policy changes, may be made in various ways. For example, state legislatures—with input from their governors—can revise features of election system leadership that are in state statute. Voters in states that permit use of ballot measures to amend state statutes or the state constitution may be able to approve changes by popular vote.

Florida voters used this latter option in 2018 to change the way some of their local election officials are selected. The Florida Constitution Revision Commission, a state commission that meets every 20 years to review the state constitution and identify possible amendments, proposed requiring county election supervisors and other county officials to be elected.[61] The measure was approved with 63% of the vote.[62]

Approval of that measure required a change in the way election system leadership was selected in the state's most populous county. Under the Miami-Dade County Charter, the county's supervisor of elections was appointed by the county mayor.[63] The 2018 measure requires the county to elect its election supervisor instead.

Wisconsin's state legislature has made multiple changes to its state election system leadership. In 1974, it transferred leadership of the state election system from the state secretary of state to an eight-member State Elections Board with members appointed by the chief justice of the Wisconsin Supreme Court, the governor, the majority and minority leaders of each chamber of the state legislature, and the chairs of the state Democratic Party and the state Republican Party.[64]

In 2007, it merged that board with the State Ethics Board to form a six-member Government Accountability Board (GAB). The GAB's members, who were retired state judges, were appointed by the governor and subject to confirmation by the state Senate.[65]

The legislature split the GAB back into separate ethics and elections boards in 2015. Two of the six members of the Wisconsin Elections Commission are appointed by the governor, and the other four are appointed by the majority and minority leaders of each chamber of the state legislature.[66]

---

# State-Local Relationship

Another way in which the structures of election systems can vary is in the relationship between local election officials and the state. Some local election officials operate largely independently, whereas others rely on state officials or resources for some, most, or all basic functions. For example, as noted in "Funding," states may provide some or all of the training for local election officials. As described in more detail in "Jurisdiction Size and Density," local election officials who serve smaller or more rural jurisdictions may also depend on their states to provide specialized expertise, such as legal or technical know-how.

States also have varying types and degrees of influence over local election officials. Choices about other structural features, such as the method used to select the leadership of local election

---

[61] Florida Division of Elections, *Proposed Constitutional Amendments and Revisions for the 2018 General Election*, p. 31, at https://dos.myflorida.com/media/699824/constitutional-amendments-2018-general-election-english.pdf; Florida Constitution Revision Commission, *About the CRC*, at http://flcrc.gov/About.html.

[62] Florida Division of Elections, *Amendment No. 10*, at https://floridaelectionwatch.gov/CompareStateToCounty/900010.

[63] The Home Rule Amendment and Charter, Miami-Dade County, Florida, *Section 2.01. Responsibilities of the Mayor*, p. 21.

[64] Wisconsin Elections Commission, *About the Wisconsin Elections Commission*, at https://elections.wi.gov/about; Huefner, Tokaji, and Foley, *From Registration to Recounts*, p. 115.

[65] Huefner, Tokaji, and Foley, *From Registration to Recounts*, p. 115; Wisconsin Elections Commission, *About the Wisconsin Elections Commission*.

[66] Wisconsin Elections Commission, *About the Wisconsin Elections Commission*.

systems, can shape this aspect of the state-local relationship. For example, in some states, state officials appoint and can remove local election officials.[67]

State officials in other states may have other options for influencing local officials. For example, state officials may have the power to initiate legal action against local officials, to provide or withhold funding for local election administration, or to certify and decertify voting systems.[68] However, they tend to have less control over how local officials perform their election administration duties than state officials with appointment and removal authority. As described in more detail in "Compliance with Federal Requirements," this dynamic may be especially pronounced for local officials who are popularly elected. Such officials are accountable primarily to voters rather than to the state.

## Jurisdiction Size and Density

Other structural variations between election systems derive from differences in the population size and density of the jurisdictions they serve. Some election jurisdictions reported serving fewer than 100 eligible registered voters in the 2016 election, for example, whereas Los Angeles County reported serving 6.8 million. The eligible registered voters in that county alone reportedly outnumbered the eligible registrants in each of 40 other states.[69]

Election jurisdictions also differ in population density. For example, Los Angeles County is an urban center, and many small jurisdictions are rural.

Jurisdictions with different population sizes and densities have different election administration advantages and face different administrative challenges.[70] For example, voter registration list maintenance is typically more straightforward in small jurisdictions because their lists are shorter and election officials are more likely to know registrants personally.[71] Meanwhile, large jurisdictions tend to have larger tax bases and more resources.[72]

Those differences between jurisdictions may be reflected in the internal structures of the election systems that serve them. One example of such a structural difference is the size and specialization of the system's staff. Larger jurisdictions, which typically have more personnel, may have much of the specialized expertise they need in-house. Smaller jurisdictions, which may have only one part-time employee dedicated to election administration, are more likely to rely on outside expertise.[73] For example, according to law professors Steven F. Huefner, Daniel P. Tokaji, and

---

[67] Huefner, Tokaji, and Foley, *From Registration to Recounts*, p. 63.

[68] Huefner, Tokaji, and Foley, *From Registration to Recounts*, pp. 63-64.

[69] This count does not include North Dakota, which does not have voter registration. U.S. Election Assistance Commission, *2016 Election Administration Voting Survey Dataset*, at https://www.eac.gov/research-and-data/2016-election-administration-voting-survey/.

[70] Heather M. Creek and Kimberly A. Karnes, "Federalism and Election Law: Implementation Issues in Rural America," *Publius*, vol. 40, no. 2 (Spring 2010), at https://www.jstor.org/stable/pdf/40608378.pdf?refreqid= excelsior%3A70863f2535d17458ccd7a553896a7dc7; David C. Kimball and Brady Baybeck, "Are All Jurisdictions Equal? Size Disparity in Election Administration," *Election Law Journal*, vol. 12, no. 2 (2013), at https://pdfs.semanticscholar.org/e12f/d6a7696cfb4b33c5d179d2eb6e20370f384d.pdf; National Conference of State Legislatures, "Worlds Apart: Urban and Rural Voting," *The Canvass*, Issue 52, October 2014, pp. 2-3, at http://www.ncsl.org/Documents/legismgt/elect/Canvass_Oct_2014_No_52.pdf.

[71] Kimball and Baybeck, "Are All Jurisdictions Equal?" p. 131; National Conference of State Legislatures, "Worlds Apart: Urban and Rural Voting," pp. 2-3.

[72] National Conference of State Legislatures, "Worlds Apart: Urban and Rural Voting," p. 2.

[73] Gerken, *The Democracy Index*, p. 21.

Edward B. Foley, smaller jurisdictions in Illinois have looked to state attorneys for election law expertise and to voting equipment vendors for technical support.[74]

Another type of difference related to jurisdiction size and density is variation in the allocation of system resources. A study prepared for the U.S. Election Assistance Commission in 2013 found that election officials in rural jurisdictions were more likely than their urban counterparts to use paid print advertising for voter outreach. Election officials in urban jurisdictions were more likely to use websites and social media.[75]

Small jurisdictions may also allocate a larger share of their resources to meeting state and federal requirements than larger jurisdictions because there are often fixed start-up costs to required changes, and smaller jurisdictions may be less equipped to capitalize on economies of scale.[76] For example, political scientists Heather M. Creek and Kimberly A. Karnes report, "There is a minimum cost to the acquisition and maintenance of voting technology that applies whether the district is purchasing 5 or 500 machines."[77]

# Interactions with the Federal Role in Election Administration

The duties and structures of state and local election systems can affect the implementation of federal election administration laws. Perhaps as a result, Congress has specified how states and localities should distribute certain election administration duties and structure certain elements of their election systems. Changes to the duties and structures of state and local election systems have sometimes also been side effects of other federal activity on election administration.

## Selected Effects of State and Local Duties and Structures on Federal Action

This section provides examples of ways in which the distribution of election administration duties at the state and local levels and the structures of state and local election systems can affect the implementation of federal election administration law. These examples include federal efforts to affect the administration of elections through (1) requirements, (2) funding, and (3) information sharing.[78]

---

[74] Huefner, Tokaji, and Foley, *From Registration to Recounts*, p. 62.

[75] U.S. Election Assistance Commission, *Urban-Rural Study: Final Report*, April 15, 2013, p. ii, at https://www.eac.gov/assets/1/28/EAC%20Urban_Rural%20Study%20Final%20Report%205_17_13.pdf.

[76] National Conference of State Legislatures, *Election Costs: What States Pay*; Sarah A. Hill, "Election Administration Finance in California Counties," *The American Review of Public Administration*, vol. 42, no. 5 (2012), p. 619, at https://journals.sagepub.com/doi/pdf/10.1177/0275074011413914.

[77] Creek and Karnes, "Federalism and Election Law," p. 292.

[78] Bemelmans-Videc, Rist, and Vedung, *Carrots, Sticks, and Sermons: Policy Instruments and Their Evaluation*.

## Compliance with Federal Requirements

Congress can use requirements to regulate how states and localities administer certain aspects of federal elections.[79] How well such requirements serve their intended purposes depends in part on how closely states and localities comply with them.

How closely states and localities comply with federal requirements may, in turn, be affected by the duties and structures of the state and local election systems that implement them. For example, UOCAVA assigns responsibility for complying with some of its requirements to the states (52 U.S.C. §20302), but the tasks required for compliance are often handled by local officials. One scholar, law professor Justin Weinstein-Tull, indicates that this means that the officials who are held liable for compliance with UOCAVA requirements may differ from the officials who take or fail to take the actions needed to comply.[80]

**Box 6** provides an illustration of this phenomenon as reported by state officials in Alabama.

---

**Box 6. UOCAVA Compliance in Alabama**

UOCAVA requires states to transmit validly requested absentee ballots to eligible absent uniformed services and overseas citizens at least 45 days before Election Day (52 U.S.C. §20302(a)(8)). In 2012, the U.S. Department of Justice filed a complaint against Alabama for failing to comply with that requirement.[81]

In a response to the complaint, Alabama said that local officials were responsible for transmitting the absentee ballots and that

> If a local official refuses to cooperate or provide information to the Secretary of State, the Secretary has no authority to compel the action of a local official… The Secretary of State cannot fire an elected Probate Judge, or an [Absentee Election Manager]…

> So while the Defendants can inform and train local election officials—and always want to look for ways to improve in doing so—the Defendants cannot perform the duties of local election officials. Defendants cannot force them to fulfill their duties on a timely basis, or fire them if they do not.[82]

The state's response illustrates the potential interaction between the division of election administration duties and efforts to comply with federal requirements. According to the state, part of the issue in its case is that local officials rather than state officials are responsible for the tasks required for compliance. This issue is compounded, the state suggests, by the structure of the relationship between state and local officials; local officials are popularly elected and not subject to removal by state officials, so the state has limited control over whether or how they perform the tasks required for compliance.

---

## Timeliness and Tailoring of Federal Funding

The federal government can provide funding for state and local election administration, which may be conditional on the adoption of certain election administration policies or practices.[83] How well such funding serves its intended purposes may depend in part on how timely it is and how well-tailored it is to its objectives.

Duties and structures of state and local election systems may affect how quickly federal funding is claimed and used and how well the uses to which it is put serve federal objectives. For

---

[79] For more on congressional authority over election administration, see CRS Report RL30747, *Congressional Authority to Direct How States Administer Elections*, by Kenneth R. Thomas.

[80] Justin Weinstein-Tull, "Election Law Federalism," *Michigan Law Review*, vol. 114, no. 747 (March 2016), pp. 751-752, at http://michiganlawreview.org/wp-content/uploads/2016/03/114MichLRev.747_WeinsteinTull.pdf.

[81] U.S. Department of Justice, *Voting Section Litigation*, at https://www.justice.gov/crt/voting-section-litigation#uocava_cases.

[82] Weinstein-Tull, "Election Law Federalism," pp. 768-769.

[83] CRS Report RL30747, *Congressional Authority to Direct How States Administer Elections*, by Kenneth R. Thomas.

example, HAVA has authorized payments to states to meet its requirements (52 U.S.C. §21007). It has directed those payments to be disbursed to states (52 U.S.C. §21001(a)) and charged chief state election officials with overseeing decisions about how to spend them (52 U.S.C. §21005(a)).

State election officials run federal elections in some states, but those states are the exception. As noted in "Implementation" and "Funding," most states assign election administration implementation and funding duties to local officials. That means that the officials who receive HAVA funding and are charged with overseeing decisions about how to use it often differ from the officials who conduct and pay for the activities and resources it is intended to fund.

That has had at least two reported consequences. First, in some cases, it has reportedly delayed access to or use of some HAVA funds. Directing HAVA funding to states introduces opportunities for state-level delays, such as decisions by state officials to wait to claim the funds or requirements in state law to obtain approval to do so.

Second, some local officials have stated the view that their states' shares of HAVA funding were not put to what they considered the areas of greatest need. **Box 7** provides examples of such consequences as described by state and local officials in Nevada, Minnesota, and Virginia.

---

### Box 7. HAVA Funding in Nevada, Minnesota, and Virginia

Congress appropriated $380 million for HAVA payments in March 2018, but some states did not claim or use their funds immediately. According to the deputy secretary of elections in one of those states, Nevada, election officials needed both gubernatorial and legislative approval to request the funds.[84] A budget dispute between the governor and state legislature in another state, Minnesota, reportedly delayed use of funds the state had claimed.[85]

Funding for payments to states was also appropriated under HAVA in earlier years.[86] Creek and Karnes interviewed local election officials in Virginia about their experiences with the use of that funding. They reported in 2010 that "[n]umerous local officials accused the state board [of elections] of misusing HAVA funds, by making ill-conceived purchasing decisions."[87] They said that "local election officials were irate at a statewide survey that the state authorized to check polling place accessibility. The same survey had been completed two years earlier, and while most saw it simply as a waste of money, other registrars disputed its accuracy."[88]

---

## Timeliness of Federal Information Sharing

Congress can require or facilitate information sharing with states and localities by federal agencies. As with funding, the effectiveness of federal information sharing may depend in part on how timely it is.

How quickly federal agencies share information with the appropriate state and local officials may be affected by the distribution of election administration duties at the state and federal levels. **Box 8** provides an example of such an effect reported by NASS.

---

[84] Miles Parks, "Bureaucracy and Politics Slow Election Security Funding to States," *NPR*, June 18, 2018, at https://www.npr.org/2018/06/18/617874348/bureaucracy-and-politics-slow-election-security-funding-to-states.

[85] U.S. Senate Committee on Rules & Administration, *Testimony of Minnesota Secretary of State Steve Simon*, June 20, 2018, at https://www.rules.senate.gov/imo/media/doc/Simon%20Election%20Security%20Testimony.pdf; Office of the Minnesota Secretary of State Steve Simon, *Secretary Simon Calls on Legislature to Release Federal Funding for Election Cyber Security*," May 16, 2018, at https://www.sos.state.mn.us/about-the-office/news-room/secretary-simon-calls-on-legislature-to-release-federal-funding-for-election-cyber-security/.

[86] For more information about this funding, see CRS Report RS20898, *The Help America Vote Act and Election Administration: Overview and Selected Issues for the 2016 Election*, by Arthur L. Burris and Eric A. Fischer.

[87] Creek and Karnes, "Federalism and Election Law," p. 287.

[88] Creek and Karnes, "Federalism and Election Law," p. 287.

---

**Box 8. Election Security Information Sharing**

Following reports of attempted foreign interference in the 2016 election, the U.S. Department of Homeland Security (DHS) designated state and local election systems as critical infrastructure.[89] The critical infrastructure designation is designed to come with prioritized access to DHS support and information, but some of that information was reportedly delayed by a misunderstanding of or miscommunication about the distribution of election administration duties.

According to NASS, DHS officials may have sent some initial election security notifications to chief state information officers and chief state information security officers rather than the state and local election officials who are primarily responsible for election cybersecurity duties.[90]

---

## Selected Effects of Federal Action on State and Local Duties and Structures

Past federal action has resulted in both intentional and unintentional changes to state and local election systems. Some federal laws include provisions that are specifically designed to establish certain responsibilities for election administration at the state level. For example, the NVRA requires states to designate chief state election officials to coordinate state responsibilities under the act (52 U.S.C. §20509), and HAVA charges chief state election officials with implementing a statewide voter registration system (52 U.S.C. §21083(a)(1)(A)).

Federal regulation has reportedly also had the side effect of shifting the distribution of other election administration duties. For example, the agency-based registration requirements in the NVRA divide voter registration responsibilities between traditional election offices and offices that had not historically been involved in election administration, such as motor vehicle and public assistance agencies (52 U.S.C. §20504; 52 U.S.C. §20506). According to Hale, Montjoy, and Brown, "the need to pass implementing legislation and the complexity of legal and technical requirements" in federal laws such as HAVA and the NVRA has also "led many states to grant new or additional rule-making power" to their chief state election officials.[91]

# Potential Considerations for Congress

Congress has considered legislation—some of which has been enacted and some of which has not—that would change election rules or the state and local systems that implement them. The interactions between the duties and structures of state and local election systems and past federal actions suggest some considerations that may be relevant to future congressional consideration of proposals that would affect the administration of federal elections. The following questions may be of interest to Members as they consider making changes to election administration or maintaining current rules and structures:

- How would any proposed change interact with the duties and structures of state and local election systems? Would the duties and structures of state and local

---

[89] U.S. Department of Homeland Security, *Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector*, January 6, 2017, at https://www.dhs.gov/news/2017/01/06/ statement-secretary-johnson-designation-election-infrastructure-critical. For more information, see CRS In Focus IF10677, *The Designation of Election Systems as Critical Infrastructure*, by Eric A. Fischer.

[90] National Association of Secretaries of State, *Letter from NASS President Connie Lawson to Secretary of Homeland Security John Kelly*, July 20, 2017, at https://www.nass.org/sites/default/files/nass-letter-urgent-items-sec-kelly-072017.doc.pdf.

[91] Hale, Montjoy, and Brown, *Administering Elections*, p. 32.

election systems make a proposed change difficult to implement? Would the design of a proposed change need to be adjusted to accommodate variations between or within states?

- Which of the policy tools available to Congress is best suited to achieving the purpose of a proposed change? For example, would it be more effective to advance a proposed change with a federal requirement, or incentivize it via federal funding?

- How might the nature of the state and local system inform a proposed change? For example, if it is a federal requirement, who is charged with compliance; who is responsible for the tasks required for compliance; and what is the relationship between the two? If it is federal funding, to whom should it be distributed, and who should be involved in making decisions about how to use it?

- Would a proposed change have the effect, either intentionally or unintentionally, of altering the duties or structures of state or local election systems? If so, what are the advantages and disadvantages of such changes?

- Are there complications with a proposed change that are not specifically related to election administration? For example, could there be federalism-related issues with intervening in the relationships between states and their political subdivisions?[92]

---

[92] For discussion of potential federalism-related complications, see Weinstein-Tull, "Election Law Federalism."

# Appendix. Selected Federal Statutes Governing State and Local Administration of Federal Elections

| Statute | Summary of Provisions Governing State and Local Election Administration |
|---|---|
| Help America Vote Act of 2002 (HAVA; P.L. 107-252, 116 Stat. 1666) | • Authorizes payments to states to make general improvements to the administration of federal elections, replace lever and punch card voting systems, comply with the requirements of the act, and comply with requirements of UOCAVA (52 U.S.C. §20904; 52 U.S.C. §21007) |
| | • Authorizes payments to states and localities to make polling places accessible to voters with disabilities and provide voter information for voters with disabilities (52 U.S.C. §21024) |
| | • Authorizes payments to state protection and advocacy systems to assure access to voting for voters with disabilities (52 U.S.C. §21062) |
| | • Requires states to provide a 5% match, submit a plan for use of the federal funds authorized for complying with the act's requirements, and report activities conducted and expenditures made with the funds (52 U.S.C. §21003(b)(5)(A); 52 U.S.C. §21003(b); 52 U.S.C. §21008) |
| | • Requires states and localities that receive payments to make polling places accessible to voters with disabilities and provide voter information for voters with disabilities to report activities conducted and expenditures made with the funds (52 U.S.C. §21025(a)) |
| | • Requires states and localities that receive payments under HAVA to keep records with respect to the payments and provides for audits of their use of the payments (52 U.S.C. §21142) |
| | • Requires states to use voting systems that allow voters to verify their ballots and correct any errors before casting them, notify voters if they vote for more than one candidate for a single office and allow them to correct their ballots before casting them, produce a permanent paper record that can be manually audited, are accessible to voters with disabilities, provide alternative language accessibility, and comply with national error rate standards (52 U.S.C. §21081(a)(1)-(5)) |
| | • Requires states to adopt a uniform standard of what counts as a vote on each voting system they use (52 U.S.C. §21081(a)(6)) |
| | • Requires states to offer provisional ballots to voters whose names do not appear on the registration list, whose eligibility to vote is otherwise in question, or who are first-time voters who registered by mail and do not present required ID (52 U.S.C. §21082(a); 52 U.S.C. 21083(b)(2)(B)) |
| | • Requires states to post voting information at the polls on federal election days (52 U.S.C. §21082(b)) |
| | • Requires states to establish and states and localities to maintain a centralized, computerized statewide voter registration list, provide adequate security measures to prevent unauthorized access to the list, and maintain a minimum standard of accuracy for registration records[a] (52 U.S.C. §21083(a)) |
| | • Requires states to require voters to provide their driver's license numbers or the last four digits of their Social Security numbers when applying to register and requires election officials to verify the numbers (52 U.S.C. §21083(a)(5)(A)) |
| | • Requires states to establish data-matching agreements between the chief state election official, the official responsible for the state motor vehicle agency, and the commissioner of Social Security (52 U.S.C. §21083(a)(5)(B)) |
| | • Requires first-time voters who register by mail to present a current and valid photo ID or a current utility bill, bank statement, government check, |

| Statute | Summary of Provisions Governing State and Local Election Administration |
|---|---|
| | paycheck, or other government document with name and address at the polls if voting in person or to include a copy of one of the above forms of identification with their ballots if voting by mail (52 U.S.C. §21083(b)(2)(a)) |
| | • Requires states to maintain a state-based administrative complaint procedure if they receive any payments under the act (52 U.S.C. §21112) |
| National Voter Registration Act of 1993 (NVRA; P.L. 103-31, 107 Stat. 77)[b] | • Requires states to process driver's license applications submitted to a state motor vehicle agency as applications for voter registration or updates to voter registration information unless they are not signed by the applicant in a specified place (52 U.S.C. §20503; 52 U.S.C. §20504(a)-(c)) |
| | • Requires states to process change of address forms submitted to a state motor vehicle agency as a change of address for voting purposes unless the registrant indicates that it is not for voter registration purposes (52 U.S.C. §20504(d)) |
| | • Requires states to designate public assistance offices, offices that provide state-funded programs that primarily provide services to persons with disabilities, armed forces recruitment offices, and other offices in the state as voter registration offices, which must distribute mail voter registration application forms, offer assistance with completing the forms, and transmit completed forms to election officials (52 U.S.C. §20503; 52 U.S.C. §20506) |
| | • Requires states to transmit completed voter registration forms submitted at motor vehicle agencies and designated voter registration agencies to election officials within 10 days of acceptance or, if the application is submitted within 5 days of the election, 5 days of acceptance (52 U.S.C. §20504(e); 52 U.S.C. §20506(d)) |
| | • Requires states to accept the federal mail voter registration application form created by the act and to make the form available through various public and private entities (52 U.S.C. §20503; 52 U.S.C. §20505) |
| | • Requires states to send notices to voter registration applicants about the disposition of their applications (52 U.S.C. §20507(a)(2)) |
| | • Requires states to conduct a general program to remove the names of ineligible voters from the voter rolls, complete the program no later than 90 days before an election, and follow specified procedures for removing the names of ineligible voters from the rolls (52 U.S.C. §20507) |
| | • Requires states to inform voters who apply to register to vote at motor vehicle agencies, by mail, or at designated voter registration agencies of the voter eligibility requirements and the penalties for submitting a false application (52 U.S.C. §20507(a)(5)) |
| | • Requires states to retain information related to voter list maintenance for at least two years and make it available for public inspection (52 U.S.C. §20507(i)) |
| | • Requires states to designate a chief state election official to coordinate activities under the act (52 U.S.C. §20509) |
| Uniformed and Overseas Citizens Absentee Voting Act of 1986 (UOCAVA; P.L. 99-410, 100 Stat. 924) | • Requires states to permit absent uniformed services and overseas voters to register and vote absentee (52 U.S.C. §20302(a)(1)) |
| | • Requires states to process any otherwise valid voter registration and absentee ballot applications from absent uniformed services and overseas voters that are received at least 30 days before an election (52 U.S.C. §20302(a)(2)) |
| | • Requires states to allow absent uniformed services and overseas voters to use the federal write-in absentee ballot or an approved state substitute[c] (52 U.S.C. §20302(a)(3)) |
| | • Requires states to allow absent uniformed services and overseas voters to use the official post card form for simultaneous voter registration and |

| Statute | Summary of Provisions Governing State and Local Election Administration |
|---------|------------------------------------------------------------------------|
| | absentee ballot applications (52 U.S.C. §20302(a)(4)) |
| | • Requires states to accept the standard oath established under the act, if they require an oath or affirmation (52 U.S.C. §20302(a)(5)) |
| | • Requires states to establish procedures for absent uniformed services and overseas voters to request and receive voter registration applications, absentee ballot applications, and absentee ballots by mail or electronically, depending on their preference (52 U.S.C. §20302(a)(6)-(7); 52 U.S.C. §20302(e)-(f)) |
| | • Requires states to transmit absentee ballots to absent uniformed services and overseas voters no later than 45 days before an election for absentee ballot requests that are received at least 45 days before the election and as quickly as practicable in other cases unless granted a hardship waiver (52 U.S.C. §20302(a)(8); 52 U.S.C. §29392(g)) |
| | • Requires states to establish a written plan to ensure ballots are transmitted to absent uniformed services and overseas voters in time to participate in the runoff, if the state conducts a runoff election (52 U.S.C. §20302(a)(9)) |
| | • Requires states to report the number of absentee ballots transmitted to and received from absent uniformed services and overseas voters (52 U.S.C. §20302(a)(11); 52 U.S.C. §20302(c)) |
| | • Requires states to designate a single state office to provide information on registration and absentee ballot procedures for absent uniformed services and overseas voters (52 U.S.C. §20302(b)) |
| | • Requires states to provide absent uniformed services and overseas voters whose voter registration or absentee ballot applications are rejected with reasons for the rejection (52 U.S.C. §20302(d)) |
| | • Requires states to designate a means of electronic communication for purposes of voting by absent uniformed services and overseas voters (52 U.S.C. §20302(e)) |
| | • Requires states to develop a free access system absent uniformed services and overseas voters can use to determine whether their absentee ballots have been received by election officials (52 U.S.C. §20302(h)) |
| | • Prohibits states from refusing to accept voter registration or absentee ballot applications or absentee ballots from absent uniformed services and overseas voters solely on the basis of notarization requirements or restrictions on paper or envelope type (52 U.S.C. §20302(i); 52 U.S.C. §20303(f)) |
| | • Prohibits states from refusing to accept voter registration or absentee ballot applications from absent uniformed services voters on the grounds that they were submitted earlier than the state typically accepts voter registration or absentee ballot applications (52 U.S.C. §20306) |
| Voting Accessibility for the Elderly and Handicapped Act of 1984 (VAEHA; P.L. 98-435, 98 Stat. 1678)[d] | • Requires states and localities to ensure that all polling places are accessible to elderly voters and voters with disabilities (52 U.S.C. §20102(a)-(b)) |
| | • Requires states to report the number of accessible and inaccessible polling places in the state for the most recent federal general election and the reasons inaccessible polling places were inaccessible (52 U.S.C. §20102(c)) |
| | • Requires states and localities to provide a reasonable number of accessible permanent voter registration facilities, unless they offer registration by mail or at voter residences (52 U.S.C. §20103) |
| | • Requires states to provide registration and voting aids for elderly voters and voters with disabilities (52 U.S.C. §20104(a)) |
| | • Requires states and localities to permit voters with disabilities to join the permanent absentee list or apply for an absentee ballot after the application deadline without providing a notarization or medical certification (52 U.S.C. |

| Statute | Summary of Provisions Governing State and Local Election Administration |
|---|---|
| | §20104(b)) |
| | • Requires states to provide public notice of the procedures for voting absentee and the availability of registration and voting aids for elderly voters and voters with disabilities (52 U.S.C. §20104(c)) |
| Voting Rights Act of 1965 (VRA; P.L. 89-110. 79 Stat. 437)[e] | • Prohibits states and localities from denying or abridging the right to vote on account of race, color, membership in certain language minority groups, or failure to comply with specified requirements (52 U.S.C. §10301(a); 52 U.S.C. §10303(f)(2); 52 U.S.C. §10501) |
| | • Requires certain states and localities—identified by a formula specified in the law—to seek preclearance from the U.S. Attorney General or the U.S. District Court for the District of Columbia for proposed changes to their voting practices and procedures[f] (52 U.S.C. §10303-10304) |
| | • Provides for requiring states and localities that violate the Fourteenth or Fifteenth Amendment to obtain preclearance for changes to their voting practices and procedures (52 U.S.C. §10302) |
| | • Requires certain states and localities—identified by a formula specified in the law—to provide ballots and other registration and voting materials in minority languages (52 U.S.C. §10303(f); 52 U.S.C. §10503) |
| | • Prohibits anyone acting under color of law from refusing to permit qualified voters to vote or refusing to tabulate, count, and report their votes (52 U.S.C. §10307(a)) |
| | • Prohibits anyone from engaging in voter intimidation, threatening, or coercion (52 U.S.C. §10307(b)) |
| | • Prohibits states and localities from imposing durational residency requirements for presidential elections and requires them to comply with uniform standards for absentee registration and voting in presidential elections (52 U.S.C. §10502) |

**Sources:** CRS, based on analysis of the text of the statutes and the *U.S. Code*.

**Notes:** Laws are presented as amended, where relevant.

a. States that have not had a voter registration requirement for federal elections since at least October 29, 2002, are exempt from the HAVA requirement to establish a statewide voter registration list (52 U.S.C. §21083(a)(1)(B)).

b. States that have either not required voter registration or offered Election Day registration for federal elections since at least August 1, 1994, are exempt from the NVRA (52 U.S.C. §20503(b)).

c. States that have required absentee ballots to be made available to certain voters at least 90 days before an election or as soon as the official list of candidates is complete since at least August 28, 1986, are exempt from the UOCAVA requirement to accept the federal write-in absentee ballot (52 U.S.C. §20303(g)).

d. The Americans with Disabilities Act of 1990 (ADA; P.L. 101-336, 104 Stat. 327) also requires states to make reasonable accommodations for voters with disabilities to ensure they are not denied access to the vote.

e. Various civil rights acts have contained provisions intended to ensure access to voting to all eligible voters regardless of race or color. The Civil Rights Act of 1960 (CRA; P.L. 86-449, 74 Stat. 89) also contains a provision that regulates the retention of records related to federal elections (52 U.S.C. §20701).

f. The U.S. Supreme Court struck down the coverage formula in the VRA in 2013. This provision remains in effect, but, unless Congress adopts a new formula, no states or localities are subject to it.

# Author Information

Karen L. Shanton
Analyst in American National Government

# Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.