# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Pennsylvania Voters Alliance, Stephanie Borowicz, Kristine Eng, Theodore A. Dannerth, Eric Kroner, Eric Nelson, Daryl Metcalfe, Dawn Wetzel Keefer, Russ Diamond, Chris Dush, Jim Gregory, Francis Ryan, Michael Harvey, David Torres, Dasha Pruett, | Civil Action No.: 4:20−CV−01761−MWB Hon. Matthew W. Brann |
| Plaintiffs, vs. | |
| Centre County, Delaware County, and the City of Philadelphia, and Kathy Boockvar, in her official capacity as Secretary of the Commonwealth of Pennsylvania, | **Supplemental Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order** |
| Defendant. | |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................iii

I.    The facts show that CTCL private federal election grants to Pennsylvania counties and cities are inconsistent with federal law. ..................................................................................................................1

II.   The Plaintiffs have Article III standing. ..............................................3

III.  The legal requirement of probability of success on the merits for a temporary restraining order to issue are met on Count I preemption.......................................................................................................11

IV.   Alternatively, the Equal Protection Clause requires that the private federal election grants be proportionally distributed to the Pennsylvania counties by the Secretary of the Commonwealth........................................................................................................21

       Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania, Centre County, Delaware

County and the City of Philadelphia for violation of the
Election Clause of the United States Constitution and the
Equal Protection Clause of the Fourteenth Amendment, 42
U.S.C. §1983. ................................................................................21

V.     The Pennsylvania Voters Alliance will suffer irreparable injury
       absent the injunction. ........................................................................28

VI.    The harm to other interested parties is little or none if the relief
       is granted. ..........................................................................................31

VII.   The public interest is aided by the preliminary injunction. ...............32

# TABLE OF AUTHORITIES

## Cases

*Arizona State Legislature v. Arizona Independent Redistricting Com'n,* 576 U.S. 787 (2015) ...................................................................................................................12

*Arizona v. Inter Tribal Council of Arizona, Inc.,* 570 U.S. 1 (2013) ....................................11

*Baker v. Carr,* 369 U.S. 186 (1962) .......................................................................................5

*Board of Education of Kiryas Joel Village School District v. Grumet,* 512 U.S. 687 (1994) ...................................................................................................................18

*Bullock v. Carter,* 405 U.S. 134 (1972)................................................................................20

*Bush v. Gore,* 531 U.S. 98 (2000) ........................................................................................21

*Caperton v. A.T. Massey Coal Co., Inc.,* 2259–63, 556 U.S. 868 (2009) ..........................18

*Christian Legal Soc'y v. Walker,* 453 F.3d 853 (7th Cir. 2006)...........................................31

*Common Cause of Pa. v. Pennsylvania,* 558 F.3d 249 (3d Cir. 2009) ...................................4

*Cook v. Gralike,* 531 U.S. 510 (2001)...................................................................................13

*Dunn v. Blumenstein,* 405 U.S. 330 (1972)...........................................................................21

*Elrod v. Burns,* 427 U.S. 347 (1976) ....................................................................................30

*Ferguson v. City of Charleston,* 532 U.S. 67 (U.S. 2001)....................................................19

*Ferring Pharm., Inc. v. Watson Pharm., Inc.,* 765 F.3d 205 (3d Cir. 2014) .........................1

*Fish v. Kobach,* 840 F.3d 710 (10th Cir. 2016) ...................................................11, 14, 15

*Gill v. Whitford,* 138 S. Ct. 1916 (2018) ........................................................................ 4, 6, 9

*Gonzalez v. Arizona,* 677 F.3d 383 (C.A.9 (Ariz.) 2012) ....................................................15

*Gray v. Sanders,* 372 U.S. 368 (1963) .................................................................................21

*Harper v. Virginia Bd. of Elections,* 383 U.S. 663 (1966)....................................................22

*Hunt v. Wash. State Apple Advert. Comm'n,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) ..........................................................................................4

*Issa v. School District of Lancaster,* 847 F.3d 121 (3d Cir. 2017)........................................1

*Konyk v. Pennsylvania State Police of Commonwealth of Pennsylvania*, 183 A.3d 981, 646 Pa. 154 (Pa., 2018) ...............................................................................10

*League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014).............................................................................................................31

*Lujan v. Defenders of Wildlife,* 504 U.S. 555 (1992) ...........................................8

*Moore v. Circosta, 2020 WL 5880129* ..............................................................21

*Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) .....................................30

*Party of Minnesota v. White,* 536 U.S. 765 (2002) ..............................................7

*Pennsylvania Democratic Party, et al., v. Boockvar, et al.,* 2020 WL 5554644 (2020) ........... 22, 27, 28

*Phelps–Roper v. Nixon,* 545 F.3d 685 (8th Cir.2008) ........................................32

*Phillips v. Selig,* 959 A.2d 420 (Pa.Super.2008) ...............................................10

*Preston v. Thompson*, 589 F.2d 300 (7th Cir. 1978) ..........................................30

*Prison Soc'y v. Cortes*, 508 F.3d 156 (3d Cir. 2007)...........................................4

*Reynolds v. Sims,* 377 U.S. 533 (1964) ..................................................5, 21, 29

*Scarpitti v. Weborg*, 530 Pa. 366, 370, 609 A.2d 147 (1992) ............................10

*Shields v. Zuccarini*, 254 F.3d 476 (3d Cir.2001).....................................1, 31, 32

*Small v. Juniata College,* 452 Pa.Super. 410, 682 A.2d 350 (1996)...................10

*Smiley v. Holm,* 285 U.S. 355 (1932) ................................................................12

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)...................................................4

*Stewart v. Blackwell*, 444 F.3d 843 (2006) ......................................................21

*Tashjian v. Republican Party of Conn.,* 479 U.S. 208 (1986) ..............................9

*U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779 (1995) ..............................9, 13

*U.S. v. Berks County, Pennsylvania,* 277 F.Supp.2d 570 (E.D.Pa. 2003)...........29

*U.S. v. Manning,* 215 F. Supp. 272 (W.D. La. 1963) .........................................11

*Voting Rights Coalition v. Wilson,* 60 F.3d 1411 (9th Cir. 1995).......................12

*Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) ........................................................14

*Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986) ...............................................................30

*Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784 (Del. Ch. 2015) ............................8, 13, 17, 29

**Statutes**

"Federal Campaign Finance" 52 U.S.C. §§ 30101 − 30146 ........................................................15

"Voting Assistance and Election Administration." 52 U.S.C. §§ 20101 − 21145....................15

"Voting Rights."  52 U.S.C.  §§ 10101 − 10702 ............................................................15

25 P.S. §§3150.11-3150.17................................................................................................22

25 P.S. §2645 ...........................................................................................................23, 24

25 P.S. §3150................................................................................................23, 24, 28

25 P.S. 3146 ...............................................................................................................22

42 U.S.C. § 1983 .......................................................................................................21

52 U.S.C. § 20901 ....................................................................................11, 15, 16

52 U.S.C. § 21141 ...................................................................................................15

**Other Authorities**

Public Law No. 116-136 (Mar. 27, 2020) ..........................................................................16

Public Law No: 116-94 (Dec. 20, 2019) ............................................................................16

Restatement (Second) of Contracts § 302 (1979)..............................................................10

Steven J. André, Government Election Advocacy: Implications of Recent
     Supreme Court Analysis, 64 Admin. L. Rev. 835, 851 (2012)..................................19

The Constitutionality of Municipal Advocacy in Statewide Referendum
     Campaigns, 93 Harv. L. Rev. 535, 554 (1980) ..........................................................19

**Constitutional Provisions**

U.S. Constitution, Art. I .................................................................................9, 11, 13, 28

The Plaintiffs file this supplemental memorandum in support of Plaintiffs' motion for a temporary restraining order. A preliminary injunction, inclusive of a temporary restraining order, is an extraordinary remedy granted in limited circumstances. *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). Those seeking one must establish that (1) they are likely to succeed on the merits of their claims, (2) they are likely to suffer irreparable harm without relief, (3) the balance of harms favors them, and (4) relief is in the public interest. *Id. See Issa v. School District of Lancaster,* 847 F.3d 121, 131 (3d Cir. 2017); *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001) .

## I.  The facts show that CTCL private federal election grants to Pennsylvania counties and cities are inconsistent with federal law.

The Center for Tech and Civic Life (CTCL) is in the process of distributing $250,000,000 to cities and counties to privately fund federal elections. Kaardal Sec. Decl. Ex. K (Stillwater Technical Solutions Timeline October 9, 2020). CTCL started and continued its nationwide funding of counties and cities in April of 2020. *Id.*

CTCL's first grant was a $100,000 grant to Racine, Wisconsin, approved on June 2, 2020, for "election planning and administration" and redistribution to the cities of Green Bay, Kenosha, Madison and Milwaukee. *Id.* at 2-3. The CTCL grant was conditioned upon development by the cities of a joint grant application for  June 15, 2020 Wisconsin Safe Voting Plan. *Id.* at 3.   On June 15, the Wisconsin Safe Voting Plan was submitted by the five Wisconsin cities as the initial application for CTCL's private federal election grants. *Id.* In July, the Wisconsin cities agreed to receive millions of dollars of CTCL's private federal election grants. *Id.* at 3-4.

Pennsylvania was the next target for CTCL's private federal election grants.  On

August 19, 2020, a CTCL grant of $2,172,858 was ratified by the Delaware County Council.

*Id.* at 4.  The private CTCL funds were required be used for specific purposes within

Delaware County:

- Install walk-in satellite voting centers with mobile "pop up" voting centers

- Provide poll worker hazard pay

- Place and monitor 50 drop boxes for vote-by-mail ballots

- Purchase equipment

- Hire staff to process mail in ballot applications and ballots

*Id.*  On August 21, 2020, the CTCL agreement for a $10,016,074 private federal election

grant was sent to the City of Philadelphia.  *Id.* at 4-5.  Later, in September, Centre County

agreed to a CTCL private federal election grant of $863,828.  The CTCL agreements have

reporting and clawback provisions which represent an ongoing liability for the local

governments skewing state legislative budgeting, and resulting in inaccurate federal and state

audits required for HAVA programs.  *Id.* at 5.

As to CTCL's private federal election grants in Pennsylvania, the current situation

with CTCL funding is:

1. Injection of private funding into county and municipal elections circumvents
   Pennsylvania and Federal appropriation processes, violates protocols in HAVA
   state implementation plans, and results in inaccurate reporting under HAVA
   254(a)(5);

2. HAVA (Help America Vote Act) , CARES Act (Coronavirus Aid, Relief, and
   Economic Security Act), and state appropriations for local elections in

Pennsylvania remain sufficient for the 2020 election cycle, rendering CTCL funding unnecessary because an estimated $13,553,179 of Pennsylvania's CARES funds are left to disburse; and,

3. When evaluated in context of the 2016 presidential election, CTCL grant funding patterns demonstrate partisanship in grant funding awards.

Kaardal Sec. Decl., Exhibit L (Stillwater Technical Solutions report Oct. 9, 2020) at 5-8 and Attachment A.

On October 2, 2020, the Louisiana Attorney General sued CTCL to enjoin CTCL's private federal election grants to local governments in Louisiana.  Kaardal Sec. Decl., Exhibit M.  CTCL is making the same private federal election grants in Pennsylvania as it is in Louisiana.  *Id.*  Pennsylvania's state government has done nothing to stop CTCL's private federal election grants to Pennsylvania's political subdivisions.

The Defendant counties and city in Pennsylvania continue to accept and use CTCL's private federal election grants for the upcoming November 3 election.

## II.   The Plaintiffs have Article III standing.

The Plaintiffs, Pennsylvania Voters Alliance, Stephanie Borowicz, Kristine Eng, Theodore A. Dannerth, Eric Kroner, Eric Nelson, Daryl Metcalfe, Dawn Wetzel Keefer, Russ Diamond, Chris Dush, Jim Gregory, Francis Ryan, Michael Harvey, David Torres, Dasha Pruett have standing.[1]  It axiomatic that as a party invoking federal jurisdiction, the plaintiff must allege facts demonstrating that each of the following elements have been satisfied in order to have standing to pursue the case: (1) the plaintiff "suffered an injury in

---

[1] Unless otherwise noted, "Pennsylvania Voters Alliance" includes all Plaintiffs.

fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). (same). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (quotation omitted). That is, the injury "must actually exist" and "must affect the plaintiff in a personal and individual way." *Id.* at 1548 (quotation omitted).  The individual plaintiffs, as explained below, meet these requirements for standing.

Pennsylvania Voters Alliance is an unincorporated association and may have standing to bring suit through the standing of its members. *Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261 (3d Cir. 2009) (quoting *Prison Soc'y v. Cortes*, 508 F.3d 156, 162–63 (3d Cir. 2007)). By associational standing, "an association may assert claims on behalf of its members, but only where the record shows that the organization's *individual members themselves have standing to bring those claims.*" *Common Cause*, 558 F.3d at 261. An entity may establish associational standing on behalf of its members where: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests it seeks to protect are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).  Pennsylvania Voters Alliance meets these requirements by the plaintiffs being members of the assocaiton.

Recently, the U.S. Supreme Court reiterated its long held view that a person's right to vote is "individual and personal in nature" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018)

*quoting Reynolds v. Sims,* 377 U.S. 533, 561 (1964).  Thus, "voters who allege facts showing disadvantage to themselves as individuals have standing to sue" to remedy that disadvantage. *Id. quoting Baker v. Carr,* 369 U.S. 186, 206 (1962).  The individual Plaintiffs have alleged a particularized harm in the city and counties they vote in.  Philadelphia, Centre County, and Delaware County have accepted private grant moneys from the Center for Tech and Civic Live for the specific purpose to maintain, promote, or favor a historic specific demographic group that can influence the outcome of federal elections within the boundaries of those counties and city.  By doing so, the Defendants are affecting the Plaintiffs' constitutional right to vote in that, their votes will be wasted in an election where the government is using private moneys to ensure candidates of a certain party will win in landslides or opposing candidates destined to lose by closer margins.  For instance, in 2016 in Philadelphia, H. Clinton defeated Trump with 84.3% of the votes—584,025 to 108,748.  In Delaware County, H. Clinton defeated Trump 177,402 to 110,667 or 61.58% of the vote and in Centre County H. Clinton defeated Trump 37,088 to 35,274 or 50.93% of the vote.  In short, the injury, using private moneys to influence a federal election outcome whether directly or indirectly is boundary specific—whether a city or county.  *C.f. Baker,* 369 U.S., at 206; *Gill,* 138 S. Ct. at 1930.

Each Plaintiff resides in a specific city or county.  For example, she votes for a single federal representative for Congress that includes the city or county and for a presidential ticket.  The disadvantage is to the voter as an individual within that boundary wherein she resides.  Hence, the remedy, halting the acceptance or grant of private moneys, is limited to that which produced the injury in the first instance.  The Plaintiffs are not asserting a claim

of injury or general grievance *outside* her city or county. The injury is specific as is the

remedy. *Gill,* 138 S. Ct. at 1930.

The U.S. Supreme Court in the *Gill* decision expressed an openness to standing based

on other "possible theories of harm." *Id.* at 1931. There is no speculation involved here.

Private moneys are involved in federal elections. As the Pennsylvania Deputy Secretary for

Elections and Commissions expressed, the nonpartisan aspect of elections regarding the

Department's duties and concerns of conflicts of interest stands at the forefront:

> Because elections are partisan in nature and the Department [of State] has the
> responsibility to remain nonpartisan in executing its duties in overseeing the
> election process in the Commonwealth, any type of donation will need to be
> properly vetted in order to ensure…elections are not compromised by an
> actual conflict to interest.

Kaardal Decl. Ex. N. That concern of a conflict of interest comes into clarity as

described in the Delaware County request for CTCL funding when is described how

the Democrats took control of the County "for the first time in 150 years" revealing a

partisan favoritism toward Democrats or at least the appearance of impropriety:

> Until 2020, the Delaware County Republican Party held a majority of the seats
> on County Council and appointed the majority of the Board of Elections. The
> Delaware County Republican party was one of the last great suburban political
> patronage machines. It made both the primary and general election days
> county holidays and required county employees to serve as poll workers…in
> the 2019 general election, Democrats swept the council races and took control
> of the County for the first time in approximately 150 years.

Kaardal Decl. Ex. O. The acceptance of private moneys is to further a specific cause within

a specific boundary to the detriment of the voter residing in either the city or county.

In addition, for standing purposes, absent an injunction, the private moneys to

finance federal elections, as a violation of the Elections Clause invalidates the federal

elections, causing injury to Pennsylvania Voters Alliance because it won't have representation in Congress and in the Electoral College.  The Pennsylvania Voters Alliance is *not* suggesting in this motion that this Court invalidate the federal elections.

As a preliminary matter, the favorable decision sought in this motion is to stop the private financing of the federal election, not to invalidate the Presidential and Congressional election process in Pennsylvania.  The Louisiana Attorney General on October 2, 2020, initiated similar litigation in Louisiana state court to stop private funding of federal elections there—presumably to stop the invalidation of Presidential and Congressional elections there.  Kaardal Decl., Ex. C.

Nevertheless, when either a city or county violates the Elections Clause by accepting private moneys, it ultimately delegitimizes the election, thereby invalidating the election outcomes under the Elections Clause.  Thus, Philadelphia, Delaware and Centre Counties will deprive each individual Plaintiff of their congressional representation and Electoral College representation, as other unaffected states will have representation in Congress and in the Electoral College.

The U.S. Supreme Court in 2002 split on the meaning of "election" under a state constitution.  Republican *Party of Minnesota v. White*, 536 U.S. 765, 805 (2002) (dissenting opinion) (Ginsburg, J.) ("I do not agree with this unilocular, 'an election is an election,' approach.").  Here, similarly, the federal courts are called to interpret what an "election" is, but this time under the federal Elections Clause, when a local subdivision of a government accepts millions of dollars for federal election purposes.

The described injury here, the Pennsylvania Voters Alliance's lack of representation in Congress and in the Electoral College, is fairly traceable to the defendant city's and counties' conduct in accepting the private federal election grants. It is not speculative and can be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992) (listing elements for standing). Another way the Pennsylvania Voters Alliance's injury is distinguishable from the general public is because other states whose counties and cities do not accept CTCL private federal election grants will still have representation in Congress and in the Electoral College.

Likewise, voter standing regarding federal elections exists when the government favors demographic groups the same way it does when the government disfavors demographic groups. The court in *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) summarized this way, "[p]arity of reasoning suggests that a government can violate the [Delaware] Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups." In a similar way, CTCL's private federal election grants cause the government to violate neutrality which injures the Pennsylvania Voters Alliance even by the appearance of the impropriety of a core public responsibility. The Defendants accepting CTCL's private federal election grants have a detrimental effect on the credibility and integrity of election outcomes because private moneys are being injected into the election process. In other words, the Pennsylvania Voters Alliance's injury is caused by the grant's attempt to promote or exceed the historical voting of progressive demographic groups within the Pennsylvania counties and cities using CTCL's private federal election grants.

The U.S. Constitution, Article I's Elections Clause and Article VI's Supremacy Clause preempts CTCL's private federal elections grant to local governments. The Elections Clause states:

> Time, place, and manner of holding. The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing [sic] Senators.

U.S. Constitution, Art. I, sec. 4, cl. 1. The Clause grants to the States "broad power" to prescribe the procedural mechanisms for holding congressional elections, *e.g., Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986) but does not authorize them to dictate electoral outcomes, to favor or disfavor a class of candidates, or to evade important constitutional restraints, *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 833-43 (1995)

The U.S. Supreme Court has not closed the door to other theories of harm to voters as previously mentioned. *C.f. Gill*, 138 S.Ct. at 1931. The state has a vital interest in the integrity of elections. And, the individual voter has an interest in the fundamental right to vote which is really an individualized concern regarding the exercise of the franchise.

Here, the Pennsylvania Voters Alliance has standing because the private federal election grants tortiously interfere with their Election Clause rights to fair, equal, and uniform elections. *C.f. Gill*, 138 S.Ct. at 1931. As the supreme law of the land, the Constitution forms the basis of an important social contract between the citizenry and their government. Here, the government promises to execute its trust faithfully, leaving to the people the right to rebel in case the government breaks the terms of the contract, or, in other words, violates the constitution. While the Constitution establishes an open-ended

association and transforms its parties in relation to that association, elements of obligations between the parties exist.  This is the social contract of the Election Clause with the people as third-party beneficiaries.

The necessary elements of the cause of action are (1) the existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct. *Phillips v. Selig,* 959 A.2d 420, 429 (Pa.Super.2008), *appeal denied,* 600 Pa. 764, 967 A.2d 960 (2009); *Small v. Juniata College,* 452 Pa.Super. 410, 682 A.2d 350, 354 (1996), *appeal denied,* 689 A.2d 235 (1997).  Under Pennsylvania law, a person assumes third-party beneficiary status where both parties to the contract express an intention to benefit the third party and that intention appears in the contract. *See Scarpitti v. Weborg,* 530 Pa. 366, 370, 609 A.2d 147, 149 (1992) (citing, *inter alia*, Restatement (Second) of Contracts § 302 (1979)); *Konyk v. Pennsylvania State Police of Commonwealth of Pennsylvania,* 183 A.3d 981, 987–88, 646 Pa. 154, 165 (Pa., 2018)

The Pennsylvania Voters Alliance is a third party beneficiary of how the Philadelphia, Delaware and Centre Counties conduct federal elections because, by those elections, the Alliance will be represented in Congress and in the Electoral College. Philadelphia, Delaware and Centre Counties and CTCL knew of the Pennsylvania Voters Alliance's third party beneficiary rights, arising from legal and contractual relationships between the federal government and the state, to fair, equal and uniform elections.  Pennsylvania Voters Alliance claims that private federal election grants are not allowed under federal law. If so, CTCL's

10

private federal election grants to the Philadelphia, Delaware County and Centre County tortiously interfere with the Alliance's third party beneficiary rights to fair, equal, and uniform elections—and interfere with the Alliance's representation in Congress and in the Electoral College.

### III.   The legal requirement of probability of success on the merits for a temporary restraining order to issue are met on Count I preemption.

Federal law preempts private federal election grants to counties and cities.  There is no legal authority under the Elections Clause nor 52 U.S.C. § 20901 for local governments to accept and use private federal election grants.  Counties and cities, as political subdivisions of States, have no power to have federal election policies under the Elections Clause.  U.S. Const., art. I, § 4, cl. 1.   The Election Clause's phrase "manner of holding elections" for Senators and Representatives "refers to the entire electoral process, from the first step of registering to the last step of promulgating honest returns."  *U.S. v. Manning,* 215 F. Supp. 272, 284 (W.D. La. 1963).  The Supreme Court has stated that the Elections Clause has two functions: "Upon the States it imposes the duty ('*shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether."  *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013).  The Supreme Court has held that the Elections Clause invests the state with power over Congressional elections subject to Congressional control. *Inter Tribal Council of Arizona, Inc.,* 570 U.S. at 9.  So, the States have "no power qua sovereigns" regarding federal elections; whatever powers the States have regarding federal elections is because Congress allows it.  *Fish v. Kobach*, 840 F.3d 710, 731–32 (10th Cir. 2016). Nor does the Constitution impose on the United States the costs incurred by Congress's

alterations of federal elections, traditionally borne by the States.  *Voting Rights Coalition v. Wilson,* 60 F.3d 1411, 1416 (9th Cir. 1995).

To be sure, Governors and independent redistricting committees, established under state law, have been found constitutionally permissible under the Elections Clause.  *Smiley v. Holm,* 285 U.S. 355 (1932).  *Arizona State Legislature v. Arizona Independent Redistricting Com'n,* 576 U.S. 787 (2015).  But, in contrast, counties and cities which are political subdivisions of the state have never been held to be sovereigns for federal election policies.  Therefore, with the acceptance of private moneys for a core public governmental function, such as processing federal elections, it is beyond the authority of any city or county as to its appearance of impropriety to use those private moneys in the conduct of those elections that may influence a particular demographic group.

Under the Elections Clause, the States and their political subdivisions (counties and cities) cannot dictate federal election outcomes; instead, fair and uniform federal elections are required. From the time of the Elections Clause, the States were to prescribe the "time, place and manner" of U.S. House of Representatives elections subject to Congressional enactments.  After 1913, the year the Seventeenth Amendment was enacted, states elected their U.S. Senators instead of the state legislatures appointing U.S. Senators.  After 1913, the States were required to prescribe the "time, place and manner" of elections of U.S. Senators as they had been doing for Representatives of the U.S. House—again subject to Congressional enactments.

Under the Elections Clause, the States and their political subdivisions (counties and cities) cannot favor or disfavor candidates.  The Supreme Court in *U.S. Term Limits, Inc. v.*

*Thornton,* 514 U.S. 779, (1995) held unconstitutional an Arkansas law that prohibited the candidacy of an otherwise eligible Congressional candidate if he or she had already served three terms in the House of Representatives or two terms in the Senate. The Supreme Court held that the ballot restriction was an indirect attempt to impose term limits on congressional incumbents that violated the Qualifications Clauses in Article I of the Constitution rather than a permissible exercise of the State's power to regulate the "Times, Places and Manner of holding Elections for Senators and Representatives" within the meaning of Article I, § 4, cl. 1.  Similarly, the Supreme Court held unconstitutional an initiative amending the Missouri Constitution to require that any failure of United States Senators or Representatives, or nonincumbent candidates for those offices, to support term limit provisions be noted on federal election ballots.  *Cook v. Gralike*, 531 U.S. 510, 511 (2001).

The States and their political subdivisions (counties and cities) under the Elections Clause also cannot favor a demographic group.  A government favoring a demographic group, similar to the government disfavoring a demographic group, skews election outcomes.  "Parity of reasoning suggests that a government can violate the [Delaware] Elections Clause if it skews the outcome of an election by encouraging and facilitating voting by favored demographic groups."  *Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del Ch. 2015).

*Red Clay Consol. Sch. Dist.* reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group.  The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-

out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law. The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.* The court stated that the government favoring a demographic group caused equivalent injury to a voter as the government disfavoring a demographic group. *Id.*

Under the Elections Clause, States and their political subdivisions are not to circumvent constitutional or other federal legal restrictions—which includes the Elections Clause and federal statutes on federal elections. And, federal elections law, need not be specific to be preemptive over actions of local governments.

Elections Clause preemption is not subject to the Plain Statement Rule. The Plain Statement Rule requires that, when Congress intends to preempt state law, "it must make its intention to do so 'unmistakably clear in the language of the statute.' " *Gregory*, 501 U.S. 452, 460 (1991) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65 (1989)). However, because Congress's regulation of federal elections displaces state regulations, and because the states have no power as sovereigns to regulate such elections, the plain statement rule, as a creature of the presumption against preemption, has no work to do in the Elections Clause setting; it is unnecessary to prevent inadvertent or ill-considered preemption from altering the traditional state-federal balance. *Fish v. Kobach*, 840 F.3d 710, 731–32 (10th Cir. 2016), *citing Inter Tribal*, 133 S.Ct. at 2257 & n.6.

Importantly, recognizing the uniqueness of the Election Clause, the Ninth and Tenth Circuits apply a canon of statutory interpretation considering "the relevant congressional and

state laws as part of a single statutory scheme but treating the congressional enactment as enacted later and thus superseding any conflicting state provision." *Fish v. Kobach*, 840 F.3d 710, 726 (10th Cir. 2016), *citing Gonzalez v. Arizona*, 677 F.3d 383, 394 (C.A.9 (Ariz.), 2012).

Further, Title 52 of the United States Code (52 U.S.C.), entitled "Voting and Elections", is a codification of the "general and permanent" voting and election laws of the United States federal government. Subtitle I covers "Voting Rights." 52 U.S.C. §§ 10101 – 10702). Subtitle II covers "Voting Assistance and Election Administration." 52 U.S.C. §§ 20101 – 21145. Subtitle III covers "Federal Campaign Finance" 52 U.S.C. §§ 30101 – 30146. 52 U.S.C. § 21141 defines "State:"

> In this chapter, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, and the United States Virgin Islands.

Counties and cities are not states. Consistent with the Elections Clause, Title 52 imposes federal legal requirements on the States and their political subdivisions regarding federal elections.

Under 52 U.S.C. § 20901, "Payments to States for activities to improve administration of elections," the provision of federal law establishes an exclusive prerogative for the federal government to grant funds to states to improve administration of federal elections: 52 U.S.C. § 20901 requires the States to use federal moneys to implement federal policy regarding federal elections:

> (b)USE OF PAYMENT
>
> (1)IN GENERAL A State shall use the funds provided under a payment made under this section to carry out one or more of the following activities: (A) Complying with the requirements under subchapter III. (B) Improving the administration of elections for Federal office…

> (c)USE OF FUNDS TO BE CONSISTENT WITH OTHER LAWS AND
> REQUIREMENTS In order to receive a payment under the program under this
> section, the State shall provide the Administrator with certifications that—(1)
> the State will use the funds provided under the payment in a manner that is
> consistent with each of the laws described in section 21145 of this title, as
> such laws relate to the provisions of this chapter; and (2) the proposed uses of
> the funds are not inconsistent with the requirements of subchapter III.

Thus, federal election moneys are distributed to the States under the federal policy limitations of 52 U.S.C. § 20901. The States then determine how much of the money is distributed locally.

On December 20, 2019, prior to the COVID-19 pandemic, the federal Consolidated Appropriations Act of 2020 was signed into law. Public Law No: 116-94 (Dec. 20, 2019). The Act included $425 million in new HAVA funds, made available to states to improve the administration of elections for Federal Office, including to enhance technology and make election security improvements. On March 27, 2020, in response to the COVID-19 pandemic, the federal Coronavirus Aid, Relief, and Economic Security Act (CARES Act) was signed into law. Public Law No. 116-136 (Mar. 27, 2020). The Act included $400 million in new Help America Vote Act (HAVA) emergency funds, made available to states to prevent, prepare for, and respond to the coronavirus for the 2020 federal election cycle. The States, consistent with 52 U.S.C. § 20901, distributed most of the federal moneys to the counties and cities for federal election purposes. The counties and cities are bound by the federal policy limitations of 52 U.S.C. § 20901.

There is no legal authority under the Elections Clause nor 52 U.S.C. § 20901 for counties and cities, which are political subdivisions of the States, to accept and use private federal election grants. The Elections Clause does not authorize the political subdivisions of

the State to have federal election policies.  52 U.S.C. § 20901 authorizes federal payments to States for the purpose of improving election administration.  The states, in turn, distribute money to the counties and cities as their respective political subdivisions.  In short, 52 U.S.C. § 20901 does not authorize private federal election grants to counties and cities. Private federal election grants to counties are legally unauthorized.  Private federal election grants to counties are legally unauthorized.

Additionally, the City of Philadelphia, Delaware County and Centre County have entered into grant agreements accepting private moneys from CTCL. In receiving the CTCL's private federal election grants, they create a public-private relationship, privatizing in part, the conduct of federal elections.

*Young v. Red Clay Consol. Sch. Dist.,* 122 A.3d 784, 858 (Del. Ch. 2015) reveals the dangers of a government scheme to target get-out-to-vote efforts on a favored demographic group.  The school district wanted its referendum to pass; so, it targeted parents of school children and adult students for a get-out-to-vote campaign. In the *Young* decision, the court identified the school district's scheme to get-out-the-vote of the parents and adult students as also violating election law.   The court held that the school district's improper influence upon a demographic group interfered with the "full, fair, and free expression of the popular will…." *Id.*   The court stated that the government favoring a demographic group was equivalent to the government disfavoring a demographic group:

> Historically, the law has focused on forms of "improper influence" that have interfered with the voting rights of disfavored demographic groups by dissuading or preventing them from voting through blatant means like fraud, violence, and intimidation. A government certainly violates the Elections Clause if it skews the outcome of an election in this manner. Parity of reasoning suggests that a government can violate the Elections Clause if it

skews the outcome of an election by encouraging and facilitating voting by
favored demographic groups. In both situations, the government has
diminished the voting rights of one portion of the electorate and enhanced the
voting rights of another portion of the electorate. In neither case is the
election "free and equal."

*Id.*

As a case of first impression, no other case is analogous to the current public-private

partnership of the Counties in the context of federal elections. However, other cases show

the need to announce the constitutional impermissibility of such public-private relationships

regarding core governmental responsibilities.

The Supreme Court in *Caperton v. A.T. Massey Coal Co., Inc.,* 2259–63, 556 U.S. 868,

876–82 (2009), held that a state appellate judge erred by not recusing himself in a case where

a party had donated $3,000,000 to the judge's judicial campaign:

We conclude that there is a serious risk of actual bias—based on objective and
reasonable perceptions—when a person with a personal stake in a particular case had
a significant and disproportionate influence in placing the judge on the case by raising
funds or directing the judge's election campaign when the case was pending or
imminent. The inquiry centers on the contribution's relative size in comparison to the
total amount of money contributed to the campaign, the total amount spent in the
election, and the apparent effect such contribution had on the outcome of the
election.
Applying this principle, we conclude that Blankenship's campaign efforts had a
significant and disproportionate influence in placing Justice Benjamin on the case.
Blankenship contributed some $3 million to unseat the incumbent and replace him
with Benjamin. His contributions eclipsed the total amount spent by all other
Benjamin supporters and exceeded by 300% the amount spent by Benjamin's
campaign committee.

*Id.* at 884.  These sort of public-private partnerships where private parties significantly

finance judges' campaigns are not allowed within the judiciary.

Similarly, in *Board of Education of Kiryas Joel Village School District v. Grumet*, 512 U.S. 687

(1994), the Supreme Court drew such a line finding a public-private partnership

constitutionally impermissible. In *Kiryas*, the New York legislature sought to create a homogenous school district for Satmar Hasidic Jews and did so by statute. This "religious" motive was improper for the state and the statute forming the new district was stuck down. *Id.* at 691. Additionally, in *Ferguson v. City of Charleston*, 532 U.S. 67, 81-86 (U.S. 2001), the Supreme Court held another public-private partnership unconstitutionally impermissible. Here, the local prosecutor, concerned about crack babies, teamed up with the local hospital to develop a program seeking to prevent expecting mothers from using cocaine during the pregnancy. They developed a program where the hospital would test for the presence of cocaine and provide a program to help with abstinence. If the patient refused, the results were shared with the prosecutor's office that in turn would encourage participation at the threat of prosecution. The Supreme Court found the entanglement of public and private interests sufficient to conclude the blood test by the hospital was a Fourth Amendment violation by the state. *Id.* at 86.

As previously mentioned, the conduct of elections is a core public responsibility that must be publicly-funded. Governmental entities are expected to remain neutral. Scholars have warned of the hazard presented by partisan government conduct: "[P]ermitting the government to depart from a neutral position would threaten both the reliability of the election result as an expression of the popular will and the appearance of integrity crucial to maintaining public confidence in the electoral process."[2] *See also Bullock v. Carter*, 405 U.S.

---

[2] Steven J. André, Government Election Advocacy: Implications of Recent Supreme Court Analysis, 64 Admin. L. Rev. 835, 851 (2012), *citing* Note, The Constitutionality of Municipal Advocacy in Statewide Referendum Campaigns, 93 Harv. L. Rev. 535, 554, 554 n.112 (1980) (observing that "[t]he [United States Supreme] Court has explicitly recognized that the validity of elections as bona fide expressions of the popular will depends as much upon

134, 145 (1972)  (recognizing states' interests maintaining integrity in election processes).

The CTCL agreements have reporting and clawback provisions which represent an ongoing liability for the local governments skewing state legislative budgeting, and resulting in inaccurate federal and state audits required for HAVA programs.  Kaardal Decl., Ex. L at 5.  For example, Delaware County received a CTCL grant of $2,172,858.  *Id.* at 4.  If the private CTCL funds received by Delaware County are not used for specific purposes within the grant agreement, they need to be returned"

- Install walk-in satellite voting centers with mobile "pop up" voting centers

- Provide poll worker hazard pay

- Place and monitor 50 drop boxes for vote-by-mail ballots

- Purchase equipment

- Hire staff to process mail in ballot applications and ballots

*Id.*  The same goes for the CTCL agreement with the City of Philadelphia for a $10,016,074 private federal election grant.  *Id.* at 4-5.  The same goes for Centre County which agreed to a CTCL private federal election grant of $863,828.

This type of public-private entanglement violates the Elections Clause. The idea of the federal and state government exclusively funding federal elections under the Elections Clause is to eliminate undue influence and the appearance of undue influence by private parties. With the City of Philadelphia, Delaware County and Centre County entangling public and private interests in running federal elections, CTCL's private funding of federal

---

citizens' faith that the electoral process is free from government tampering as on the actual fairness of that process").

elections introduces undue influence and the appearance of undue influence into federal elections. The Court should declare such public-private partnerships constitutionally impermissible because it de-legitimizes federal elections—which is exactly what the Elections Clause was intended to prevent.

**IV.    Alternatively, the Equal Protection Clause requires that the private federal election grants be proportionally distributed to the Pennsylvania counties by the Secretary of the Commonwealth.**

> **Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania, Centre County, Delaware County and the City of Philadelphia for violation of the Election Clause of the United States Constitution and the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. §1983.**

"Voting is a fundamental right" *Reynolds v. Sims,* 377 U.S. 533, 561-562 (2006).   "The right to vote is more than the initial allocation of the franchise.  Equal protection applies as well to the manner of its exercise." *Moore v. Circosta, 2020 WL 5880129, __ F.Supp.3d ___, citing, Bush v. Gore,* 531 U.S. 98, 104, (2000).  The Commonwealth of Pennsylvania must have "specific rules designed to ensure uniform treatment" of a voter's ballot. *Bush, 531 U.S. at 106; see, Dunn v. Blumenstein,* 405 U.S. 330, 336, (1972).  A citizen of the Commonwealth of Pennsylvania "has a constitutionally protected right to participate in the election on an equal basis with other citizens" in the Commonwealth.  *Gray v. Sanders,* 372 U.S. 368, 380 (1963).

"When the state legislature vests the right to vote for President in its people, the right to vote as the legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Stewart v. Blackwell*, 444 F.3d 843, 859-860 (2006), *quoting, Bush v. Gore,* 531 U.S. 98, 104-105 (2000).  States may not, "by later arbitrary and disparate treatment, value one

person's vote over that of another." *Id.* at 859-860, *quoting, Bush* at 104-105, *citing Harper v. Virginia Bd. of Elections,* 383 U.S. 663, 665 (1966).

Defendant, Kathy Boockvar, in her capacity as the Secretary of the Commonwealth of Pennsylvania, has the constitutional obligation and duty to assure that the Election Code of the Commonwealth, as established and amended by the General Assembly, is implemented equally throughout the Commonwealth of Pennsylvania.  In October 2019, the General Assembly of the Commonwealth of Pennsylvania approved Act 77 of 2019, *25 P.S. 3146.1 et seq.*, which amended the Election Code of the Commonwealth of Pennsylvania. "Pennsylvania has enacted a comprehensive code of election laws pursuant to its authority to regulate its elections" and, "[a]ccordingly, it is presumed to be valid…" *Pennsylvania Democratic Party, et al., v. Boockvar, et al.,* 2020 WL 5554644 at 29-30, __ A.3d __ (2020).

For the first time, the Pennsylvania General Assembly provided qualified electors with the ability to vote via mail-in ballots without the requirement of first demonstrating their expected absence from the voting district on Election Day.  *25 P.S. §§3150.11-3150.17.* Section 3150.16(a) of the Election Code, as amended by Act 77, states in relevant part as follows:

> "(a) General Rule. – At any time after receiving an official mail-in-ballot, but on or before eight o'clock p.m. the day of the primary or election, the mail-in elector shall, in secret, proceed to mark the ballot only in black lead pencil, indelible pencil or blue, black or blue-black ink, in fountain pen or ball point pen, and the fold the ballot, enclose and securely seal the same in the envelope on which is printed, stamped or endorsed 'Official Election Ballot.'  This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and the address of the elector's county board of election and the local election district of the elector.  The elector shall then fill out, date and sign the declaration printed on such envelope.  Such envelope shall then be securely sealed, and the elector shall send same by mail, postage

prepaid, except where franked, or deliver it in person to said county board of election." *25 P.S. §3150.16(a)*

Section 3150.16(c) of the Election Code, as amended by Act 77, states in relevant part

as follows:

"(c) Deadline. – Except as provided under 25 Pa.C.S. § 3511 (relating to receipt of voted ballot), a completed mail-in-ballot must be received in the office of the county board of elections no later than eight o'clock p.m. on the day of the primary or election." *25 P.S. §3150.16(c)*

Finally, Section 2645(b) of the Election Code, which was not amended by Act 77,

states in relevant part as follows:

"(b)  The county commissioners or other appropriating authorities of the county shall provide the county board with suitable and adequate offices at the county seat, property furnished for keeping its records, holding its public sessions and otherwise performing its public duties, and shall also provide, such branch offices for the board in cities other than the county seat, as may be necessary." *25 P.S. §2645(b)*

Defendant Boockvar is permitting Defendants Centre County, Delaware County and

City of Philadelphia to accept CTCL's unregulated private financial support specifically

earmarked for activities that violate the Election Code of the Commonwealth of

Pennsylvania, the Election Clause of the United States Constitution and the Equal

Protection Clause of the Fourteenth Amendment. For example, CTCL's private federal

election grants in Pennsylvania are being used in Philadelphia, Delaware County and/or

Centre County for:

- Private funding of installation of walk-in satellite voting centers with mobile "pop up" voting centers
- Private funding of poll worker hazard pay
- Private funding of placement and monitoroing 50 drop boxes for vote-by-mail ballots
- Private funding purchase of equipment

- Private funding to hire staff to process mail in ballot applications and ballots

Despite the clear and unambiguous language of the Election Code, Defendant Boockvar has permitted Defendants Centre County, Delaware County and City of Philadelphia to utilize unstaffed "drop-boxes," "satellite locations" and/or mobile voting vehicles solely for the collection of "mail-in" ballots.

The Election Code makes no mention of and provides no authorization for staffed or unstaffed "drop-boxes," "satellite locations" or mobile voting vehicles to be solely used for the collection of "mail-in" ballots. Although the Election Code references branch offices, those offices must be "property furnished for keeping its records, holding its public sessions and otherwise performing its public duties". *25 P.S. §2645(b)* The "drop-boxes," "satellite locations" or mobile voting vehicles, permitted by Defendant Boockvar, and utilized by the other Defendants, are not "additional offices" as referenced in Section 2645(b) of the Election Code because they are not "property furnished for keeping its [Board of Elections'] records" or, "holding its [Board of Elections'] public sessions" or, "otherwise performing its [Board of Elections'] public duties." *25 P.S. §2645(b)*

In addition, the Election Code does not provide for multiple collection sites for "mail-in" ballots. Section 3150.16(c) of the Election Code, as amended by Act 77, states in relevant part "a completed mail-in ballot must be received *in the office* of the county board of elections no later than eight o'clock P.M. on the day of the primary election." *25 P.S. §3150.16(c). (emphasis added)* Section 3150.16(a) of the Election Code, as amended by Act 77, states in relevant part "… This envelope shall then be placed in the second one, on which is printed the form of declaration of the elector, and *the address of the elector's county board of election*

and the local election district of the elector.  The elector shall then fill out, date and sign the declaration printed on such envelope.  Such envelope shall then be securely sealed, and the elector shall send same by mail, postage prepaid, except where franked, or deliver it in person _to said county board of election_."  *25 P.S. §3150.16(a)*

If the General Assembly intended to permit the collection of mail-in ballots in multiple locations, the General Assembly would have amended Section 3150.16(a) and 3150(c) to read "in any of the offices of the county board of elections" or, "to any of the addresses of the elector's county board of election" or, "in person to any of the offices of the county board of elections." The General Assembly declined to make of these obvious amendments to the Election Code and Defendants unilateral usurpation of the General Assembly's exclusive authority to regulate elections within the Commonwealth of Pennsylvania is violates the Election Clause and the Equal Protection Clause.

Defendant Boockvar is permitting Defendants Centre County, Delaware County and City of Philadelphia to accept unregulated private financial support specifically earmarked to fund "drop-boxes," "satellite locations" and/or mobile voting vehicles within Centre County, Delaware County and the City of Philadelphia in violation of the Election Code as approved by the General Assembly of the Commonwealth of Pennsylvania.

There is no provision within the Election Code of the Commonwealth of Pennsylvania that authorizes Defendant Boockvar to permit private financial support of elections within the Commonwealth.  Nor is there any provision that authorizes Defendant Boockvar to permit counties, cities or other municipalities, including Defendants Centre County, Delaware County and the City of Philadelphia, to accept private financial support of

elections within their respective counties, cities and/or other municipalities. Defendant Boockvar is permitting this unregulated private financial support without regard for the disparate impact created between counties, cities and other municipalities that have received unregulated private financial support and those that have not received such financial support. Counties, cities and other municipalities that have not received unregulated private financial support will have to rely solely on the regulated public financial support available to conduct elections within the Commonwealth which means that these counties, cities and other municipalities will have less financial resources available to conduct elections within their respective municipalities.

Defendant Boockvar is permitting this unregulated private financial support without regard for the disparate impact created between voters who live in counties, cities and other municipalities that have received private financial support and those who live in counties, cities and other municipalities that have not received private financial support. Voters who live in counties, cities and other municipalities that have not received unregulated private financial support will have less election resource to assist them in casting their votes because their respective counties, cities and other municipalities must solely rely upon the regulated public financial support available to counties, cities and other municipalities to conduct elections within the Commonwealth.

If Defendant Boockvar is going to permit counties, cities and other municipalities, including, Defendants Centre County, Delaware County and the City of Philadelphia, to accept unregulated private financial support to conduct their respective elections, Defendant Boockvar must either make proportional and equivalent public financial support available to

those counties, cities and other municipalities that have not received private financial support; or, require all private financial support to be distributed in a proportional and equivalent manner to all counties, cities and other municipalities within the Commonwealth so that the utilization of private financial support to conduct elections does not result in disparate or unequal treatment.

Further, if Defendant Boockvar is going to permit counties, city and other municipalities to accept unregulated private financial support, Defendant Boockvar cannot restrict or discriminate against the source of the private financial support without violating the Equal Protection Clause. If Defendants Centre County, Delaware County and the City of Philadelphia are permitted to accept unregulated private financial support to conduct elections within their respective counties and city, other counties, cities and municipalities will secure or attempt to secure their own unregulated private financial support from any number of sources all of which will further create disparity in the elections within the Commonwealth in violation of the Equal Protection Clause of the Fourteenth Amendment and the Election Code of the Commonwealth.

Although, the Pennsylvania Supreme Court declined to address the Equal Protection issues related to Defendant Boockvar's above-described conduct, the Court acknowledged "… *the exact manner in which each county board of elections will accept these votes is entirely unknown at this point; thus, we have no metric by which to measure whether any one system offers more legal protection than another, making an equal protection analysis impossible at this point*." *Boockvar, 2020 WL 5554644 at 9-10.* (emphasis added).  Defendants' conduct, as set forth herein, provides this Court with the "metric by which to measure whether any one system offers more legal

protection than another" which not only makes an Equal Protection analysis possible, but essential to safeguard Pennsylvanians' fundamental right to vote.

In addition, despite the clear and unambiguous language of the Election Code, Defendant Boockvar is permitting Defendants Centre County, Delaware County and City of Philadelphia, to accept mail-in ballots beyond the statutory deadline established by the General Assembly and in in violation of the Election Code of the Commonwealth.  Section 3150.16(c) of the Election Code, as amended by Act 77, states in relevant part as follows:

> "(c) Deadline. – Except as provided under 25 Pa.C.S. § 3511 (relating to receipt of voted ballot), a completed mail-in-ballot must be received in the office of the county board of elections no later than eight o'clock p.m. on the day of the primary or election." *25 P.S. §3150.16(c)*

The deadline of 8:00 p.m. on Election Day for the receipt of ballots, as established by the General Assemble, is not ambiguous; nor does it violate the Constitution of the United States. *Pennsylvania Democratic Party, et al., v. Boockvar, et al.*, 2020 WL 5554644, __ A.3d __ (2020).

Defendant Boockvar's failure to enforce the deadline established by the General Assembly by permitting municipalities, including, Defendants Centre County, Delaware County and City of Philadelphia, to accept mail-in ballots beyond the statutory deadline established by the General Assembly in violation of the Election Clause of the Constitution. *Art. I, Sec 4 U.S. Const. and Art. II, Sec. 1 U.S. Const.*

## V.     The Pennsylvania Voters Alliance will suffer irreparable injury absent the injunction.

The Pennsylvania Voters Alliance, absent the injunction, will suffer irreparable injury. The  favorable decision sought in this motion is to stop the private financing of the federal

election, not to invalidate the Presidential and Congressional election process in

Pennsylvania.  The Louisiana Attorney General on October 2, 2020, initiated similar

litigation in Louisiana state court to stop private funding of federal elections there—

presumably to stop the invalidation of Presidential and Congressional elections there.

Kaardal Decl., Ex. M.  Nevertheless, when either a Pennsylvania city or county violates the

Elections Clause by accepting private moneys, it ultimately delegitimizes the election, thereby

invalidating the election outcomes under the Elections Clause.  Thus, Philadelphia, Delaware

and Centre Counties will deprive each individual Plaintiff of their congressional

representation and Electoral College representation, as other unaffected states will have

representation in Congress and in the Electoral College.

Of course, denial of the right to participate in a constitutionally-legitimate election is

by its nature an irreparable injury. *U.S. v. Berks County, Pennsylvania*, 277 F.Supp.2d 570, 578

(E.D.Pa. 2003) (citiation omitted).  And, the "right to vote freely for the candidate of one's

choice is of the essence of a democratic society, and any restrictions on that right strike at

the heart of representative government." *Reynolds v. Sims,* 377 U.S. 533, 555 (1964). The

government's election policy where certain Pennsylvania counties and cities receive CTCL's

private federal election grants and other Pennsylvania counties and cities don't skew the

federal election into illegitimacy.  "Parity of reasoning suggests that a government can violate

the [Delaware] Elections Clause if it skews the outcome of an election by encouraging and

facilitating voting by favored demographic groups."  *Young v. Red Clay Consol. Sch. Dist.,* 122

A.3d 784, 858 (Del Ch. 2015).

Philadelphia's, Delaware County's and Centre County's use of the private federal election grants causes irreparable injury, absent the pre-election injunction because it de-legitimizes the election. After the election, the voters of Philadelphia, Delaware County and Centre County, if the Court agrees with the Plaintiffs, may be without representation in Congress and without representation in the Electoral College.

Further, where, as here, the plaintiffs have demonstrated a likelihood of success on the merits as to a constitutional claim, such an injury has been held to constitute irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (where plaintiff had proven a probability of success on the merits, the threatened loss of First Amendment freedoms "unquestionably constitutes irreparable injury"); *Preston v. Thompson*, 589 F.2d 300, 303 n.4 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm."). Moreover, courts have specifically held that infringement on the fundamental right to vote constitutes irreparable injury. *See Obama for Am. v. Husted*, 697 F.3d 423, 435 (6th Cir. 2012) ("restriction on the fundamental right to vote constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (holding that plaintiffs "would certainly suffer irreparable harm if their right to vote were impinged upon"). The same would be true of infringement of the fundamental right to have representation in Congress or in the Electoral College.

Once the November election occurs, the damage to Pennsylvania Voters Alliance will be complete. Without injunctive relief, the CTCL moneys will cause a non-conformity of fair, equal and uniform elections in Pennsylvania—sought by Congress under HAVA and all

other election laws, including those of the state of Pennsylvania. This illegal public-private partnership causes the PVA irreparable injury.

 Additionally, traditional legal remedies are inadequate, since infringement on a citizens' constitutional right to vote cannot be redressed by money damages. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006); *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

**VI.     The harm to other interested parties is little or none if the relief is granted.**

The Pennsylvania Voters Alliance, absent the injunction, will suffer harm. *Shields,* 254 F.3d at 482.

While it is known there will be anticipated increases in voting, namely absentee ballot voting, it does not excuse the circumvention of federal and state laws.[3]  Hence, the need of the $14 million of private federal election grants split between two Pennsylvania counties and Philadelphia is questionable at best. The counties and cities have access to HAVA moneys and additional Cares Act moneys, specifically for election related needs—as does every other county and city in Pennsylvania responsible for conducting the 2020 federal elections. According to a Pennsylvania post-primary report, Pennsylvania has on hand an estimated $13,553,179 of CARES funds remaining for the November 3, 2020 election.  The federal grant money should be used by the Defendants prior to using private federal election grants.

On the other hand, the introduction of a public-private relationship in the federal election context is a first-time foreign element not contemplated by either HAVA or by the

---

[3] *E.g.* Kaardal Decl. Ex. I.

Secretary of the Commonwealth nor the Pennsylvania Legislature since the laws exclusively control the conduct and moneys related to federal elections. There is no question of the historical success and consistency of the counties and cities in their election process. What also is notably are the voter outcomes—predominately progressive.  Hence, the $14 million in grants from the CTCL raises sufficient questions as to the propriety of the public-private created relationship and government advocacy in favor of a demographic group. In short, injunctive relief to stay expenditures of the grant will cause little or no harm to the conduct of elections.

Moreover, a grant process is in place through the Secretary of the Commonwealth should the Defendants need more money to conduct federal elections. By doing so, the local governments will stay true to their core public responsibilities in conducting elections consistent with federal and state laws.  For these reasons, the balance of harms favors granting the motion.

## VII.    The public interest is aided by the preliminary injunction.

The public interest, absent the injunction, will be impeded.  *Shields,* 254 F.3d at 482. Centre County's, Delaware County's and Philadelphia's acceptance of the CTCL's grants reveal a public-private relationship that privatizes federal elections to skew the outcome of an election in areas of favored demographic groups. The private financing of federal elections skews the neutrality of an election which is the core public responsibility of the Cities. *Red Clay Consol. Sch. Dis*t., 122 A.3d at 857–58. Threats of private unconstitutional interference with the November 3 elections pose the same type of public interest analysis as in First Amendment deprivations.  *See Phelps–Roper v. Nixon,* 545 F.3d 685, 690 (8th Cir.2008)

(concluding that if the movant "can establish a sufficient likelihood of success on the merits of her First Amendment claim, she will also have established irreparable harm as the result of the deprivation").  And, it is always in the public interest to protect constitutional rights. Additionally, the PVA has no alternative administrative remedy to obtain immediate injunctive relief against the City of Philadelphia, Delaware County and Centre County.

Dated: October 12, 2020

_Electronically Signed by Jordan P. Shuber_
Jordan P. Shuber, PA ID 317823
Ronald T. Elliott, PA ID 71567
Thomas W. King, III, PA ID 21580*
Thomas E. Breth, PA ID 66350*
Special Counsel for the Amistad Project
of Thomas More Society
Dillon McCandless King Coulter &
Graham, LLP
128 West Cunningham Street
Butler, PA 16001
Telephone:     (724) 283-2200
Facsimile:     (724) 283-2298
E-mail addresses: jshuber@dmkcg.com
relliott@dmkcg.com
tking@dmkcg.com
tbreth@dmkcg.com

Dated: October 12, 2020

_  /s/ Erick G. Kaardal          _
Erick G. Kaardal, MN 229647
Special Counsel to Amistad Project
of the Thomas More Society
Gregory M. Erickson, 1050298
William F. Mohrman, 168816
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: 612-341-1074
Facsimile: 612-341-1076
Email: kaardal@mklaw.com
_Attorneys for Plaintiffs_