**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

---

| | |
|---|---|
| Pennsylvania Voters Alliance, Stephanie Borowicz, Kristine Eng, Theodore A. Dannerth, Eric Kroner, Eric Nelson, Daryl Metcalfe, Dawn Wetzel Keefer, Russ Diamond, Chris Dush, Jim Gregory, Francis Ryan, Michael Harvey, David Torres, Dasha Pruett, | Civil Action No.: 4:20−CV−01761−MWB Hon. Matthew W. Brann |
| Plaintiffs, | **Plaintiffs' Supplemental Memorandum in Support of Temporary Restraining Order** |
| vs. | |
| Centre County, Delaware County, and the City of Philadelphia, and Kathy Boockvar, in her official capacity as Secretary of the Commonwealth of Pennsylvania, | |
| Defendant. | |

---

Oral argument on the motion for preliminary injunctive relief was heard on October 16, 2020.  At oral argument, the Court invited a supplemental memorandum on the matters discussed.

**I.    Plaintiffs have standing because to be left without representation in Congress is a concrete injury-in-fact caused by election misconduct—as with the 2018 North Carolina Ninth Congressional District matter.**

A party invoking federal jurisdiction must allege facts demonstrating that each of the following elements have been satisfied in order to have standing to pursue the case: (1) the plaintiff "suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v.*

*Robins*, 136 S. Ct. 1540, 1547 (2016). (same). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (quotation omitted). That is, the injury "must actually exist" and "must affect the plaintiff in a personal and individual way." *Id.* at 1548 (quotation omitted).

At oral argument, Plaintiffs' counsel explained that the challenged conduct of the Defendants, accepting millions of dollars of Zuckerberg's private federal election grants to turn-out-the-vote in urban areas, could be fairly traced to an invalidation of Congressional elections—leaving Plaintiffs without representation in Congress. The Plaintiffs' disenfranchisement involved with not having a representative in Congress is "an invasion of a legally protected interest that is concrete and particularized, not conjectural or hypothetical." Plaintiffs not having a representative in Congress is an injury that actually exists and affects the Plaintiffs in a personal and individual way. It is not a generalized grievance affecting the general public. Citizens of Congressional Districts whose public election officials refused the Zuckerberg private federal election grants would still have representation in Congress.

At oral argument, the 2018 matter of the North Carolina Ninth Congressional District was discussed in the context of standing. In that matter, election misconduct led to invalidation of a Congressional election and a vacant Congressional District seat which disenfranchised voter within the Congressional district until a special election could be held. In that case, election misconduct occurred including illegal ballot harvesting. The U.S. Constitution, Article I, section 5, states that the House is the judge of the elections of its members and the final arbiter of contests. While the election contest in the North Carolina Board of Elections was

pending, incoming U.S. House Majority Leader Steny Hoyer issued a statement saying House Democrats won't allow Republican Mark Harris to be sworn in because of the ongoing investigation, "Given the now well-documented election fraud that took place in NC-09, Democrats would object to any attempt by Mr. Harris to be seated on January 3," Hoyer said, adding that "the integrity of our democratic process outweighs concerns about the seat being vacant at the start of the new Congress."[1] The North Carolina Board of Elections concurred—refusing to certify the November 2018 results and scheduling a special election on September 10, 2019.[2] So, the residents of North Carolina's Ninth Congressional District were without representation in the U.S. House of Representatives from January of 2019 through September 10, 2019—an actual and concrete injury particularized to the residents of that Congressional District.

At oral argument, the Plaintiffs claimed that their Pennsylvania election officials accepting Zuckerberg's private federal election grants will similarly leave them without representation in Congress.

## II. A private cause of action exists under 42 U.S.C. § 1983 and under the Elections Clause.

The Plaintiffs amended their complaint adding as Count II an Equal Protection Clause claim under 42 U.S.C. § 1983. The Court has original jurisdiction over such claims. 28 USCA § 1343, titled "Civil Rights and Elective Franchise," provides that "the district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person"

---

[1] *See* https://www.politico.com/story/2018/12/28/nc-election-board-turns-down-request-to-certify-a-gop-victory-before-disbanding-1076617 (last visited Oct. 19, 2020).

[2] *See* https://ballotpedia.org/North_Carolina%27s_9th_Congressional_District_special_election, 2019.

upon certain elaborated grounds.  28 U.S.C.  § 1343 (a) (3) provides the Court with original jurisdiction "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." 28 U.S.C.  § 1343 (a) (4) provides the Court with original jurisdiction "to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."  Similarly, 28 U.S.C. § 1331 provides "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

Additionally, as previously briefed or argued, in this case, there is a "civil action authorized by law."  The Court can provide the equitable remedy sought under the All Writs Act, 28 U.S.C. § 1651, the Federal Elections Clause, Title 52 of the U.S. Code and related federal common law thereto.  For the sake of brevity, previous arguments are not repeated here.

However, one additional argument needs to be clarified. The federal common law under the Elections Clause should recognize a private cause of action against a local election official for tortious interference with a federal election when a local official uses private donations to run a federal election.  Here, it is appropriate for the Court to recognize this tort because there is a significant conflict between the federal policy and the use of state law. *See Atherton v. F.D.I.C.*, 519 U.S. 213, 218–19 (1997) (citations omitted) (when courts decide to fashion rules of federal common law, the guiding principle is that a significant conflict between some federal policy or interest and the use of state law must first be specifically

4

shown); *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728 (1979); *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 98 (1991). Federal policy requires that federal elections be exclusively-publicly-funded.  The local government's policies are to accept the Zuckerberg moneys which conflicts with the federal policy.  Because of this conflict, the federal common law tort should be recognized.  If this federal common law tort is recognized under the Elections Clause and Title 52 of the U.S. Code, then the All Writs Act, 28 U.S.C. § 1651, provides the Court with an equitable remedy prior to an election to enjoin local public officials from illegally accepting Zuckerberg moneys to fund federal elections.

The All Writs Act provides that "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *Grider v. Keystone Health Plan Cent., Inc.*, 500 F.3d 322, 328 (3rd Cir. 2007), quoting 28 U.S.C. § 1651(a).  "The All Writs Act confers on courts 'extraordinary powers' that are 'firmly circumscribed.' "*Alabama v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1132 (11th Cir.2005) (quoting *ITT Cmty. Dev. Corp. v. Barton,* 569 F.2d 1351, 1358 (5th Cir.1978)).

The U.S. Supreme Court in *FTC v. Dean Foods Co.,* 384 U.S. 597, 606 (1966), held that the All Writs Act where Congress failed to provide a solution regarding preliminary injunctions in Federal Trade Commission matters. At the time, the Federal Trade Commission sought a preliminary injunction under the All Writs Act to stop the respondents from merging until it reviewed the legality of the merger.  *Id.* at 605-605. But respondents argued because Congress had not given the FTC express statutory authority to request preliminary relief, that relief is unavailable. *Id.* at 605-606.  The Court agreed with the FTC reasoning that Congress

could not have entrusted the enforcement of the Clayton Act to the FTC without allowing the court of appeals to exercise its derivative power under the All Writs Act. *Id.* at 605. Thus, in the absence of explicit congressional direction, courts may exercise their authority under the All Writs Act to ensure effective judicial review.

Similarly, the Constitution, Article I, section 5, leaves to each House of Congress to be judge of its own elections, "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members." But, in this case, Congress has failed to provide specific pre-election remedies against local public officials when illegally accepting Zuckerberg moneys to fund federal elections. 52 U.S.C. § 21112, regarding federal election standards, is too limited requiring only an "appropriate remedy" from the states for HAVA violations, but not the meaningful equitable remedy required prior to the federal election—as demonstrated in this case—to stop local election officials from using private money to fund public elections. So, in this situation, as in *FTC v. Dean Food Co.*, the All Writs Act provides a remedy to the Court based on the federal common law claim described above to provide a pre-election preliminary injunction to enjoin the local election officials from violating federal law by accepting Zuckerberg moneys for federal elections.

**III.    Under Dillon's Rule, counties and cities, as political subdivisions of Pennsylvania, have no power to accept Zuckerberg moneys to run federal elections.**

During Oral Argument before this Honorable Court, counsel for Defendants argued "... the Dillon rule has nothing to do with this case. Right ? … In fact, the election code basically provides that it's up to counties to run these elections." *October 16, 2020, TR pp. 60-61.*

6

Under the Elections Clause, counties and cities, as political subdivisions of Pennsylvania, have no power whatsoever over federal elections. The Elections Clause allocates the powers exclusively to the state legislatures and Congress:

> The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators. (sic)

U.S. Const., art. I, § 4, cl. 1.

The Election Clause's phrase "manner of holding elections" for Senators and Representatives "refers to the entire electoral process, from the first step of registering to the last step of promulgating honest returns." *U.S. v. Manning,* 215 F. Supp. 272, 284 (W.D. La. 1963). The Supreme Court has stated that the Elections Clause has two functions: "Upon the States it imposes the duty (*'shall* be prescribed') to prescribe the time, place, and manner of electing Representatives and Senators; upon Congress it confers the power to alter those regulations or supplant them altogether." *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013).

The Supreme Court states that the Elections Clause invests the state with power over Congressional elections subject to Congressional control:

> The power of Congress over the "Times, Places and Manner" of congressional elections "is paramount, and may be exercised at any time, and to any extent which it deems expedient; and so far as it is exercised, and no farther, the regulations effected supersede those of the State which are inconsistent therewith." *Ex parte Siebold,* 100 U.S. 371, 392, 25 L.Ed. 717 (1880). *Inter Tribal Council of Arizona, Inc.,* 570 U.S. at 9.

So, the States have "no power qua sovereigns" regarding federal elections; whatever powers the States have regarding federal elections is because Congress allows it. *Fish v. Kobach,*

840 F.3d 710, 731–32 (10th Cir. 2016).  Nor does the Constitution impose on the United States the costs incurred by Congress's alterations of federal elections, traditionally borne by the States.  *Voting Rights Coalition v. Wilson,* 60 F.3d 1411, 1416 (9th Cir. 1995).

"Accordingly, the logic behind the plain-statement rule—that Congress must be explicit when it encroaches in areas traditionally within a state's core governmental functions—does not apply when Congress acts under the Elections Clause, as it did in enacting the NVRA." *Harkless v. Brunner,* 545 F.3d 445, 455 (6th Cir. 2008).  "To this end, state election laws cannot 'directly conflict' with federal election laws on the subject." *Voting for Am., Inc. v. Steen,* 732 F.3d 382, 399 (5th Cir. 2013), quoting *Voting for America, Inc. v. Andrade,* 488 Fed.Appx. 890, 896 (5th Cir. 2012) (citing *Voting Integrity Project, Inc. v. Bomer,* 199 F.3d 773, 775 (5th Cir.2000)).

To be sure, Governors and independent redistricting committees, established under state law, have been found constitutionally permissible under the Elections Clause.  *Smiley v. Holm,* 285 U.S. 355 (1932) (whether Governor of State through veto power shall have part in making of state laws concerning the time, place and manner for holding elections is matter of state policy); *Arizona State Legislature v. Arizona Independent Redistricting Com'n,* 576 U.S. 787 (2015) (Elections Clause did not preclude State's people from creating commissions operating independently of state legislature to establish Congressional Districts).

But, in contrast, counties and cities have no powers over federal election policies because they are mere political subdivisions of the state.  Importantly, under the Federal Elections Clause, the federal common law Dillon's Rule applies.  *See Atherton v. F.D.I.C.,* 519 U.S. 213, 218–19 (1997) (citations omitted) (when courts decide to fashion rules

8

of federal common law, the guiding principle is that a significant conflict between some federal policy or interest and the use of state law must first be specifically shown); *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 728 (1979); *Kamen v. Kemper Financial Services, Inc.,* 500 U.S. 90, 98 (1991).

The Pennsylvania Supreme Court has recently re-affirmed Dillon's Rule in *Pennsylvania Restaurant and Lodging Association v. City of Pittsburgh:*

> This bedrock legal principle sometimes is referred to as "Dillon's Rule," after Judge John F. Dillon, who explained:
>
> Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control. Unless there is some constitutional limitation on the right, the legislature might, by a single act, if we can suppose it capable of so great a folly and so great a wrong, sweep from existence all of the municipal corporations in the State, and the *corporation* could not prevent it. We know of no limitation on this right so far as the corporations themselves are concerned. They are, so to phrase it, the mere *tenants at will* of the legislature. *City of Clinton v. Cedar Rapids & M.R.R. Co.*, 24 Iowa 455, 475 (1868) (emphasis in original).

211 A.3d 810, 816, n. 3 (Pa. 2019) (emphasis in original).

This philosophy has been adopted by the United States Supreme Court in statements such as:

> "We think the following principles have been established by them and have become settled doctrines of this court, to be acted upon wherever they are applicable. Municipal corporations are political subdivisions of the state, created as convenient agencies for exercising such of the governmental powers of the state as may be intrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the state. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a

contract with the state within the meaning of the Federal Constitution. The state, therefore, at its pleasure, may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the state is supreme, and its legislative body, conforming its action to the state Constitution, may do as it will, unrestrained by any provision of the Constitution of the United States." *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79 (1907).

The U.S. Supreme Court, more recently, affirmed the principal "The States' political subdivisions have no such inherent power and can levy taxes only to the extent authorized by the State." See 16 E. McQuillin, Law of Municipal Corporations § 44.05, pp. 19–24 (rev.3d ed.2003); see also *Wiggins Ferry,* 107 U.S., at 375, 2 S.Ct. 257 (noting "[t]he power of [a State] to authorize any city within her limits to impose a license tax" on ferries). *Polar Tankers, Inc. v. City of Valdez, Alaska*, 557 U.S. 1, 27 (2009). Under Dillon's Rule, the Pennsylvania counties and cities have no inherent powers separate and apart from express grants of power. And, in this case, Pennsylvania's counties and cities have no express grants of power to accept private federal election grants to fund their own federal election policies.

Article 7, Section 6, of Pennsylvania's Constitution expressly provides "All laws regulating the holding of elections by the citizens, or for the registration of electors, *shall be uniform throughout the State*, …" *Art. 7, §6. PA Const.* [Emphasis added]

Article 7, Section 11, of Pennsylvania's Constitution expressly provides at Article 7, Section 11, Section 11. Election Officers:

"District election boards shall consist of a judge and two inspectors, who shall be chosen at municipal elections for such terms as may be provided by law. Each elector shall have the right to vote for the judge and one inspector, and each inspector shall appoint one clerk. The first election board for any new district shall be selected, and vacancies in election boards filled, as shall be

10

provided by law. Election officers shall be privileged from arrest upon days of election, and while engaged in making up and transmitting returns, except upon warrant of a court of record or judge thereof, for an election fraud, for felony, or for wanton breach of the peace. In cities they may claim exemption from jury duty during their terms of service.*" Art. 7, §11. PA Const.*

Pennsylvania statutes expressly limit municipal powers. Local subdivisions of Pennsylvania state government are not sovereigns. Title 53 Pa.C.S.A., Section 2962, <u>Limitation on Municipal Powers</u>, specifically limits local governments' powers.

§ 2962. Limitation on municipal powers.

(a) Powers granted by statute.--With respect to the following subjects, the home rule charter shall not give any power or authority to the municipality contrary to or in limitation or enlargement of powers granted by statutes which are applicable to a class or classes of municipalities:

(1) The filing and collection of municipal tax claims or liens and the sale of real or personal property in satisfaction of them.

(2) The procedures in the exercise of the powers of eminent domain and the assessment of damages and benefits for property taken, injured or destroyed.

(3) Boundary changes.

(4) Regulation of public schools.

(5) The registration of electors and the conduct of elections.

(6) The fixing of subjects of taxation.

(7) The fixing of the rates of nonproperty or personal taxes levied upon nonresidents.

(8) The assessment of real or personal property and persons for taxation purposes.

(9) Defining or providing for the punishment of any felony or misdemeanor.

(10) Municipal planning under the act of July 31, 1968 (P.L.805, No.247), known as the Pennsylvania Municipalities Planning Code. *53 Pa.C.S.A. §2962.*

Pennsylvania's counties and cities, because they are not sovereign under Dillon's Rule, cannot claim powers they do not have.  Centre County is not a Home Rule County and is governed by the Second through Eighth Class County Code.  Delaware County has elected Home Rule by virtue of the County Home Rule provisions found in Pennsylvania law.  Philadelphia has opted to be a First-Class City Home Rule entity pursuant to the First-Class City Home Rule Act.  *53 P.S. §13131.*

Philadelphia is subject to the limitations set forth in Section 13133 of the First Class City Code as follows:

> "No city shall exercise any powers or authority beyond the city limits except such as are conferred by an act of the General Assembly, **and no city shall engage in any proprietary or private business except as authorized by the General Assembly.** Notwithstanding the grant of powers contained in this act, ***no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are--***
>
> (a) Applicable to a class or classes of cities on the following subjects:
>
> (1) Providing for the filing and collection of municipal and tax claims or liens and for the sale of real or personal property in satisfaction thereof;
>
> (2) Providing for the exercise of the power of eminent domain and the procedure for the condemnation of property for public purposes;
>
> (3) Providing for the assessment of damages and benefits for property taken, injured or destroyed;
>
> (4) Providing methods for the incurring or increasing of indebtedness;
>
> (5) Providing for the annexation or exclusion or detachment of territory;
>
> (6) Regulating public schools;
>
> (7) ***Providing for the personal registration of electors***;
>
> (8) Limiting rates and fixing subjects of taxation;

(9) Providing for the assessment of real or personal property and persons for taxation purposes.

(b) ***Applicable in every part of the Commonwealth***.

(c) Applicable to all the cities of the Commonwealth, including, but not limited to, those acts providing for the disability compensation of police officers and firefighters." *53 P.S. §13133 [Emphasis added]*

Section 13113 - <u>Conduct of Elections; returns.</u> of the Chapter 32 - <u>Home Rule</u> of the

First Class City Code, *53 P.S. §13113*, provides in relevant part as follows:

> "***All elections provided for in this act shall be conducted by the election officers for such city in accordance with the Pennsylvania Election Code.*** The election officers shall count the votes cast and make return thereof to the county board of elections. The result of any such election shall be computed by the county board of elections in the same manner as is provided by law for the computation of similar returns at any such election. Certificates of the result of any such election shall be filed by the county board of elections with the city council of the city and with the Secretary of the Commonwealth." *53 P.S. §13113 [Emphasis added]*

Section 3253 - <u>Contributions or Expenditures by National Banks, Corporations, or</u>

<u>Unincorporated Associations,</u> *25 P.S. §3253,* of Pennsylvania's Election Code provides as

follows:

> "It is unlawful for any National or State Bank, or any corporation incorporated under the laws of this or any other state .... except those corporations formed primarily for political purposes or as a political committee**, to make a contribution or expenditure** in connection with the election of any candidate **or for any political purpose whatever** except in connection with any question to be voted on by the electors of this Commonwealth.  ***Furthermore, it shall be unlawful for any ... other person to knowingly accept or receive any contribution prohibited by this section ...***" *25 P.S. §3253 [Emphasis added]*

"As a general matter, municipalities are creatures of the state and "possess only such

powers of government as are expressly granted to [them] and as are necessary to carry the

same into effect." Pennsylvania Gaming Control Board v. City Council of Philadelphia, 928

A.2d 1255, 1270-71, 593 Pa. 241 (2007); quoting, Devlin v. City of Philadelphia, 580 Pa. 564, 862 A.2d 1234, 1242 (2004) (alteration in original) (quoting City of Philadelphia v. Schweiker, 579 Pa. 591, 858 A.2d 75, 84 (2004)). "A municipality is therefore powerless to enact ordinances except as authorized by statute, and ordinances not in conformity with the municipality's enabling statute will be void." *PA Gaming Board at 1271.*

"Further, the First Class City Home Rule Act provides that a city 'taking advantage of this act and . . . amending its charter thereunder shall have and may exercise all powers and authority of local self-government and shall have complete powers of legislation and administration in relation to its municipal functions . . . [,]' subject to certain enumerated limitations. 53 P.S. § 13131. Among the limitations are that 'no city shall exercise powers contrary to, or in limitation or enlargement of, powers granted by acts of the General Assembly which are . . . [a]pplicable in every part of the Commonwealth.' 53 P.S. § 13133(b). With respect to this second limitation, this Court has explained that ordinances enacted by home rule municipalities are negated when they conflict with a statute the General Assembly has enacted concerning 'substantive matters of statewide concern.'" *Pennsylvania Gaming Control Board v. City Council of Philadelphia, 928 A.2d 1255, 1270-71, 593 Pa. 241 (2007); quoting, Ortiz v. Commonwealth,* 545 Pa. 279, 681 A.2d 152, 156 (1996).

It is quite clear from the evidence presented with respect to the request for temporary restraining order that Defendants have entered into private agreements which are prohibited under the Pennsylvania Constitution and the Election Code of the Commonwealth of Pennsylvania, and, in particular, Defendants have received contributions for political purposes in contravention of the law.

Plaintiffs' sole justification for their acceptance of the unprecedented financial contributions is their assertion that Pennsylvania's Election Code does not expressly prohibit them from accepting the money.  Dillon's Rule is applicable because the United States Constitution grants Pennsylvania's Legislature with the sole authority to regulate the time, place, and manner of elections within the Commonwealth of Pennsylvania.  Further, Pennsylvania's Constitution requires uniformity in the election process throughout the Commonwealth.  Defendants' actions are in violation of Pennsylvania's Constitution in that Defendants have ceded control of their elections to a third party entity in exchange for unregulated private financial support.

These "Grants," which are actually private contracts containing dire consequences as set forth in the "claw back provisions" require the Defendants to expend the grant money for the purposes set forth in the grants.  It is therefore clear that where this money is currently being used to pay the salaries of Election officers (Pennsylvania Constitution Article 7, Section 11 prescribing the manner of the make-up of "District Election Boards" in Pennsylvania) clearly establishes that the Zuckerberg money paid through CTCL is being used to pay the salaries of Pennsylvania constitutional officers in contravention of the law. (See also, 25 P.S. Section 2645 "Expenses of county boards and of primaries and elections to be paid by county ... ")

Further, Defendant Centre County's application to CTCL states in relevant part "The mobile drop box will be deployed to rural areas of the County and to precincts where there is a low return rate for mail-by-ballot." *Centre County Application p. 6*. Defendant City of Philadelphia's application states in relevant part "…The Office of the City Commissioners

understands CTCL's interest in maximizing the number of polling locations and will work to identify over 800 locations.  However, given the nature of Philadelphia's neighborhoods, there are scenarios where more locations could result in voters having to travel farther to less convenient locations in order to have a higher number of total locations. The Commissioners will make the final decisions based on ADA standards, relative distance to the division, accessibility, and voter convenience." *Philadelphia Application p. 6.*

There is no legal authority for the utilization of mobile voting vehicles.  Further, the boards of election have no authority to engage in "get-out-the-vote" activities.

It is abundantly clear that the scheme engaged in by CTCL utilizing the huge financial resources of Mr. Zuckerberg totaling more than $350 Million is violative of the laws of the Commonwealth of Pennsylvania, the Constitution of the United States and therefore is contrary to the requirements set forth in the Election Clause of the United States Constitution which defers only to the "Legislatures" of each state and not to the City of Philadelphia, County of Delaware, or County of Centre.  For these reasons, the Temporary Restraining Order should issue to maintain the status quo and to prevent further violation of the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment, the Constitution of the Commonwealth of Pennsylvania and, Pennsylvania's Election Code.

Dated: October 19, 2020            Respectfully Submitted,

/s/ Thomas W. King, III
Thomas W. King, III (Pa. I.D. No. 21580)
Email: tking@dmkcg.com
Thomas E. Breth (Pa. I.D. No. 66350)
Email: tbreth@dmkcg.com
Ronald T. Elliott (Pa. I.D. No. 71567)
Email: relliott@dmkcg.com
Jordan P. Shuber (Pa. I.D. No. 317823)
Email: jshuber@dmkcg.com
*Special Counsel for the Amistad Project*
*of the Thomas More Society*
Dillon, McCandless, King, Coulter
& Graham, L.L.P.
128 West Cunningham Street
Butler, PA 16001
Telephone: (724) 283-2200
Facsimile: (724) 283-2298
*Co-Counsel for Plaintiffs*

/s/ Erick G. Kaardal
Erick G. Kaardal (Wis. I.D. No. 1035141)*
Email: kaardal@mklaw.com
*Special Counsel for the Amistad Project*
*of the Thomas More Society*
Mohrman, Kaardal & Erickson, P.A.
150 South Fifth Street, Suite 3100
Minneapolis, Minnesota 55402
Telephone: (612) 341-1074
Facsimile: (612) 341-1076
*Co-Counsel for Plaintiffs*

*Admitted Pro Hac Vice*