# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PENNSYLVANIA VOTERS
ALLIANCE, *et al.*,

        Plaintiffs,

     v.

CENTRE COUNTY, *et al.*,

        Defendants.

No. 4:20-CV-01761

(Judge Brann)

## MEMORANDUM OPINION

### OCTOBER 21, 2020

## I.    BACKGROUND

Plaintiffs filed this civil rights action to enjoin Centre County, Delaware County, and the City of Philadelphia (collectively "Defendants") from receiving election grants from the Center of Tech and Civic Life ("CTCL").[1]  Plaintiffs argue that these grants violate the Election and Equal Protection Clauses of the United States Constitution,[2] and that they are preempted by both the Constitution and federal law.[3]

---

[1]    Doc. 1.  Plaintiffs have since amended their complaint and added Kathy Boockvar, in her capacity as Secretary of the Commonwealth of Pennsylvania, as a Defendant.  Doc. 38 at ¶ 196.

[2]    *Id.* at ¶¶ 102-76.

[3]    *Id.* at ¶¶ 177-216.  Specifically, Plaintiffs argue that these grants are preempted by the Elections Clause, the Supremacy Clause, the Help America Vote Act, and the National Voters Registration Act.  *Id.*

### A.    Plaintiffs

Plaintiffs consist of the Pennsylvania Voters Alliance organization ("PVA") and fourteen individual registered voters who reside in Pennsylvania.[4]   These fourteen individuals are residents of Centre County, Delaware County, and the City of Philadelphia.[5]   They all generally oppose the election of "progressive" candidates in local, state, and federal elections.[6]

### B.    CTCL and the CTCL Grants

CTCL, a non-party to this action, is a nonpartisan, nonprofit organization formed in 2012 by a "team of civic technologists, trainers, researchers, election administration and data experts" to "foster a more informed and engaged democracy" and to help "modernize elections."[7]   CTCL has designated $250,000,000 in grant money to be paid to election offices across the country "to help ensure that [these offices] have the staffing, training, and equipment necessary so this November every eligible voter can participate in a safe and timely way and have their vote counted."[8]

These funds may be used for election-related expenses, including to: maintain in-person polling on election day; obtain personal protective equipment for election

---

[4]   *Id.* at ¶¶ 4-18.
[5]   *Id.* at ¶¶ 5-18.
[6]   *Id.* Several Plaintiffs are members of the Pennsylvania House of Representatives and several are Republican candidates in the upcoming election.  *Id.* at ¶¶ 5, 9-18.  But because neither group asserts claims based on these statuses, they will be treated the same as the other individual Plaintiffs.
[7]   *Id.* at ¶ 44; Doc. 37 at 5.
[8]   Doc. 38 at ¶ 55.

officials and voters; support drive-thru voting; publish reminders to voters to update their voter registration information; educate voters on election policies and procedure; recruit and hire poll workers; provide increased cleaning and sanitation at poll sites; train poll workers; expand in-person early voting sites; and deploy additional staff or technology to improve mail ballot processing.[9]

CTCL provides grant funds to any local election office that applies, and the final grant is calculated using nonpartisan criteria.[10]  CTCL reports that over 1,100 local election administrators across the country have applied for CTCL grants, including eighteen counties within Pennsylvania, as well as the Pennsylvania Department of State.[11]  Of these eighteen counties, eleven voted for Donald Trump over Hillary Clinton in the 2016 election, "and five did so by more than a two-to-one margin."[12]

Nevertheless, Plaintiffs claim that CTCL provides funds only to regions that contain "demographics with overwhelmingly progressive voters."[13]  Plaintiffs count Defendants among such regions, and note that for the 2016 presidential election,

---

[9]  *Id.* at ¶ 59.
[10]  Doc. 37 at 6.
[11]  *Id.*
[12]  *Id.*
[13]  *Id.* at 17.  Specifically, Plaintiffs contend that CTCL is "a progressive organization [that] targets urban counties and cities for its private federal election grants to turn out the progressive vote so [that] progressive candidates win."  Doc. 38 at ¶ 53.

Hillary Clinton received 84.3% of the votes in Philadelphia, 61.58% of the votes in Delaware County, and 50.93% of the votes in Centre County.[14]

### C.      Procedural Posture

The genesis of this action stems from Defendants' decision to accept funding from CTCL, allegedly without the consent of the United States Congress or the Commonwealth of Pennsylvania.[15]  Each Defendant has accepted grant money from CTCL to varying degrees.[16]  This money has been used to fund various election-related initiatives and to defray certain election-related expenses.  For example, Defendants have used CTCL moneys to: purchase processing equipment for mail-in and absentee voting; create satellite election offices; install secure drop-boxes; pay for in-person voting expenses; and cover the cost of printing and postage.[17]  All three counties have also received election grants under the Help America Vote Act ("HAVA") and the Coronavirus Aid, Relief, and Economic Securities Act, both of which are distributed by the Secretary of the Commonwealth of Pennsylvania.[18]

Plaintiffs allege that Defendants' acceptance of the CTCL grants is unlawful for two reasons.  First, they argue that any authority granted to the Defendants to receive these CTCL grants is preempted by the Elections Clause, the Supremacy

---

[14]   *Id.* at ¶¶ 72-74.
[15]   *Id.* at ¶¶ 79-83.
[16]   Philadelphia received $10,012,000, Delaware County received $2,200,000, and Centre County received $863,838.  *Id.*; *see* Doc. 37 at 15-16.
[17]   Doc. 38-3.
[18]   Doc. 38 at ¶¶ 87-97.

Clause, HAVA, and the National Voters Registration Act.[19]  And second, Plaintiffs

claim that the grants directly violate the Pennsylvania Election Code, the Election

Clause of the United States Constitution, and the Equal Protection Clause of the

Fourteenth Amendment.[20]  Specifically, Plaintiffs argue that the CTCL grants violate

the Equal Protection Clause because only some counties chose to apply for them;

thus resulting in those counties with CTCL funding having more money to spend on

elections than those who chose to forgo applying.[21]  It is this resultant inequity that

Plaintiffs argue is unconstitutional.[22]

Plaintiffs have filed a motion for a temporary restraining order and

preliminary injunction.[23]  They contend that: they are likely to succeed on the merits

of their claims; they will be irreparably harmed absent an injunction; there will be

little to no harm to Defendants should an injunction issue; and the public interest

weighs in favor of an injunction.[24]

Plaintiffs make sweeping constitutional claims.  But there is less to this case

than meets the eye.  That is because, despite their assertions, Plaintiffs cannot satisfy

the threshold standing requirement of Article III.  The Court thus concludes that it

---

[19]   *Id.* at ¶¶ 102-76.

[20]   *Id.* at ¶¶ 176-217.

[21]   *Id.* at ¶¶ 211, 213.

[22]   *Id.* Plaintiffs' claims against Defendant Boockvar are premised on the alleged illegality of the
CTCL grants.  Plaintiffs argue that Boockvar is culpable because she permitted Defendants to
accept the grants.

[23]   Doc. 4.

[24]   Doc. 5.

cannot reach the merits of Plaintiffs' motion because they lack standing. Accordingly, the complaint will be dismissed without prejudice.[25]

## II.   DISCUSSION

"Article III of the United States Constitution limits the power of the federal judiciary to 'cases' and 'controversies.'"[26]  "For a federal court to exercise jurisdiction under Article III, plaintiffs must allege—and eventually prove—that they hav[e] 'standing' to pursue their claims."[27]  "The [United States] Supreme Court has repeatedly described the question of Article III standing as a 'threshold' issue."[28]  "It is an 'irreducible constitutional minimum,' without which a court would not have jurisdiction to pass on the merits of the action."[29]  "As a result, federal courts 'have an obligation to assure themselves of litigants' standing under Article III.'"[30]  As the United States Court of Appeals for the Third Circuit has explained, the "continuing obligation to assure that [courts] have jurisdiction requires that [they] raise the issue of standing sua sponte."[31]

"The plaintiff, 'as the party invoking federal jurisdiction,' bears the burden of establishing the minimal requirements of Article III standing: '(1) an injury in fact,

---

[25]  *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 n.7 (3d Cir. 2017) ("Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals 'with prejudice' for lack of standing are generally improper").

[26]  *Id.* at 161-62 (quoting U.S. Const. art. III).

[27]  *Id.*

[28]  *Wayne Land & Mineral Grp., LLC v. Delaware River Basin Comm'n*, 959 F.3d 569, 573-74 (3d Cir. 2020) (quoting *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019)).

[29]  *Id.* at 574 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

[30]  *Id.* (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340 (2006) (brackets omitted)).

[31]  *Id.* (brackets and ellipsis omitted).

(2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"[32]  "In assessing whether a plaintiff has carried this burden, [courts must] separate [the] standing inquiry from any assessment of the merits of the plaintiff's claim."[33]  "To maintain this fundamental separation between standing and merits at the dismissal stage, [courts] assume for the purposes of [the] standing inquiry that a plaintiff has stated valid legal claims."[34]  "While [the Court's] standing inquiry may necessarily reference the nature and source of the claims asserted, [the Court's] focus remains on whether the plaintiff is the proper party to bring those claims."[35]

Plaintiffs assert three theories of standing.[36]  First, they argue that the CTCL grants disadvantage the Plaintiffs because they provide an advantage to progressive and Democrat candidates in the counties where Plaintiffs live and vote.[37]  Second, they argue that, without injunctive relief, the CTCL grants will delegitimize and thus invalidate the elections, consequently resulting in Plaintiffs lacking political representation until the election can be re-done.[38]  Third, Plaintiffs offer the novel

---

[32]  *Cottrell*, 874 F.3d at 162 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (ellipsis omitted)).

[33]  *Id.*

[34]  *Id.*

[35]  *Id.* (brackets, citation, and internal quotation marks omitted).

[36]  Plaintiff PVA premises its associational standing on the standing of its members, the individual named Plaintiffs in this case.  Doc. 39 at 4.  Accordingly, the Court will analyze Plaintiffs' standing together.  Similarly, because Plaintiffs base their theories of standing against all Defendants on the same injuries, the Court will analyze Plaintiffs' standing against the Defendants as a whole.

[37]  *Id.* at 5-7.

[38]  *Id.* at 7.

7

theory that they have suffered an injury as a third-party beneficiary to the "social contract" between the federal government and the individual States.[39]

None of these theories are persuasive. Plaintiffs have not shown that they can satisfy any of the three elements of standing. That is, Plaintiffs have not shown that they will suffer an injury in fact, that any injury is fairly traceable to Defendants, or that any purported injury is likely to be redressable. Consequently, their complaint is dismissed.

## A.   Injury in Fact

Plaintiffs have not alleged an injury in fact sufficient to support standing. "To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent.'"[40] Plaintiffs' injuries lack particularity and imminence, and the Court accordingly dismisses this action for lack of standing.

### 1.   Particularity

All three of Plaintiffs' alleged injuries constitute generalized grievances and are thus insufficiently particularized to support standing. Limiting jurisdiction to those cases which are "personal and individual" to the party "ensures that courts exercise power that is judicial in nature."[41] Thus, the Supreme Court has made clear that "[a] federal court is not 'a forum for generalized grievances.'"[42] The

---

[39]  *Id.* at 9-10.
[40]  *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)).
[41]  *Lance v. Coffman*, 549 U.S. 437, 441 (2007).
[42]  *Gill v. Whitford*, 183 S. Ct. 1916, 1929 (2018).

Supreme Court defines generalized grievances as those "predicated upon an interest . . . which is held in common by all members of the public."[43]  As a result, the Supreme Court has repeatedly rejected challenges to government action premised solely on an individual's general interest in ensuring that the law is followed.[44]

In the voting rights context, the Supreme Court has "long recognized that a person's right to vote is individual and personal in nature."[45]  But this right does not give plaintiffs carte blanche to challenge any action that conceivably infringes upon that right.  For example, a mere violation of the Elections Clause, on its own, will not support standing because it constitutes a generalized grievance.[46]  Nor will "statewide harm" to a voter's interest in "collective representation in the legislature" or in "influencing the legislature's overall 'composition and policymaking.'"[47]  To the extent that the latter interest is recognized, it is "embodied in [an individual's] right to vote for [his or her] representative."[48]

In asserting their first theory of standing, Plaintiffs argue that Defendants, by accepting and using CTCL funding, have disadvantaged and wasted Plaintiffs' votes

---

[43]  *Lance*, 549 U.S. at 441.
[44]  *E.g.*, *id.* at 442; *United States v. Richardson*, 418 U.S. 166, 176-77 (1974); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974).
[45]  *Lance*, 549 U.S. at 442.
[46]  *Id.*
[47]  *Gill*, 138 S. Ct. at 1931.
[48]  *Id.*

9

in the upcoming state and federal elections.[49]  They claim that Defendants accepted CTCL funding "for the specific purpose to maintain, promote, or favor a historic specific demographic group that can influence the outcome of federal elections within the boundaries of those counties and city."[50]  The general crux of this argument seems to be that Defendants' use of CTCL funding will improve voter turnout which in turn will make it more likely that progressive candidates will succeed in the upcoming election.

Importantly, however, Plaintiffs try to dodge the burden of articulating precisely which of their interests have been purportedly infringed.  Despite citing their "right to vote," Plaintiffs do not allege that CTCL funding has actually been used to restrict that right.  They do not argue that Defendants have used the CTCL funding to impede Plaintiffs' ability to vote or deny them the ability to effectively participate in the upcoming election.  Moreover, Plaintiffs remain free to advocate on behalf of their preferred candidates and encourage others to vote.[51]  Thus, Plaintiffs' appear to allege only that their right to vote has been infringed   because it now might be more difficult for them to elect their preferred candidate.

Plaintiffs' argument is unavailing because, at core, their claim is merely a generalized grievance.  Though Plaintiffs have done a valiant job of disguising it,

---

49   Doc. 39 at 6.
50   *Id.*
51   Their efforts may even be more easily rewarded now that Defendants have taken additional steps to facilitate early and in-person voting.

the only interest they have identified is of a general nature: that Plaintiffs ability to influence state and federal elections will be diluted if Defendants take steps that might result in increased voter turnout.  This is not a legally cognizable injury under Article III.  And it is "precisely the kind of undifferentiated, generalized grievance about the conduct of government that [the Supreme Court has] refused to countenance in the past."[52]  The Court therefore finds Plaintiffs' first theory insufficient to support standing.

Plaintiffs' second theory of standing also fails because it constitutes a generalized grievance.  Plaintiffs argue that maintaining CTCL's grants to Defendants would result in Plaintiffs losing representation in their individual districts (because the election results would be subsequently invalidated).  But the Court is not aware of any cases holding that the right to be politically represented is a legally cognizable interest under Article III.  And the Court declines to expand standing doctrine in such a manner, especially given that any right to political representation would be one "held in common by all members" of the county.[53]  This injury is not sufficiently particularized, and thus does not satisfy standing.

Finally, Plaintiffs' third theory of injury also constitutes a generalized grievance.  They claim that there is a social contract between the federal government and the individual States, and that Plaintiffs, as citizens, are third-party beneficiaries

---

[52]  *Lance*, 549 U.S. at 442.
[53]  *Schlesinger*, 418 U.S. at 220.

to this contract.  The general thrust of this argument is that Plaintiffs' interest as third-party beneficiaries are harmed whenever the government violates the Constitution, and that this injury is particularized enough to predicate standing.

The Court cannot accept this argument.  To adopt Plaintiffs' conception of standing would be to reject the entirety of standing doctrine as it exists today.  Under Plaintiffs' theory, any citizen of the United States would have standing to challenge any constitutional violation for any reason.  This is simply not supported by precedent or doctrine.[54]  And the Court declines to take such an expansive approach in this case.

### 2.    Imminence

Even if Plaintiffs could establish that their first two theories state a particularized and concrete injury, the alleged injuries are far too speculative to support standing.[55]  To show standing for an alleged future injury, a party must show that the injury is imminent.[56]  "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure the alleged injury is not too speculative for Article III purposes—that the injury is

---

[54]  *Lance*, 549 U.S. at 441 (asserting only that the law has not been followed is insufficient to establish standing); *Richardson*, 418 U.S. at 176-77 (holding that a federal taxpayer does not have standing to challenge certain CIA expenditures as a violation of the Constitution's Accounts Clause absent a showing that he suffered a particular injury); *Schlesinger*, 418 U.S. at 220 ("[S]tanding to sue may not be predicated upon an interest of the kind alleged here which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share.").

[55]  It is clear that Plaintiffs' "social contract" theory is too generalized to establish standing.

[56]  *Clapper*, 568 U.S. at 409.

*certainly* impending."[57]  Standing thus cannot be predicated on a "highly attenuated chain of possibilities."[58]  And courts should exercise caution when determining whether to "endorse standing theories that rest on speculation about the decisions of independent actors."[59]

Plaintiffs' theories of standing fail to show that any alleged injury is certainly impending because they rely on a highly attenuated causal chain of events.  For example, both theories require the Court to assume that: (1) CTCL funding will result in higher voter turnout; (2) any higher voter turnout will be in support of progressive candidates; (3) the higher voter turnout will be significant enough to impact the outcome of the election; (4) this turnout will impact the election in favor of progressive candidates; and (5) regarding Plaintiffs' second theory, that a party will challenge the election if this Court does not grant Plaintiffs' motion and that challenge will result in the invalidation of the election results.

None of these assumptions are supported by the record.  Defendants have used CTCL funding in a nonpartisan way to facilitate the upcoming election; they have spent the CTCL money to set up satellite election offices, offer dropboxes, and pay for various election-related expenses.  Defendants have notably not attempted to use the CTCL funds to increase voter turnout by, for example, implementing get-out-the-vote efforts.  There simply is no indication in the record that CTCL funds will

---

[57]  *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 (1992)) (emphasis in original).
[58]  *Id.* at 410.
[59]  *Id.* at 414.

increase voter turnout at all, which Plaintiffs allege is the root cause of their purported harm.[60]

Further, nothing in the record suggests that, if Defendants' use of the CTCL funding does increase voter turnout, it will necessarily benefit progressive candidates.  The implication that increased voter turnout is inherently beneficial to progressive candidates is dubious at best.[61]  And the Court finds this assumption far too dependent on the actions of tens, if not hundreds, of thousands of voters to premise standing.  As a result, the Court finds that Plaintiffs' injuries are too speculative and not sufficiently imminent to support standing.

**B.    Causation**

Plaintiffs also fail to establish that any alleged injury "is fairly traceable to the challenged conduct of the defendant."[62]  In *Allen v. Wright*, the Supreme Court concluded that standing was absent where "[t]he links in the chain of causation between the challenged Government conduct and the asserted injury [we]re far too weak for the chain as a whole to sustain respondents' standing."[63]  There, the plaintiffs challenged the Internal Revenue Service's grant of tax-exempt status to

---

[60]  It could be argued that safer, more efficient funding will increase voter turnout in these areas. However, it is equally likely that even without safe and efficient funding, voters in a presidential election—especially one that is viewed as highly consequential to both Republican and Democratic voters—will still be motivated to turn out in the same numbers regardless of any risks associated with voting during a pandemic.

[61]  As the adage goes, "a rising tide lifts all boats."  *Missouri v. Jenkins*, 515 U.S. 70, 102 (1995).

[62]  *Cottrell*, 874 F.3d at 162.

[63]  *Allen v. Wright*, 468 U.S. 737, 759 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

certain racially discriminatory schools, arguing that such tax-exempt status aided the schools in maintaining segregation and, accordingly, in harming their children by forcing them to attend segregated schools.[64]

Such alleged harm was "not fairly traceable to the Government conduct respondents challenge as unlawful" because there was no evidence that "there were enough racially discriminatory private schools receiving tax exemptions in respondents' communities for withdrawal of those exemptions to make an appreciable difference in public school integration."[65]  The Supreme Court noted that it was unclear "how many racially discriminatory private schools [we]re in fact receiving tax exemptions," whether the withdrawal of tax-exempt status "from any particular school would lead the school to change its policies,"  "whether any given parent of a child attending such a private school would decide to transfer the child to public school as a result of any changes in educational or financial policy made by the private school once it was threatened with loss of tax-exempt status," or "whether, in a particular community, a large enough number of the numerous relevant school officials and parents would reach decisions that collectively would have a significant impact on the racial composition of the public schools."[66]

Ultimately, any alleged harm "involve[d] numerous third parties (officials of racially discriminatory schools receiving tax exemptions and the parents of children

---

[64]   *Id.* at 743-45
[65]   *Id.* at 757-58.
[66]   *Id.* at 758.

attending such schools) who may not even exist in respondents' communities and whose independent decisions may not collectively have a significant effect on the ability of public school students to receive a desegregated education."[67] Given that the harm was not directly traceable to the IRS, the Supreme Court concluded that plaintiffs did not have standing to pursue their claims.[68]

Here too, Plaintiffs' alleged harms result from a third-party and, thus, their alleged injuries are not fairly traceable to Defendants.  The purported injuries here arise not from Defendants' acceptance of CTCL funds, but from CTCL's decision to allegedly direct those funds to counties with higher rates of progressive voters. Indeed, Plaintiffs make clear in their amended complaint that they are not harmed by the use of funds to secure a safer and more efficient election, but instead "are injured by CTCL's private federal election grants because they are targeted to counties and cities with progressive voter patterns."[69]  Because Plaintiffs' injuries are not fairly traceable to Defendants' actions but, instead, to the actions of a non-defendant (CTCL), Plaintiffs do not have standing to pursue their claims in this action.[70]

---

[67]   *Id.* at 759.

[68]   *Id.* at 759-60.

[69]   Doc. 38 at 2.

[70]   *See Leeke v. Timmerman*, 454 U.S. 83, 86-87 (1981) (injury indirect insufficient to support standing because injury turned on the action of a prosecutor who was not a party not before the court); *Linda R.S. v. Richard D.*, 410 U.S. 614, 617-18 (1973) (injury too indirect to support standing where injury turned on the action of non-party actor).

### C.    Redressability

Lastly, the Court finds that standing is absent because Plaintiffs have not demonstrated that any purported harm is likely to be redressed by a favorable decision.[71]  At bottom, Plaintiffs claim rests on supposition—their conclusion that safer and more efficient voting as a result of CTCL funds will necessarily lead to increased progressive voter turnout, thereby harming Plaintiffs' preferred conservative candidates.

However, as discussed above, there is no evidence that CTCL funds will result in an increase in voter participation.  Indeed, a majority of the funding appears to be dedicated to assisting with the processing of mail-in voting and, thus, would appear likely to have no discernable effect on voter turnout.  It appears then that the harm alleged by Plaintiffs would instead be caused by the number of progressive voters who may turn out to vote, not by additional funding that increases the safety and efficiency of the election in the Defendant counties.  Consequently, simply forcing Defendants to return all CTCL funding is not likely to stem the harm of which Plaintiffs complain, as those voters may still turn out regardless of whether or not Defendants keep or return the CTCL grant.

It is therefore "entirely conjectural whether the . . . activity that affects respondents will be altered or affected by" the Court blocking Defendants from using

---

[71]    *Cottrell*, 874 F.3d at 162.

CTCL funding.[72]   Because Plaintiffs' alleged injuries stem from the actions of voters, not Defendants, their claims are not redressable and the Court finds that they lack standing.

## III.   CONCLUSION

In accordance with the above discussion, Plaintiffs' complaint will be dismissed without prejudice for lack of standing.

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge

---

[72]   *Lujan*, 504 U.S. at 571.